**1922-CC12062**

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

**IN THE TWENTY-SECOND JUDICIAL CIRCUIT
STATE OF MISSOURI
(CITY OF ST. LOUIS)**

| | | |
|---|---|---|
| MANDY RICE, D.O., | ) | |
| | ) | Case No. |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ST. LOUIS UNIVERSITY, | ) | |
| A Missouri Benevolent Corporation, | ) | |
| | ) | |
| | ) | |
| CATHERINE M. WITTGEN, M.D., | ) | |
| | ) | |
| CARL A. FREEMAN, M.D., and | ) | |
| | ) | |
| MICHAEL WILLIAMS, M.D., | ) | |
| | ) | |
| **HOLD FOR SERVICE** | ) | |
| | ) | |
| Defendants. | ) | |

## PETITION FOR BREACH OF CONTRACT, DEFAMATION, INJUNCTIVE RELIEF, VIOLATION OF THE MISSOURI HUMAN RIGHTS ACT, AND VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

Plaintiff, Mandy Rice, D.O., for her Petition, states as follows:

### Summary

1.     Plaintiff, Mandy Rice, D.O., was, until on or about May 10, 2018 a resident in the general surgery program ("Residency Program") at St. Louis University Medical School ("SLU").  Shortly before completing her fourth year (July 1, 2016 through June 30, 2017) in the SLU Residency Program, and after already having signed a contract for her fifth (and final) year in the Residency Program, Dr. Rice was informed, without good cause, that she would be required to repeat the fourth year of the Residency Program. Dr. Rice pursued the process for appealing this decision through the grievance process provided under SLU's Graduate Medical Education Policies and Procedures, but

1

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

ultimately the decision to make her repeat the fourth year of residency was upheld by SLU's Associate Dean for Graduate Medical Education ("GME").  The program's bias in this regard were demonstrated by statements by both male and female faculty that Dr. Rice was "too much of a nurse" and "too nice" in oral and written evaluations of Rice. One of the primary reasons Plaintiff was required to repeat her 4th year of residency was because she displayed stereotypically female characteristics of kindness, compassion, nurturing, proactive communication, an inclusive team approach, and consideration of others as having equal importance, which was contrary to the male stereotypical traits desired in the general surgery residency program by both male and female faculty.

2.      For the repeat 4th year of residency (July 1, 2017 through June 30, 2018), Dr. Rice was punitively, in retaliation for challenging being required to repeat the 4th year of residency, assigned to a unique rotation schedule different from all other 4th year residents, including being assigned to several rotations which she had successfully completed in her third year of residency.  As a result, Dr. Rice was unable to obtain surgical experience required to become a Board eligible surgeon.

3.      During one of her rotations in March 2018, Dr. Rice was repeatedly verbally abused in the operating room by Dr. Grace Montenegro, an attending physician at St. Louis University Hospital ("Hospital"), and a SLU faculty member.  After one surgery in which she was subject to particularly abusive language by Dr. Montenegro, Dr. Rice (and several nurses in the operating room) reported this abuse to the Chief Medical Officer at Hospital, Dr. Nirav Patel.  This situation was apparently also reported by others to SLU.  Upon information and belief, Dr. Montenegro was given a warning by Dr. Patel on behalf of Hospital, and also by SLU, as a result of her abusive behavior toward Dr. Rice.  Thereafter, in retaliation for the report she made concerning Dr.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

Montenegro's abusive behavior and the filing of a lawsuit against SLU and several faculty members by Dr. Rice, Dr. Rice was removed from her rotation at Hospital and reassigned to John Cochran's Veterans Administration Hospital ("VA Hospital"), denying her opportunities to participate in performance of surgeries necessary to qualify for Board certification.

4.     Shortly thereafter, and several months before she was to complete her repeat fourth year of training in the Residency Program, Dr. Rice was informed by SLU that it would not renew her residency contract for the fifth year of the residency program, even though only several weeks earlier SLU and Dr. Rice had entered into a contract for Dr. Rice to enter into the 5th year of residency beginning July 1, 2018.  SLU made the decision not to renew Dr. Rice's contract without good cause, and in retaliation for Dr. Rice filing a lawsuit against SLU and faculty members, reporting Dr. Montenegro's abusive behavior, and complaining that she was being discriminated against because she displayed female characteristics traits which at least some SLU faculty considered to be undesirable in a surgeon.  Although SLU offered to allow Dr. Rice to remain employed by it for six months, she would not have been offered the opportunity for meaningful surgical experience during this time period, and if allowed to perform any surgical related work at all, would have continued to suffer retaliation from SLU and attending physicians in the Residency Program.  In other words, she was constructively discharged by SLU from her employment.  As a result, she submitted her resignation to SLU on or about May 10, 2018.

5.     SLU's GME Policies and Procedures are incorporated by reference in the residency agreement entered into between SLU and Dr. Rice.  The Common Program Requirements and Institutional Requirements of the Accreditation Council for Graduate

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

Medical Education ("ACGME") (ACGME is the organization which accredits and governs residency programs including SLU's general surgery program), are incorporated by reference in the SLU GME Policies and Procedures.  Alternatively, SLU promised Dr. Rice at the time that she executed her initial residency contract, and each subsequent yearly residency agreement, that SLU would comply with its own GME Policies and Procedures and the ACGME Requirements, which promise Dr. Rice relied upon in selecting SLU for her residency, and in continuing to renew her residency contract each year.

6.      SLU failed in many respects, as outlined more fully below, to comply with its own policies and procedures and the ACGME Common Program Requirements and Institutional Requirements (hereinafter collectively "ACGME Requirements"), including by: (a) failing to provide Dr. Rice with timely evaluations of, and feedback concerning her performance throughout her residency; (b) placing her on probation in March 2016, during her third year of residency, for low scores on the American Board of Surgery Inservice Training Examination ("ABSITE") (a national standardized examination for surgical residents) without specifying a term for said probation; (c) in failing to put her in contact with SLU's ombudsman and failing to provide her with a mentor, educational assistance, and monthly feedback at the time she was initially placed on probation in March 2016; (d) in considering improper, false and defamatory statements in making its decision to require Dr. Rice to repeat the 4th year of her residency; (e) by discriminating against Dr. Rice because she displayed stereotypically female characteristics;  (f) by assigning Dr. Rice to a rotation schedule for the repeat 4th year of residency which was not the standard schedule of rotations for a 4th year resident, which did not offer her the opportunity to gain surgical experience required to be eligible for Board certification, in

4

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

retaliation for appealing the decision to make her repeat the 4th year of the Residency Program; (g) in removing Dr. Rice from a surgical rotation at SLU Hospital and reassigning her for the duration of the rotation to Transplant Surgery and making other changes to Dr. Rice's surgical rotations, in retaliation for reporting that she had been subjected to serious and repeated verbal abuse by Dr. Montenegro; and (g) by not renewing Dr. Rice's residency contract for the 2018-2019 residency year, and failing to promote her to the 5th year of residency, in retaliation for her filing this lawsuit and/or complaining that she had been subject to repeated and serious verbal abuse by Dr. Montenegro.   Each of these actions by SLU constituted a breach of the residency contract between SLU and Dr. Rice; and/or otherwise breached the promise that SLU had made to Dr. Rice when she initially entered into a residency agreement with SLU and upon her execution of annual residency contracts thereafter, that SLU would comply with its own GME Policies and Procedures and ACGME Requirements.

7.     Additionally, Plaintiff was subject to discrimination, based on being a woman who displayed stereotypically female characteristics in performing her duties as a resident in the general surgery program; was subjected to abusive, bullying and hostile behavior by faculty members in the general surgery program because of her sex, and was retaliated against when she complained about such discrimination, including by being required to repeat her 4th year of residency, being removed from a rotation on or about March 18, 2018 and being terminated from the residency program thereafter, in violation of the Missouri Human Rights Act and Title VII of the Federal Civil Rights Act of 1964 (42 USC§ 2000e).

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

**Parties and Venue**

8.      Plaintiff, Mandy Rice, D.O. ("Dr. Rice"), is a natural person residing in St. Louis County, Missouri.

9.      Dr. Rice was, between on or about July 1, 2013 through May 10, 2018, employed as a medical resident in the general surgery residency program operated by SLU.

10.     St. Louis University is a Missouri benevolent corporation, with its principal place of business located in the City of St. Louis.

11.     One of the divisions of St. Louis University is its medical school, which operates a number of medical residency programs, including its general surgery residency program, which employs medical school graduates to further their medical education, provide practical training, and provide medical services to patients at Hospital and other hospitals in the St. Louis area.  The medical school is located in the City of St. Louis, and the surgery residency training program places residents in rotations in different departments of various hospitals, including St. Louis University Hospital, Cardinal Glennon Hospital, and John Cochran Veterans' Hospital, all of which are located in the City of St. Louis.

12.     At all times relevant to this lawsuit, Catherine Wittgen, M.D. was the program director of the Residency Program.  Dr. Wittgen works primarily within the vascular surgery department at Hospital, which is where her office is located.

13.     Dr.  Carl Freeman is a faculty member in the Residency Program, an attending physician at Hospital, and a trauma surgeon.  He works at Hospital, and has an office located there.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

14.     Dr. Michael Williams is a faculty member in the Residency Program, an attending physician at Hospital, and a vascular surgeon.  He works at Hospital, and has an office located there.  Dr. Williams became the program director of the general surgery program in or about April 2018.

15.     Venue is proper in this Circuit, in that Defendants may be found here, and all of the events giving rise to this lawsuit occurred within the City of St. Louis.

**Facts Common to All Counts**

16.     Dr. Rice became a Registered Nurse after graduating from San Antonio College in 1999.  She soon thereafter decided she wanted to pursue a career as a physician and surgeon, and she began taking necessary classes and engaging in activities in her position as a nurse not ordinarily performed by nurses, to prepare herself for a career as a physician and surgeon.

17.     Dr. Rice graduated from the medical school at the University of North Texas Health Science Center in Fort Worth, Texas in 2013.

18.     Thereafter, Dr. Rice was accepted in the Surgery (Categorical) Residency program at SLU, starting on July 1, 2013, at which time she signed a residency agreement with SLU for the first year of residency.  The Surgery Residency program is a 5-year program, and residents generally enter into a new residency agreement with SLU each year.  Subsequently, Dr. Rice and SLU entered into a new residency agreement ("Agreement") each year for her second through fifth years of residency.  A copy of the contract which Dr. Rice entered into with SLU on or about December 22, 2016 for her fifth year of residency ("as a Postgraduate Level V trainee") is attached hereto as **Exhibit 1**.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

19.     Each of these agreements were subject to certain terms and conditions which were supposed to be set forth on an information sheet attached to the Agreement.  However, no such information sheet was attached to the copy of Dr. Rice's fifth year agreement recently provided to her by SLU.  Upon information and belief, the information sheet provided, among other things, that the Agreement was subject to, or incorporated, the terms of the SLU GME Policies and Procedures (section 2.1 of the GME Policies and Procedures, which contains the provisions thereof relevant to this suit, is attached hereto as **Exhibit "2"**) and the ACGME Requirements (attached hereto as **Exhibits "3"** and **"4"**).   The ACGME Institutional Requirements, § IV.B.2.e) specifically require that the residency agreement directly contain or make reference to "grievance and due process" procedures. In any event, both the SLU GME Policies and Procedures and the ACGME requirements are a part of the contract between SLU and residents, including Dr. Rice.

20.     Dr. Rice received universally good evaluations from her attending physicians through her third year of residency.

21.     However, near the end of her third year, on or about March 31, 2016, Dr. Rice was placed on academic probation by SLU due to poor scores on the American Board of Surgery Inservice Training Examination ("ABSITE").  This is despite the fact that other residents in the SLU Surgery program have been allowed to advance and even graduate with poor ABSITE scores, and that SLU has allowed residents with poor ABSITE scores to transfer from other residency programs, without placing them on probation.  The letter placing her on probation is attached hereto as **Exhibit "5"**.

22.     ACGME and the American Medical Association recognize six core competencies – patient care, medical knowledge, practice-based learning and

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

improvement, interpersonal and communication skills, professionalism and systems-based practice.  Prior to being placed on probation in March 2016, Dr. Rice had never been disciplined for, or told by her program director, Dr. Wittgen, or any other attending physician, that she had any deficiencies in any of the six core competencies.

23.     Contrary to the requirements of §2.6 of the SLU GME Policies and Procedures: (1) the March 2016 probation letter made no reference to the GME Ombudsman, and Dr. Rice was not referred to the ombudsman at the time she was placed on probation (2) Dr. Rice was not appointed a mutually agreed upon faculty advisor or mentor at the time she was placed on probation, (3) no specific probationary period was specified in the letter, and (4) Dr. Rice did not receive monthly evaluations of her performance by her supervisors while on probation. Additionally, the letter states that Dr. Rice was strongly encouraged to attend a board review course at her own expense, which she had recently done in November 2015.  Dr. Wittgen would later erroneously state in a meeting on or about June 13, 2017, which reviewed the outcome of the appeals process with several faculty members, that the surgery department had paid for the review course, as, upon information and belief, SLU had done for other residents with low in-service test scores.

24.     Dr. Rice received passing scores on her rotations during her third year of residency and was advanced to the fourth year of residency for the year starting July 1, 2016.

25.     Surgery residents rotate through a number of different surgical services each year (normally working for 1-2 months in each rotation).  During the fourth and fifth years, surgery residents generally serve as the "chief resident" for the service in which they are placed during each rotation.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

26.     Attending physicians at SLU are supposed to evaluate residents on a timely basis following the completion of each rotation by the resident.  These evaluations are to be input into a computer program called "New Innovations," and be available for review, on demand, by the resident, the program director and others associated with the program.

27.     Dr. Rice's fourth year of residency started on July 1, 2016, at which time she was assigned as chief resident to the SLU trauma nights rotation. Both verbal feedback and the written evaluations in New Innovations for this rotation were overall very good.

28.     In September and October 2016, Dr. Rice was assigned as chief resident to the SLU Vascular Service, on which Dr. Wittgen was a supervising attending.  During this rotation, on or about September 9, 2016, Dr. Rice was describing for the scrub tech and circulating nurse assigned to a surgery she was to perform how she wanted the patient to be positioned and prepped for an amputation.  Dr. Wittgen entered the room and angrily told Dr. Rice to, "Stop being a nurse!  Go be a surgeon and scrub."  When Dr. Rice tried to explain to Dr. Wittgen that Dr. Rice needed to direct the team to prepare the patient prior to her scrubbing and performing the operation, Dr. Wittgen adamantly repeated, in a loud voice, her instruction that Dr. Rice go and scrub.  This was stated in front of the OR and anesthesia staff.  This was not the first time that Dr. Rice had been reprimanded by Dr. Wittgen or other attendings for being "too much of a nurse."  This was just one example of Dr. Wittgen's displaying intimidating behavior towards Dr. Rice during her rotation on the vascular service.

29.     Dr. Wittgen generally created a hostile environment for, and exhibited animus toward, Dr. Rice which made it difficult for Dr. Rice to perform her job as a chief

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

resident of the Vascular Service.  Dr. Rice continued to be subjected to a hostile environment by Dr. Wittgen and other faculty members throughout Dr. Rice's remaining tenure as a resident at SLU, primarily as a result of perceptions that Dr. Rice was "too much of a nurse", "too nice" to be a surgeon, and because she displayed other typically female personality traits.

30.     Further, contrary to the American Board of Surgery's ("ABS") training requirements, a surgical fellow was assigned to the vascular service at the same time Dr. Rice was assigned as chief resident to the same service.  As a result, the lines of authority were unclear, and created further difficulties for Dr. Rice during her vascular rotation.

31.     Neither Dr. Wittgen nor any other attending from the vascular service ever entered an evaluation of Dr. Rice in the New Innovations system to assess her overall performance as chief resident during September and October 2016.  Other than Dr. Wittgen's negative comments to Dr. Rice during their meeting on September 9, 2016 (see paragraph 34, below), Dr. Rice received overall positive verbal feedback from the other attending physicians on the vascular service.

32.     At the end of August 2016, Dr. Rice was instructed to go to the Program Coordinator's office to sign the Milestones Evaluation Report prepared from the findings made at a  March 2016 meeting of the Surgery Residency Clinical Competency Committee ("CCC") (one of the CCC's responsibilities is to evaluate residents on a semi-annual basis).

33.     Receiving written Milestone scores from the March 2016 CCC meeting, nearly 6 months after the CCC meeting, did not provide Dr. Rice with timely guidance as to what she might need to do to improve her performance as a resident and surgeon.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

This is in violation of §2.1.II.3 of the GME Policies and Procedures, which require that residents be provided a quarterly evaluation by their residency program, and §2.1.II.4 thereof, which requires that "concerns about unsatisfactory performance should be communicated in writing to the resident as soon as possible during the academic year with suggestions for improvement."  Instead, Dr. Rice was presented during her fourth year of residency with an evaluation performed during her third year of residency.

34.     The low scores on the Milestones report were generally contradictory to evaluations of Dr. Rice that had been input in the New Innovations system, and also with the oral feedback that Dr. Rice received from her attending physicians.

35.     Upon receipt of the Milestones report, Dr. Rice requested a meeting with Dr. Wittgen and Dr. Jason Keune, the assistant program director, to discuss the evaluations of her set forth in the report.  This meeting was scheduled for and took place on September 9, 2016.  However, Dr. Keune did not attend most of this meeting (he came in at the very end) as he was in surgery.  Dr. Wittgen started the meeting with the statement, "wipe that puppy dog look off of your face," then began criticizing Dr. Rice's performance on her vascular service where Dr. Rice was currently serving as chief resident, although Dr. Wittgen never submitted a written evaluation of Dr. Rice's performance on the vascular service in the New Innovations System.

36.     During the meeting, Dr. Rice explained to Dr. Wittgen the difficulties and disruptions that resulted from having both a fellow and chief resident on the Vascular Service at the same time, and also stated that having both a chief resident and fellow on a service at the same time violated ABS training requirements.  The difficulties and disruptions were, at least in part, the result of contradictions in treatment plans for patients; confusion within the team as to whom assumed ultimate clinical responsibility

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

under the attending surgeon; breaks in the lines of communication between team members such that important information, consult requests, and plans regarding patients would bypass Dr. Rice as the chief resident, which could put patients at risk and potentially give the impression to attending physicians and others that Dr. Rice was inattentive or uninformed regarding the patients for whom she was responsible. In essence, the disruptions undermined Dr. Rice's leadership and clinical decision making. While Dr. Wittgen promised to get the fellow "off Dr. Rice's back," the problems caused by having both a fellow and chief resident on service at the same time continued throughout Dr. Rice's remaining time on the Vascular Service.

37.    Although the meeting had been requested by Dr. Rice to review the Milestone report, and the basis for the low scores reflected on that report, Dr. Wittgen did not discuss the report at the meeting, other than to state "We're moving on and not re-writing any of it."  Dr. Keune arrived from surgery at the end of this meeting and did not express any opinions concerning Dr. Rice or the Milestone report.

38.    At the end of the vascular surgery rotation, Dr. Rice sought oral feedback from attending physicians in the vascular surgery service, including Dr. Michael Williams and Dr. Wittgen.  Dr. Williams, who is a member of the CCC, reassured Dr. Rice that there were no significant problems with her performance on the vascular service.  Dr. Wittgen told Dr. Rice that she had seen improvement and could see that Dr. Rice had been studying. Thus, Dr. Rice's time on the Vascular Service ended with her receiving positive verbal feedback.

39.    However, Dr. Rice never received any written, or additional oral, evaluations during or following her vascular surgery rotation. This violates ACGME Common Program Requirement §V.A.2.a), which provides that, "The faculty must

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

evaluate resident performance in a timely manner during each rotation or similar educational assignment and document this evaluation at completion of the assignment." Further, § 2.1.II.3. of the SLU GME Policies and Procedures requires, in relevant part, that "Each department/program director is responsible for developing and implementing a system to evaluate the knowledge, skills and professional growth of residents using defined criteria that meets or exceeds ACGME and specialty board standards…"

40.     In November and December 2016, Dr. Rice was assigned to a trauma/acute care surgery rotation at Mercy Hospital.  The evaluations submitted to the New Innovations system, and oral feedback received by Dr. Rice, concerning her performance during this rotation were universally positive.

41.     Although Dr. Wittgen had provided Dr. Rice with generally positive oral feedback in October 2016, at the conclusion of her vascular surgery rotation, Dr. Rice soon was informed that Dr. Wittgen was saying very different things about Dr. Rice behind her back.   On Monday, November 7th, 2016, Dr. Rice  was told that earlier that afternoon, during a high school girls' career day at SLU Hospital, Dr. Wittgen told several people in a public setting that "I think that Mandy is too much of a nurse to be a surgeon," and that she would "give (Dr. Rice) until April." These statements by Dr. Wittgen in a public setting violated the provision of §2.1.II.3 of the GME Policy and Procedures, which provides, in relevant part, that "Departmental deliberations concerning the performance of individual residents should be confidential."

42.     This statement by Dr. Wittgen was the beginning of gender stereotyping, and gender stereotype priming of Dr. Rice within the SLU general surgery residency program, which continued throughout the remainder of Dr. Rice's employment in the general surgery residency program at SLU.  Repeatedly, thereafter, comments were

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

made by the faculty members in the residency program to the effect that Dr. Rice was "too much of a nurse" and "too nice." Some of the comments regarding Dr. Rice being too nice were including in written evaluations of Dr. Rice, as were comments that she spent too much time talking to patients and family. Evaluation documents also included statements that there were differences between nursing duties and duties of a surgeon. All such comments displayed bias against what are traditionally considered feminine traits.

43.      On November 10, 2016, Dr. Rice met with Dr. Bryan Troop to discuss the allegation that she was "too much of a nurse". Dr. Troop is a trauma surgeon, the Residency Director at Mercy, and additionally, a member of the CCC. At that meeting, Dr. Troop stated he didn't think there was concern about Dr. Rice having been a nurse, but rather that she had a people-pleasing personality. He said, "We don't want to change your personality." He described that his group at Mercy wanted to push her to clearly state her plans with confidence so that they could evaluate her judgment. He denied there being any critical deficiencies, said that Dr. Rice had good judgment and is a safe surgeon. He told Dr. Rice that he did not see a need for remediation or repeating of the year. He noted that no one at Mercy was worried about her and that the group of surgeons there enjoyed working with her.

44.      Later that same day, November 10, 2016, Dr. Rice met with Dr. Keune, the Assistant Program Directory, and Ms. Kris Forneris, the Program Coordinator (a non-medical position), to review findings concerning Dr. Rice made at the most recent CCC meeting.  In that meeting, Dr. Keune said that the group had determined that Dr. Rice had "critical deficiencies" and that some attending physicians believed her lack of confidence could lead to reduced trust in her decision making.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

45.     Before the conclusion of the November 10, 2016 meeting, Dr. Rice requested that she be provided with documentation of her alleged deficiencies (including dates of observed deficiencies, specific descriptions of any problems observed by faculty, and who witnessed each alleged deficiency), the specific metrics that would be used to measure her progress, and a specific plan for improving performance.

46.     In response to Dr. Rice's request made at the conclusion of the meeting on November 10, 2016, Dr. Rice received a letter from Drs. Wittgen and Keune dated November 14, 2016, attached hereto as **Exhibit 6**. This letter had been placed in Dr. Rice's mailbox at the SLU library, despite the fact that she was on a two-month rotation at Mercy Hospital in November and December 2016. Dr. Rice only became aware that there was a letter for her in her mailbox at SLU when Ms. Forneris e-mailed her on December 14, 2016, asking that Dr. Rice sign a letter, without any indication of its content. Dr. Rice's schedule did not permit her to retrieve the letter until December 21, 2016.

47.     The letter dated November 14, 2016, from Drs. Wittgen and Keune contained no specifics to back up the alleged deficiencies noted in the Milestone report and no information as to the metrics which would be used to measure Dr. Rice's progress. Further, it contained no suggestions regarding how Dr. Rice could improve with regard to any of the alleged deficiencies cited in the letter. While the letter stated that all members of the Department of Surgery faculty had offered to assist Dr. Rice none of them offered any assistance to Dr. Rice outside of normal supervision in the operating room, until Dr. Keune spent less than half an hour with her near the end of a

16

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

session in the cadaver laboratory on April 14, 2017. (Dr. Rice had scheduled this session on her own initiative).

48.     The November 14, 2016 letter identified nine issues of supposed deficiency, however, despite her request, Dr. Rice never received any supporting documentation or other evidence for these allegations of deficient performance. Reference is made in the letter to alleged "common issues identified by attending surgeons on the trauma, vascular, blue surgical service(s)...." Of the services listed: (a) the only New Innovations evaluation from the blue service was submitted by Dr. Hsueh, which was good; (b) the New Innovations evaluations from trauma had some constructive criticism, but were overall good; and (c) none of Dr. Rice's attending physicians on the vascular service ever submitted <u>any</u> evaluations on New Innovations.

49.     The lack of specifics regarding deficiencies, the metrics which would be used to evaluate Dr. Rice, and suggestions regarding steps Dr. Rice should take to improve her performance in both the CCC evaluation of Dr. Rice and the follow up letter of November 14, 2016, demonstrate a lack of compliance by the surgery residency program with § 2.1.II.3. of the SLU GME Policies and Procedures, which provide in relevant part, that:

> The residency program must demonstrate that it has an effective plan for assessing resident performance throughout the program and for utilizing assessment results to improve resident performance.  This plan should include use of dependable measures to assess residents' competence..., and a process involving use of assessment results to achieve progressive improvements in residents' competence and performance."

50.     Dr. Rice responded to the November 14, 2016 letter from Drs. Wittgen and Keune, by letter dated December 27, 2016 (attached hereto as **Exhibit 7**). In that letter, Dr. Rice pointed out that the November 14 letter did not contain any specifics

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

regarding the alleged deficiencies to which she could respond, and again requested such specifics.  The only response Dr. Rice received to her December 27 letter was an email from Dr. Wittgen which directed Dr. Rice back to her resident file for clarification. However, there was no documentation in the file which supported the alleged deficiencies, and nothing in the file which specified how her progress would be measured or which identified steps Dr. Rice should take to improve her performance.

51.     Since December 2016, a number of documents which are critical of Dr. Rice have been placed in her resident file.  A number of these documents have been backdated, so as to indicate that they were placed in her file prior to December 2016, and/or contain incorrect information. These documents were placed in Dr. Rice's file despite the absence of any negative events, poor patient outcomes, complaints or written evaluations that would support the negative findings, much less the conclusion that Dr. Rice exhibited critical deficiencies.

52.     Prior to the conclusion of Dr. Rice's trauma/acute care surgery rotation at Mercy Hospital at the end of December, 2016, Dr. Rice sought out formal and/or informal feedback from her attending physicians in that program.  Overall, the feedback was quite positive, and all of the attending physicians with whom Dr. Rice worked during that rotation denied that she had any critical deficiencies.  Several of these physicians wrote formal evaluations which were submitted through the New Innovations system. Dr. Rice received no rating of less than a 4 on a scale of 6 from any of the reviewing physicians.

53.     In January and February of 2017, Dr. Rice was assigned a rotation as daytime chief resident on the Trauma Service at SLU Hospital.  While working on that service, Dr. Rice sought feedback and advice for improvements from her attending

18

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

physicians. None of the attending physicians on the service stated that they had observed any significant deficiencies with regard to Dr. Rice's performance as a resident.  Further, all of the evaluations submitted through New Innovations by trauma service attending physicians for this rotation were positive.

54.     However, during an exchange that Dr. Rice had with Dr. Carl A. Freeman, the chief of the trauma service, in January 2017, he said that Dr. Rice was "too much of a nurse." Dr. Rice responded that she found this statement to be discriminatory and biased. From that point on, Dr. Freeman (and other faculty in the general surgery residency program) accused Dr. Rice of being "too nice." Dr. Freeman did stress that Dr. Rice needed to be more direct and assertive, which is constructive criticism, but he did not identify any significant deficiencies or offer any specific improvement plans.

55.     While she was serving her SLU Hospital trauma rotation, Dr. Rice was told that at the beginning of the rotation, in January of 2017, Dr. Wittgen had met with the attending physicians in the trauma department at which time she informed them of what Dr. Wittgen described as Dr. Rice's shortcomings.  Reportedly, several of the trauma surgeons, when speaking amongst themselves after the meeting with Dr. Wittgen, wondered out  loud "what Mandy had done to get on Dr. Wittgen's bad side," and noted that they had not witnessed what Dr. Wittgen had described to them when Dr. Rice had been on the SLU Trauma Service in July and August of 2016.  Upon information and belief, Dr. Wittgen's comments included statements that Dr. Rice was "too much of a nurse" and/or other gender stereotyping characterizations of Dr. Rice.  These statements constituted gender stereotype priming directed against Dr. Rice.  Further, upon information and belief, Dr. Wittgen met with the trauma surgery attending physicians to "poison" their evaluation of Dr. Rice.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

56.     During the two-month trauma rotation at SLU, Dr. Rice successfully managed the trauma bay, the surgery floor, the operating room, and even the trauma ICU – as there was no trauma fellow present in January 2017. In her role as chief resident, Dr. Rice evaluated patients, created plans, and managed trauma and critical care patients every day with increasing autonomy. Dr. Rice notified her attending physicians of the surgery plans for patients of whom she took charge.  These plans were rarely altered by her attending physicians.  In addition, Dr. Rice operated, worked with the nurse practitioners, and directed the interns and medical students, without any significant problems.

57.     During her time as chief resident of the SLU Hospital Trauma Service, none of the patients for whom Dr. Rice was responsible suffered an adverse outcome. In fact, none of Dr. Rice's patients ever suffered an adverse outcome during her fourth year of residency.  Nor did Dr. Rice receive any negative written evaluation from an attending physician while on the trauma service.

58.     At the end of her rotation as chief resident on the Trauma Service, Dr. Rice was invited by Dr. Freeman to an unprecedented meeting with some of the attending physicians from the Trauma Service.  Dr. Freeman told Dr. Rice that this would be the first of what would become a routine end of rotation session for all subsequent residents.  However, upon information and belief, no subsequent chief resident has had such a meeting with attending physicians at the conclusion of their rotation on the Trauma Service. Specifically, the trauma service did not have such a meeting with any male resident who followed Dr. Rice as chief resident of the Trauma Service.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

59.     This meeting took place on March 2, 2017.  There were four attending physicians from the Trauma Service present.  Dr. Freeman handed Dr. Rice what he stated was a "consensus" letter, from the trauma service (attached hereto as **Exhibit 8**), dated February 24, 2017.  The letter contained multiple severe critiques that were contradictory to the written evaluations, and oral feedback, that Dr. Rice had previously received from many of the same surgeons present at this meeting.  Dr. Freeman's overarching critique was that Dr. Rice was "too nice," which "could interfere with leadership," and might also make it difficult for the attending physicians to "decipher through that." The letter handed to Dr. Rice at this meeting was addressed to Dr. Wittgen as program director and recommended that Dr. Rice be remediated.

60.     Upon information and belief, the letter had not been circulated to the attending physicians in the Trauma Service prior to the March 2, 2017 meeting, and did not actually represent the consensus of the attending physicians on the Trauma Service.

61.     Despite the recommendation of remediation in the alleged "consensus letter," Dr. Rice received a passing grade for her January – February 2017 SLU Trauma Surgery rotation.

62.     Dr. Rice responded to the "consensus" letter from the Trauma Service by letter dated March 4, 2017 (attached hereto as **Exhibit 9**), which was e-mailed to all of the trauma attendings and Dr. Wittgen, as program director.  In that letter, Dr. Rice requested data to corroborate the "consensus" findings of the February 24 letter, which was never provided to her.  In her March 4 letter, Dr. Rice cited from various, almost entirely positive, New Innovations and email evaluations that she had received from the

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

attending physicians on the Trauma Service, and stated that the allegations in the February 24 letter were contradictory to these evaluations.

63.     Dr. Rice closed her March 4, 2017 letter as follows:

> A recurring theme in our meeting Thursday was a problem with my "niceness," which Dr. Freeman then stated may be interfering with the attendings' ability to assess me and my progression. This critique is vague and needs clarification. I don't believe that my personality has resulted in a problem or poor patient outcome and, in fact, I believe there is overwhelming evidence to the contrary. In summary, I believe that the statements in your letter, the concern for my progression to fifth year, and the call for remediation with formal counseling sessions are generally unfounded. Furthermore, the very late voicing of many of your concerns, after the completion of four months on trauma service, robs me of my ability to have been able to address them during our time together and to have made improvements. The submission of your letter to my residency file greatly threatens my progression to fifth year. This comes at an especially critical time as I need to be gathering letters of recommendation and starting applications for trauma/surgical critical care fellowship.

64.     Because none of the concerns expressed in the February 24, 2017 letter had been communicated to Dr. Rice during her rotation as Day Trauma Surgery Chief Resident, Dr. Rice was not able to address the alleged deficiencies while working on the night Trauma Service. Again, this violates the spirit, of §§ 2.1. II. 3-6, and specifically violates § 2.1.II.4. which requires that, "Concerns about unsatisfactory performance should be communicated in writing to the resident as soon as possible during the academic year with suggestions for improvement; and § 2.1.II.3, which requires "regular and timely performance feedback to residents; and … use of assessment results to achieve progressive improvement in residents' competence and performance."

65.     On March 7, 2017, Dr. Wittgen wrote a letter to Dr. Rice, informing her that Dr. Theresa Schwartz had been appointed as a mentor for Dr. Rice.  This was the first time Dr. Rice was notified that a mentor was being assigned to her.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

66.     On or about February 23, 2017 Dr. Rice met with Dr. Julie Gammack, Associate Dean for Graduate Medical Education, to express Dr. Rice's concern that Dr. Wittgen was trying to set Dr. Rice up to require her to repeat her fourth year of residency.  Dr. Gammack told Dr. Rice that she was unaware of any attempt to impose remediation and that since Dr. Rice had already signed her contract for the PGY-5 year (signed on January 12, 2017), it was unlikely that Dr. Rice would be remediated.

67.     The failure to appoint a mentor for Dr. Rice when she was placed on probation in March 2016, with the surgery residency program waiting a year to appoint a faculty mentor, violates § 2.1.II.6. of the SLU GME Policies and Procedures, which provides in relevant part that the required remediation plan "must include assistance by the GME Ombudsman and the appointment of a mutually agreeable faculty advisor."

68.     During the February 23, 2017 meeting, at Dr. Rice's request, Dr. Gammack agreed to attend and monitor the upcoming surgery residency CCC meeting to ensure objectivity and compliance with ACGME procedures. However, on information and belief, Dr. Gammack stated to Dr. Sara Barnett (SLU's learning analyst who was acting as ombudsman for Dr. Rice at the time), prior to the CCC meeting, that if Dr. Rice were made to repeat the 4th year of residency that Dr. Rice should consider that a gift, as she could be dismissed from the program entirely.

69.     On or about April 3, 2017, the CCC met to discuss Dr. Rice's performance during her fourth year of residency.  Upon information and belief, Dr. Gammack was present at this meeting of the CCC (of which she is not a member). While the CCC was supposed to score Dr. Rice's performance during the previous 6 months on the Milestone report, upon information and belief, it did not do so and, instead, Dr. Wittgen individually scored Dr. Rice on the Milestone report.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

70.    Upon information and belief, the CCC did not review any of the evaluations of Dr. Rice that had been filed in the New Innovations system, or any other written evaluations of her performance submitted by attending physicians, staff members, other residents or medical students (this violates the requirement for multiple evaluators set forth in ACGME Core Program Requirements §V.A.2.b).(2).  This is despite that fact that Dr. Rice had emailed each CCC member on March 31, 2017, in advance of their meeting on April 3, 2017, with her concerns about both procedural irregularities in the evaluation process and the propagation of untrue statements about her in her resident file. Additionally, Dr. Rice attached all faculty evaluations submitted during the 2016-17 academic year through the date of the CCC meeting for easy review by the CCC members.

71.    Instead of relying on written evaluations or other dependable measures of Dr. Rice's performance, in a discussion led by Dr. Wittgen, some of the CCC members discussed their general impressions of Dr. Rice, including re-stating gossip and information that was simply untrue.  This included the false and defamatory statement, made at this meeting by Dr. Wittgen and Dr. Williams, that when Dr. Rice had been excused by Dr. Williams from vascular clinic on or about Sept 6, 2016, to prepare for a Morbidity and Mortality conference presentation the following day, Dr. Rice had instead gone to a shopping mall with her husband. Again, this was gender stereotyping and gender stereotype priming. Additionally, on information and belief, the CCC members specifically discussed Dr. Rice's former role as a nurse, and that she was "too nice" and the opinion that this could be an impediment to becoming a surgeon.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

72.     The subjective evaluation of Dr. Rice engaged in by the CCC, violated § 2.1.II.3. of SLU's GME Policies and Procedures, which requires the "use of dependable measures to assess residents' competence in patient care, medical knowledge, practice-based learning and improvement, interpersonal and communication skills, professionalism, and system-based practice…"; and also violated the requirement for "objective assessments of competence…" set forth in ACGME Core Program Requirements §V.A.2.b).(1).

73.     Upon information and belief, the CCC also heavily relied on the February 24, 2017 letter from Dr. Freeman, in which he falsely stated that the criticisms contained therein were the consensus of the attending physicians on the Trauma Surgery Service. This evaluation was further poisoned by the gender stereotype priming engaged in by Dr. Wittgen with trauma attendings prior to Rice starting the trauma night rotation, and the evaluation itself included gender stereotypical language about Dr. Rice being too nice.

74.     The  CCC largely abdicated its duty to "advise the program director regarding resident progress, including promotion, remediation, and dismissal" (per ACGME Common Program Requirements §V.A.1.b).(1).(c)), instead deferring to the biases and hearsay-based opinions of Dr. Wittgen, the Program Director, and Dr. Freeman's letter which had falsely been labeled as representing the consensus of the Trauma Service. Again, the CCC decision was infected by gender stereotype priming by Dr. Wittgen and other faculty members.

75.     On April 7, 2017, Dr. Rice attended a meeting with Dr. Wittgen, Dr. Gammack, Dr. Keune and Kris Forneris, to discuss the CCC's conclusions.  At this meeting, Dr. Rice was presented a letter dated April 3, 2017, attached hereto as **Exhibit**

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

**10,** signed by Drs. Wittgen, Keune and Gammack, which stated, in part, that Dr. Rice had not demonstrated sufficient mastery of key milestones to advance to the fifth year chief resident level, and would "continue (her) probationary status as a PGY-4 (fourth year) General Surgery Resident…"   This is apparently a continuation of the probation first imposed in March 2016 for low ABSITE scores, for which no term had been specified, in violation of § II.2.1.6. of SLU's GME Policies and Procedures.  Further, the "extended probation" provided for by the April 3, 2017 letter was also without any term, again in violation of § II.2.1.6.

76.     The April 3, 2017 letter sets out what purports to be a remediation plan to address Dr. Rice's alleged deficiencies. However, while there are specifics in the plan regarding Dr. Rice's alleged knowledge gaps, including her admittedly low ABSITE score, there is nothing in the way of identification of specific deficiencies in her performance, surgical skills or competency, specifics concerning how her progress will be measured, or specific steps she is to take to improve her performance or competency, all of which she has been requesting since at least September 2016.  In this regard, SLU failed to comply with § 2.1.II.6 of the GME Policies and Procedures, which requires, in relevant part, that: "Specific deficiencies must be pointed out in writing…"

77.     The April 3, 2017 letter informed Dr. Rice that she would be required to repeat the fourth year of the surgery residency program.

78.     Dr. Rice timely appealed the decision to require her to repeat her fourth year of residency, pursuant to the "Grievances and Due Process" procedures ("Due Process procedures") set forth in § 2.1.XI. of the GME Policies and Procedures.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

79.     The Due Process procedures state, in part, "the GME ombudsman is available to assist any trainee through this process."  Dr. Rice first started working with Sara Barnett, Ph.D., the GME ombudsperson in December 2016.  Upon information and belief, Dr. Barnett continued throughout the 2016-2017 residency year to serve as SLU's GME ombudsman.  However, despite Dr. Barnett's familiarity with Dr. Rice's situation, she was removed from acting as ombudsman on behalf of Dr. Rice on or about April 6, 2017.  Dr. Rice was told this was because of an alleged "conflict of interest" in having Dr. Barnett act as ombudsman in Dr. Rice's case.  This alleged conflict was never discussed with, or explained to, Dr. Rice.  Thereafter, Dr. Michael Railey, the Associate Dean for Diversity and Student Affairs of the medical school, acted as ombudsman on behalf of Dr. Rice through the appeal process.

80.     Pursuant to the Due Process procedures, Dr. Rice first submitted her "appeal" of the decision to hold her back for a year to the CCC, which then made a recommendation to Dr. Wittgen on or about May 10, 2017.  Upon information and belief, the CCC discussed promoting Dr. Rice into her fifth year and merely continuing her probationary status with a re-evaluation after 3 months. However, the committee voiced concern that given Dr. Freeman's negative trauma "consensus" letter and the negative "vascular opinion," that the CCC members "might be held liable if Dr. Rice didn't do well."

81.     Dr. Wittgen, in her capacity as program director, ultimately upheld her original decision to require Dr. Rice to repeat the fourth year of her residency.

82.     Dr. Rice then appealed to Dr. Donald Jacobs, then the Department Chair, who was also an attending vascular surgeon. Dr. Rice met with Dr. Jacobs on May 25, 2017. Upon information and belief, Dr. Jacobs had not reviewed the appeals materials

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

or Dr. Rice's resident file prior to their meeting. Before Dr. Rice could present her case, Dr. Jacobs spent approximately the first ten minutes of the appeals meeting explaining that he would be upholding the CCC's decision to have her repeat the year. As Dr. Rice attempted to interject objective information from the printed materials she brought (and had provided to him ahead of time) in order to make her case, Dr. Jacobs began to flip through the materials in an unfamiliar manner, as if seeing it for the first time. Dr. Jacobs upheld Dr. Wittgen's decision to remediate Dr. Rice.

83.    Dr. Rice had previously met with Dr. Jacobs on or about February 18, 2017, at her request, to detail her concerns for documentation, evaluation and procedural irregularities in her case.  Dr. Rice noted to Dr. Jacobs in that meeting that there were an increasing number of errors in her resident file and told him about Dr. Keune's submission of an evaluation on November 13, 2016, for a rotation that had ended in December 2015.  At that February 18, 2017 meeting, Dr. Rice told Dr. Jacobs of her concern that a case was being built against her for remediation based upon false information. Dr. Jacobs told Dr. Rice that he would review her resident file and follow up with her.  However, Dr. Rice never received any further communication from Dr. Jacobs on those topics until when they met on May 25, 2017.

84.    Further, Dr. Jacobs, as a vascular attending, had worked with Dr. Rice in September and October of 2016, while she served as chief resident on the Vascular Service. Dr. Jacobs did not submit any formal evaluations of Dr. Rice.

85.    Dr. Rice then appealed to the Associate Dean for Graduate Medical Education, Dr. Julie Gammack.  Pursuant to § 2.1XI. of the SLU GME Policies and Procedures, upon receipt of such an appeal, the Associate Dean for Graduate Medical Education or her designee, is to: "review the situation, meet separately with the trainee

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

and the Program Director, review all program and performance documentation…" and either uphold or reverse the decision being grieved.  Dr. Gammack never met separately with Dr. Rice after Dr. Rice pursued her grievance following Dr. Jacobs' decision to confirm Dr. Wittgen's decision to make Dr. Rice repeat her fourth year of residency.  Further, upon information and belief, Dr. Gammack did not "review all program and performance documentation" either prior to or after recommending to the Dean that a Grievance Committee be formed to hear Dr. Rice's appeal.

86.     Pursuant to SLU's Due Process procedures, Dr. Gammack recommended that a Grievance Committee be appointed.  The purpose of this committee is to consider the appeal and relevant information, and make a recommendation back to the Associate Dean for Graduate Medical Education, who then makes the final decision on the appeal.

87.     Upon information and belief, Dr. Gammack had already reached a conclusion to uphold the decision to require Dr. Rice to repeat the fourth year of her residency long before she received the recommendation of the Grievance Committee.  Upon information and belief, Dr. Gammack had, on or about March 6, 2017, stated to Dr. Barnett that the decision to hold Dr. Rice back a year was not grievable, and that the decision of the CCC would be upheld without an opportunity for appeal.  Further, as noted in paragraph 59 of this Petition, Dr. Gammack had made a statement on or about March 6 that Dr. Rice should consider the "opportunity" to repeat her fourth year of residency a "gift."

88.     Given Dr. Gammack's participation in the CCC meeting on April 3, 2017, and the appearance that she had already reached a conclusion that Dr. Rice should be required to repeat the fourth year of her residency, Dr. Rice made a request to the Dean of the Medical School, Dr. Kevin Behrns, that he make the final decision on her appeal.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

Dr. Behrns responded by email to Dr. Rice on May 9, 2017, and "noted the rationale" of Dr. Rice's argument, however, he refused this request to intervene. Dean Behrns also sent Dr. Rice a letter dated May 8, 2017, in which he enclosed the GME policy for Due Process.

89.     Dr. Rice was allowed to appear and make a presentation to the Grievance Committee for approximately one-half hour on June 8, 2017.  She was not permitted to be represented by counsel.  Further, neither Dr. Rice nor any representative of Dr. Rice was permitted to be present for any other proceedings of the Grievance Committee, including the presentation made to the Grievance Committee by Dr. Wittgen.  Dr. Wittgen presented her case for Dr. Rice's remediation to the committee, behind closed doors, for approximately 45 minutes, prior to Dr. Rice's appearance before the committee. Thus, Dr. Rice had no chance to hear or rebut any information presented to the Grievance Committee by Dr. Wittgen. Following the Grievance Committee's "hearing," Dr. Gammack ultimately upheld the decision of Dr. Wittgen to require Dr. Rice to repeat the fourth year of her residency.

90.     On or about June 23, 2017, Dr. Rice was required to sign a new residency agreement (attached hereto as **Exhibit 11**).  This agreement stated that she would be repeating her fourth year of residency in the surgery program, although it also provided that she would be paid the stipend received by fifth year residents.

91.     Also, on or about June 23, 2017, Dr. Rice was assigned a unique schedule of rotations for the 2017-2018 year.  Although she was being required to repeat the fourth year of her residency, Dr. Rice, in fact, was not assigned to the rotations typically assigned to fourth year residents.  Instead, two months of her

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

assigned rotations are typically assigned to third year residents, even though Dr. Rice has previously successfully completed all of her third year rotations.

92.    Dr. Rice was assigned to two months in the trauma ICU (one in July 2017, and again in February 2018) to substitute for a fellow (a physician who is obtaining post-residency graduate medical education) to cover the service during that fellow's absence.  Having Dr. Rice substitute for a fellow during a rotation is clearly contrary to SLU's position that Dr. Rice had not sufficiently performed during her fourth year of residency to advance to the fifth year.

93.    Upon information and belief, Dr. Rice was assigned this unique rotation schedule by Dr. Wittgen at least partially in retaliation for appealing Dr. Wittgen's decision to hold Dr. Rice back a year.  Such retaliation is a violation of ACGME Institutional Requirement III.A., which states that each ACGME accredited residency program "must provide a learning and working environment in which residents/ fellows have the opportunity to raise concerns and provide feedback without intimidation or retaliation."

94.    Upon information and belief, Dr. Wittgen structured this unique schedule for Dr. Rice, at least partially, to "fill gaps" to ensure resident coverage on services which would otherwise not have residents or fellows assigned during the months that Dr. Rice was assigned to such services, without regard to the training and learning opportunities that Dr. Rice would have in such services.

95.    As a result of Dr. Rice being assigned to services which traditionally have been covered by third year residents, she was deprived of leadership roles and the opportunity to perform more complicated surgical procedures.  She was also be

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

deprived of the number of resident-supervisory surgical cases required for graduation from the residency program.

96.     On June 29, 2017, at Dr. Rice's request, the Dean of the Medical School, Dr. Kevin Behrns, met with Dr. Rice.  With the prescribed appeals process complete, Dr. Rice intended to present to Dr. Behrns a summary of the events of the appeals process, the irregularities she had noted, a list of the surgery residency's ACGME violations in the evaluation process, her concerns for the use of hearsay and gossip in the evaluation of her in lieu of objective data, and the "unique" (per Dr. Wittgen's description) rotation schedule that she had been assigned for the upcoming residency year.

97.     Dr. Behrns did not give Dr. Rice an opportunity to present the information.  Dr. Behrns sternly told Dr. Rice that she was "way out on a limb," that she needed to "stop (her) personal crusade," that her persistence in the matter was "harassment," that she was "not accepting of peer review," that "there has been a decision, you just don't like it," and that "the ACGME recently did a site visit and found that things are fine." Dr. Rice offered to leave copies of her evaluations and other material with Dr. Behrns, but he held up his hand and stated, "you already sent me all of that documentation, I won't read it."

98.     Dr. Rice has further been damaged as a result of defamation engaged in by Drs. Wittgen, Williams and Freeman.  Not only has their defamation of Dr. Rice caused both the CCC and the Grievance Committee to recommend that Dr. Rice be held back for a year, but this defamation has further damaged Dr. Rice's reputation among her resident peers, faculty, hospital staff, and throughout the broader medical community in St. Louis, and will, among other things, make it more difficult for her to become employed as a surgeon.

99.     From July 1, 2017 through mid-March 2018, Dr. Rice received generally positive verbal feedback and New Innovations evaluations from the attending physicians

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

she worked with in the rotations to which she was assigned.  This was despite, upon information and belief, that Dr. Wittgen met with attendings in Dr. Rice's rotations and requested that they submit negative evaluations of Dr. Rice's performance on their services.

100.    Despite the positive verbal feedback and New Innovations evaluations she received in this period, Dr. Rice received a poor mid-year Milestone report in January 2018.  Upon information and belief, this poor Milestone report was in direct retaliation by Dr. Wittgen and SLU for Dr. Rice filing this lawsuit in or about October 2017, her complaints about being subjected to gender-based stereotyping, and her continuing to challenge the decision to make her repeat the fourth year of her residency.

101.    On or about March 2, 2018, Dr. Rice was offered, and she and all required signatories on behalf of SLU executed, a contract for Dr. Rice to become a fifth-year resident starting July 1, 2018.

102.    The execution by SLU of a fifth-year residency contract with Dr. Rice in early March 2018 demonstrates that, at that time, the surgery residency program believed that she had made sufficient progress to advance to the fifth year in the residency program.

103.    During March of 2018, Dr. Rice was assigned to the "silver" surgical service, which performs both breast cancer surgery and colorectal surgery.  Her attendings on this service included both Dr. Schwartz and Dr. Grace Montenegro, who, upon information and belief, are close friends.

104.    On or about March 12, 2018, Dr. Rice was subjected to inappropriate and highly abusive language and behavior in the operating room directed toward her by Dr. Montenegro.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

105.    Dr. Rice was subjected to this abuse and bullying language and behavior, as were the female operating room staff.  A male resident who was also in the operating room at the same time on March 12, 2018, was not subjected to any abusive or bullying language or behavior during this surgery.  Dr. Rice was subjected to this abuse and bullying because of her sex, female.

106.    This was the most egregious example of a pattern of severe and pervasive bullying and abusive behavior and language directed by Dr. Montenegro at Dr. Rice because of her sex during Dr. Rice's rotation on the Silver Service.  Dr. Montenegro's behavior and SLU's failure to stop it, created a hostile work environment for Dr. Rice.

107.    Dr. Montenegro has also engaged in repeated bullying and abusive language and behavior toward other female residents, nurses and OR staff.  She has not engaged in similar bullying and abuse against male residents or staff members.

108.    Dr. Montenegro's abusive behavior violated numerous ACGME guidelines, including ACGME Institutional Requirement III.A., which states that each ACGME accredited residency program "must provide a learning and working environment in which residents/ fellows have the opportunity to raise concerns and provide feedback without intimidation or retaliation."  Dr. Montenegro's language and behavior constituted disruptive behavior, in violation of the requirements of the Joint Commission on Accreditation of Hospitals, and also violated Hospital and SLU regulations prohibiting disruptive or abusive behavior.

109.    On March 12, 2018, Dr. Rice made a formal complaint to Hospital's then Chief Medical Officer, Dr. Nirav Patel, and Chief Nursing Officer, Patti Kelley, concerning the abusive language and behavior to which she and other women had

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

been subjected to by Dr. Montenegro in the operating room that day.  It should be noted that St. Louis University Hospital is not a division of St. Louis University but, instead, is owned by the Sisters of St. Mary's ("SSM").

110.   Upon information and belief, complaints regarding Dr. Montenegro's abusive language and behavior in the operating room directed to Dr. Rice on March 12, 2018 were also made to SLU.

111.   Upon information and belief, Dr. Montenegro was disciplined both by Hospital and SLU for the language and behavior she directed toward Dr. Rice in the operating room, including being required to apologize to Dr. Rice (which apology was half-hearted and insincere).

112.   In the days following Dr. Rice complaining about Dr. Montenegro's abusive language and behavior on March 12, 2018, Drs. Schwartz and Montenegro wrote up severely negative reviews of Dr. Rice.  These reviews were, upon information and belief, in retaliation for Dr. Rice complaining about being subjected to abusive language and behavior by Dr. Montenegro.

113.   On or about March 19, 2018, SLU removed Dr. Rice from her rotation on the "silver" surgical service and reassigned her to transplant surgery at SLU (a rotation she had completed during the 2016-2017 residency year (first fourth year).  Upon information and belief, she was re-assigned in retaliation for complaining about the abusive language and behavior to which she had been subjected in the operating room by Dr. Montenegro on or about March 12, 2018.  By being reassigned to transplant, Dr. Rice was deprived of the opportunity to obtain experience with breast cancer and colorectal cancer surgeries she needed to qualify for her boards.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

114.     While Dr. Rice had generally received positive verbal feedback and positive New Innovations and e-mail reviews from her attendings during the 2017-2018 residency year prior to her complaining about the treatment to which she had been subjected by Dr. Montenegro on March 12, 2018, thereafter, almost all of the reviews she received from SLU attendings, and particularly Schwartz and Keune were negative. This is despite the fact that Dr. Keune had given Dr. Rice two positive New Innovations review in or about October or November 2017.

115.     On May 4, 2018, Dr. Rice attended a meeting with Lisa Israel (SLU's then newly hired ombudsman) and Drs. Gammack and Keune, at which time Dr. Rice was told that SLU would not renew her contract and would not allow her to advance to the fifth year of the residency program.  She was given a letter at this meeting to this same effect, attached hereto as **Exhibit 12.**

116.     SLU's decision not to advance Dr. Rice to the fifth year of residency for the residency year starting July 1, 2018, was made in retaliation for Dr. Rice filing this lawsuit in August 2017 and/or for the complaint she made to SLU Hospital and SLU about the abusive language and behavior of Dr. Montenegro.  This, and all other retaliatory acts undertaken by SLU against Dr. Rice violate ACGME Institutional Requirement III.A., which states that each ACGME accredited residency program "must provide a learning and working environment in which residents/ fellows have the opportunity to raise concerns and provide feedback without intimidation or retaliation."

117.     Dr. Rice did not appeal the decision made in or about May 2018 not to renew her residency contract and not to advance her to the fifth year of the surgical residency program because to do so would have been futile, particularly given SLU's failure to comply with the Due Process requirements of its Policies and Procedures, and

36

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

relevant provisions of the ACGME Requirements, when Dr. Rice appealed the decision to make her repeat the fourth year of the surgical residency program in 2017, and given the retaliation to which she had been subjected thereafter, as set forth above.

118.   While SLU told Dr. Rice when it informed her her contract would not be renewed that she could continue as a SLU employee for 6 months, the decision not to renew her contract was essentially a demotion and was a constructive discharge, in that she would no longer have chief resident duties and was denied opportunities to participate in surgeries.

119.   As a result of Dr. Rice first being required to repeat a year of residency, and then not being allowed to advance to the fifth year of residency and not having her residency contract renewed, the discrimination and retaliation to which Dr. Rice was subjected and the defamation against Dr. Rice by Drs. Wittgen, Williams and Freeman, as set forth in this Petition, Dr. Rice has been directly damaged in at least the following ways:

a.   Even though Dr. Rice was able to obtain a position in another surgical residency program, she was not be able to start until July 1, 2019 and, because ACGME requires that a resident complete the last two years of residency in the same program in order to graduate, Dr. Rice has been delayed in graduating from surgical residency until at least June 30, 2021.  This is 3 years beyond when she would have graduated had she been advanced normally by SLU, and she has been denied the salary of a general surgeon during this time.  She received no salary for the period of July 1, 2018 through June 30, 2019.  Despite being admitted to another

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

surgical residency program, she will receive only a resident's stipend for an additional two years. The difference between such stipend and the salary that Dr. Rice would be able to earn as a board eligible or board-certified surgeon is in the hundreds of thousands of dollars per year;

b.      Despite Dr. Rice being admitted to another surgical residency program, the actions of SLU and the defamation of Dr. Rice by Drs. Wittgen, Williams and Freeman, as complained of in this Petition, will most likely make it impossible for Dr. Rice to gain acceptance into a sub-specialty surgical fellowship.  The difference between the salary of a physician who has completed a sub-specialty fellowship and one who has only graduated from a residency program is more than one hundred thousand dollars per year;

c.      Dr. Rice will most likely not be able to pursue an academic medical career, which has been her goal since prior to attending medical school; and

d.      Dr. Rice's reputation has been irreparably damaged.

**COUNT I – BREACH OF CONTRACT --**
**FAILURE OF SLU TO COMPLY WITH SLU  GME POLICIES AND PROCEDURES**

For Count I of her Petition, for breach of contract against St. Louis University, Plaintiff Mandy Rice, D.O., states as follows:

120.   Dr. Rice hereby adopts by reference, as if fully set forth herein, paragraphs 1 through 113 of this Petition.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

121.    The GME Policies and Procedures were incorporated by reference into the Residency Agreements entered into by Dr. Rice with SLU.

122.    As set forth more fully above, SLU (by and through its agents, including Dr. Wittgen and the CCC) failed to comply with numerous provisions of its GME Policies and Procedures regarding evaluation of Dr. Rice's performance as a resident including, but not necessarily limited, to the following breaches of the GME Policies and Procedures:

a.) Failing to provide Dr. Rice with quarterly evaluations, in violation of §2.1II.3 of the GME Policies and Procedures;

b.) Failing to develop and implement a system to evaluate knowledge, skills and professional growth of residents using "defined criteria that meets or exceeds ACGME…standards" and "dependable measures", ignoring written evaluations of Dr. Rice in the New Innovations system, and instead making subjective evaluations of Dr. Rice, in violation of §2.1II.3 of the GME Policies and Procedures;

c.) Failing to timely evaluate Dr. Rice's performance, so that evaluations could be used to improve Dr. Rice's performance, in violation of §§2.1II.3. and 2.II.4. of the GME Policies and Procedures;

d.) Failure to maintain the confidentiality of assessment of Dr. Rice's performance as a resident, in violation of §2.1II.3 of the GME Policies and Procedures;

e.) Failure by Dr. Rice's supervisors to prepare and keep monthly performance evaluations after she was placed on probation in March 2016, in violation of §2.II.6 of the GME Policies and Procedures; and

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

f.) Engaging in numerous acts of retaliation against Dr. Rice for challenging the decision that she be held back a year in her residency (including by filing this lawsuit) and for complaining about the abusive language and behavior to which she was subjected by Dr. Montenegro, as more fully set forth above.

123.    As set forth more fully above, SLU (by and through its agents, including Dr. Wittgen and the CCC) failed to comply with the provisions of its GME Policies and Procedures when it placed Dr. Rice on probation in March 2016, when it extended that probation in or about April 2017 and when it decided in or about May 2018 not to renew Dr. Rice's contract and not to advance her to the fifth year in the surgical residency program, including but not limited to the following breaches of the GME Policies and Procedures:

a.) Failing in March 2016 to point out in writing to Dr. Rice any specific deficiency other than her low ABSITE score, in violation of §2.II.6 of the GME Policies and Procedures;

b.) Failure in March 2016 to include in the probation letter an offer of assistance of the GME Ombudsman or otherwise referring Dr. Rice to the Ombudsman at that time, in violation of §2.II.6 of the GME Policies and Procedures;

c.) Failing in March 2016 to appoint a mutually agreeable faculty advisor for Dr. Rice, in violation of §2.II.6 of the GME Policies and Procedures;

d.) Failure in April 2017, when the decision was made to extend Dr. Rice's probation and require her to repeat the fourth year of her residency, to utilize objective, dependable and defined criteria to evaluate Dr. Rice's

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

performance in her fourth year of residency, in violation of §2.II.3 of the GME Policies and Procedures;

e.) Failure by Dr. Wittgen, in her capacity as program director, and the CCC, to review written evaluations of Dr. Rice's performance by her supervisors (i.e., attending physicians) prior to extending her probation in or about April 2017, and deciding in or about May 2018 not to renew her contract and not to advance her to the fifth year of the surgical residency program, in violation of §2.II.6 of the GME Policies and Procedures; and

f.) Failure to specify a time period in April 2017 for the extended period of probation, in violation of §2.II.6 of the GME Policies and Procedures.

124.    SLU violated the due process provisions of its GME Policies and Procedures, §2.II. XI, in the following respects:

a.)  The CCC, and upon information and belief the Grievance Committee and Dr. Gammack, in making their recommendations and/or decisions regarding whether Dr. Rice should be required to repeat the fourth year of her residency, considered false and defamatory information, and Dr. Rice was not given an opportunity to rebut such information;

b.) Neither Dr. Rice, nor any representative of Dr. Rice was permitted to hear, and therefore was unable to rebut, information presented to the Grievance Committee by Dr. Wittgen;

c.) The Ombudsman, Sara Barnett, who had been assisting Dr. Rice since December 2016 was "disqualified" by SLU prior to the beginning of the appeal process, without any explanation provided to Dr. Rice, which

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

denied Dr. Rice of an effective advocate with knowledge of Dr. Rice's situation; and

d.) Dr. Gammack was the final decision-maker with regard to Dr. Rice's appeal, although she had made statements which clearly indicated she had already decided to uphold Dr. Wittgen's decision to make Dr. Rice repeat her fourth year of residency before the Grievance Committee hearing; and

e.) In deciding not to renew Dr. Rice's contract for the residency year beginning July 1, 2018 and not to advance Dr. Rice to the fifth year of the surgical residency program, in retaliation for Dr. Rice challenging the decision to make her repeat the fourth year of the residency program (including filing this lawsuit) and/or for complaining about the abusive behavior to which she was subjected by Dr. Montenegro.

125.   The various breaches by SLU and/or its agents of the SLU GME Policies and Procedures are a violation of the Residency Agreements entered into between SLU and Dr. Rice for the years starting July 1, 2015, July 1, 20116, and July 1, 2017.

126.   The various breaches of the SLU GME Policies and Procedures by SLU and/or its agents contributed to, or caused: (a) the decision by SLU to require Dr. Rice to repeat the fourth year of her residency, and (b) its decision not to renew Dr. Rice's contract for the residency year beginning July 1, 2018 and not to advance Dr. Rice to the fifth year of the surgical residency program.

127.   As a result of these breaches, and being required to repeat the fourth year of her residency and not being allowed to advance to the fifth year of the residency program, Dr. Rice has been damaged as set forth in paragraph 113 of this Petition.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

WHEREFORE, Plaintiff, Mandy Rice, D.O., prays that the Court:

a.) Award damages in her favor and against SLU, in an as yet undetermined amount, in excess of $25,000.00;

b.) Order SLU to pay Court costs; and

c.) For such other and further relief as this Court deems just and proper.

### COUNT II – BREACH OF CONTRACT –
### FAILURE OF SLU TO COMPLY WITH ACGME REQUIREMENTS

For Count II of her Petition, for breach of contract against St. Louis University, Plaintiff Mandy Rice, D.O., states as follows:

128.    Dr. Rice hereby adopts by reference, as if fully set forth herein, paragraphs 1 through 121 of this Petition.

129.    The ACGME Requirements were incorporated by reference into the Residency Agreements entered into by Dr. Rice with SLU.

130.    SLU and/or its agents failed to comply with, and breached, the ACGME Requirements in the following respects:

a.) By failing to timely evaluate Dr. Rice's performance during each rotation and also by failing to document such evaluations at the end of each rotation, in violation of ACGME Common Core Requirement §V.A.2.a);

b.) By failing to utilize multiple evaluators to assess Dr. Rice's performance, instead essentially deferring to the evaluation of Dr. Wittgen, in violation of ACGME Common Core Requirement §V.A.2.b).(1);

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

c.) By failing to engage in an "objective assessment of (Dr. Rice's competence...", in violation of ACGME Common Core Requirement §V.A.2.b).(1), and instead relying on hearsay, gossip, and false information;

d.) The CCC abdicated one of its most important roles, as imposed by Common Core Requirement §V.A.1.b).(1).(c), which required that it to advise the program director regarding the progress of Dr. Rice as a resident, including advising whether Dr. Rice should be promoted and/or remediated, instead deferring to the decision made by Dr. Wittgen in this regard;

e.) By engaging in retaliation against Dr. Rice for advocating for herself, requesting specific information regarding her alleged deficiencies, and raising concerns about her treatment as complained of herein (including, but not limited to Dr. Rice filing this Petition), and for complaining about the abusive treatment to which she was subjected by Dr. Montenegro.  SLU's retaliation against Dr. Rice includes, but is not necessarily limited to: (a) the decision to require Dr. Rice to repeat her fourth year of residency; (b) the residency schedule for Dr. Rice for July 1, 2017 through June 30, 2018; (c) the extremely poor mid-year Milestone evaluation of Dr. Rice for the 2017-2018 residency year; (d) removing Dr. Rice from the "silver" surgery service after she complained about Dr. Montenegro's abusive language and behavior directed at Dr. Rice; and (e) the decision on or about May 4, 2018 not to advance Dr. Rice to the fifth year of the surgical residency program

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

and not to renew Dr. Rice's contract for the residency year beginning July 1, 2018, after SLU and Dr. Rice had executed a fifth-year residency contract on or about March 2, 2018.

131.    The various breaches of the ACGME Requirements by SLU and/or its agents contributed to, or caused, the decision made by SLU to require Dr. Rice to repeat the fourth year of her residency and the decision by SLU not to renew Dr. Rice's residency contract for the year beginning July 1, 2018, and not to promote her at that time to the fifth year of the residency program.

132.    As a result of these breaches, Dr. Rice has been damaged as set forth in paragraph 113 of this Petition.

WHEREFORE, Plaintiff, Mandy Rice, D.O., prays that the Court:

a.) Award damages in her favor and against SLU, in an as yet undetermined amount, in excess of $25,000.00;

b.) Order SLU to pay Court costs; and

c.) For such other and further relief as this Court deems just and proper.

### COUNT III – PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF (ALL DEFENDANTS)

For Count III of her Petition, for preliminary and permanent injunctive relief against all Defendants, Plaintiff Mandy Rice, D.O., states as follows:

133.    Dr. Rice hereby incorporates by reference, as if fully set forth herein, the allegations of paragraphs 1 through 126 of this Petition.

134.    Dr. Rice is suffering, and will continue to suffer, immediate and irreparable harm as a result of: (a) not being advanced to the fifth (PGY-5) year in SLU's surgical residency; (b) being subject to retaliation for advocating for herself, including but not

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

limited to being placed on a "unique" schedule of rotations and (c) being subjected to discriminatory conduct directed at her by Dr. Montenegro, in the form of abusive and bullying behavior on account of her sex and being retaliated against when she complained about such behavior.  This harm includes damage to her reputation in the medical community in the St. Louis area and beyond, which will impact her employment opportunities throughout her career, her ability to obtain a surgical sub-specialty fellowship, and which will also likely prevent her from obtaining an academic medical position after completion of her training.

135.   Given SLU's failure to comply with both its own GME Policies and Procedures and ACGME Requirements, the discrimination and retaliation suffered by Dr. Rice, and the harm suffered by Dr. Rice as a result, Dr. Rice is likely to prevail on the merits of her claims.

136.   The balance of harm if the relief requested by Dr. Rice is granted as opposed to if it is not weighs in favor of Dr. Rice, particularly as no patient treated by Dr. Rice during either of the fourth years of her residency (2016-2017 and 2017-2018) suffered any adverse consequence, and as Dr. Rice passed each of the rotations on which she served during her fourth year.

WHEREFORE, Plaintiff Mandy Rice, D.O., prays that this Court issue a permanent injunction:

a.) Ordering Defendants not to engage in further retaliation against Dr. Rice;

b.) Ordering Defendants to expunge from Dr. Rice's record any reference to her having been required to repeat the fourth year of her residency,

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

or that she was terminated from the residency program and not permitted to advance to the fifth year of surgical residency;

c.) Prohibiting Defendants from reporting to, or telling, any potential employer, fellowship program, licensing board, or reporting entity (e.g., the National Practitioners Data Bank) that Dr. Rice was required to repeat the fourth year of residency or that she was terminated from the residency program and not permitted to advance to the fifth year of surgical residency;;

d.) Ordering Defendants to pay court costs; and

e.) For such other and further relief as the Court deems just and proper under the circumstances.

## COUNT IV – DEFAMATION, DR. WITTGEN AND DR. WILLIAMS

For Count IV of her Petition, for defamation against Defendants Catherine M. Wittgen and Michael Williams, M.D., Plaintiff Mandy Rice, D.O., states as follows:

137.   Dr. Rice hereby incorporates by reference, as if fully set forth herein, the allegations of paragraphs 1 through 130 of this Petition.

138.   Dr. Williams reported to Dr. Wittgen and, upon information and belief, again stated at the April 3, 2017 CCC meeting, that Dr. Rice had not been present at one of his clinics on or about September 6, 2016, and when he called her he heard significant noise, at which time Dr. Rice allegedly admitted that she was at the mall.

139.   This statement was false, and Dr. Williams was aware that this statement was false at the time he had made it.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

140.   Dr. Williams had told Dr. Rice that she did not need to remain in the clinic, and instead could use that time to prepare for a Morbidity and Mortality presentation the next day, which she did.

141.   Dr. Rice did not go to the mall either during Dr. Williams clinic or at any time thereafter on September 6, 2016.

142.   Dr. Wittgen made a statement to all of the surgical faculty members present at the CCC meeting on or about April 3, 2017, that Dr. Rice had been excused from the vascular clinic by Dr. Michael Williams on or about September 6, 2016 so that she could prepare to make a presentation at a Morbidity and Mortality conference the next day, but that she instead went to a shopping mall with her husband (the "Statement").

143.   Upon information and belief, the April 3, 2017 CCC meeting was not the first time that Dr. Wittgen had made this defamatory Statement.

144.   Upon information and belief, the Statement was repeated by Dr. Wittgen when she met with the Grievance Committee.

145.   The Statements made by Drs. Wittgen and Williams concerning Dr. Rice going to the mall, instead of preparing for her presentation at the Morbidity and Mortality conference is false.  This never occurred.

146.   The Statement was defamatory, in that it specifically implied a lack of capacity or fitness on the part of Dr. Rice to perform her duties as a surgical resident.

147.   Dr. Wittgen and Dr. Williams made the Statement with malice, in that she made the Statement with reckless disregard to whether it was true or false at a time when both should have had serious doubt as to whether it was true.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

148.   The Statement damaged Dr. Rice's reputation for professionalism amongst the faculty of the surgery residency, the medical school faculty generally, and the medical community in the St. Louis area at large.  Further, Dr. Rice was damaged by the Statement as it was considered and relied upon by the CCC in imposing the requirement that Dr. Rice repeat the fourth (PGY-4) year of her residency, upon information and belief was also considered and relied upon by the Grievance Committee in recommending that the decision to hold Dr. Rice back for a year be upheld, and upon information and belief was relied upon by the CCC in deciding not to renew Dr. Rice's residency contract for the year beginning July 1, 2018, and not allowing her to advance to the fifth year of the residency program.

WHEREFORE, Plaintiff, Mandy Rice, D.O., prays that this Court grant judgment in her favor and against Drs. Wittgen and Williams:

a.)  Granting actual damages against Drs. Wittgen and Williams in such amount as will justly and fairly compensate Dr. Rice for the actual damages suffered by her as a result of their defamatory statements;

b.) Granting punitive damages against Drs. Wittgen and Williams in such amount as will deter them and others from engaging in similar egregious conduct in the future;

c.) Ordering Defendants Wittgen and Williams to pay court costs; and

d.) For such other relief as this Court deems just and proper under the circumstances.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

## COUNT V – DEFAMATION, DR. FREEMAN

For Count V of her Petition, for defamation against Defendant Carl A. Freeman, M.D. Plaintiff Mandy Rice, D.O., states as follows:

149.   Dr. Rice hereby incorporates by reference, as if fully set forth herein, the allegations of paragraphs 1 through 142 of this Petition.

150.   In the February 24, 2017 letter written by Dr. Freeman to Dr. Wittgen (**Exhibit 8**) (the "Letter"), Dr. Freeman represented that it was the "consensus" of the attending physicians on the trauma surgical service that Dr. Rice had serious deficiencies, that as a group they were concerned about whether Dr. Rice should be permitted to advance to the fifth year of residency, and "at least remediation is warranted…"

151.   The statement made by Dr. Freeman that the Letter represented the consensus of the attending physicians on the trauma surgical service was false.

152.   The statement that the Letter represented the consensus of the attending physicians on the trauma surgical service was defamatory, in that it specifically implied that there was a consensus among the trauma surgery attendings that Dr. Rice lacked the knowledge, skill capacity or fitness to perform her duties as a surgical resident.

153.   Dr. Freeman knew that the representation that the defamatory statements in the Letter were false, such that this statement was made with actual malice.

154.   The statements in the Letter that it was the consensus of the attending physicians in the trauma surgery service that Dr. Rice had numerous deficiencies, that they were unsure whether she should be advanced to the fifth year of residency, and that at a minimum she should be subject to remediation damaged Dr. Rice's reputation

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

for competency and professionalism amongst the faculty of the surgery residency, the medical school faculty generally, and the medical community in the St. Louis area at large.  Further, Dr. Rice was damaged by the representation that the Letter represented the consensus of the attending physicians on the trauma surgery service in that it was considered and relied upon by the CCC in imposing the requirement that Dr. Rice repeat the fourth (PGY-4) year of her residency, upon information and belief was also considered and relied upon by the Grievance Committee in recommending that the decision to hold Dr. Rice back for a year be upheld, and upon information was relied upon by the CCC in deciding not to renew Dr. Rice's residency contract for the year beginning July 1, 2018, and not allowing her to advance to the fifth year of the residency program.

WHEREFORE, Plaintiff, Mandy Rice, D.O., prays that this Court grant judgment in her favor and against Dr. Freeman:

> a.)  Granting actual damages against Dr. Freeman in such amount as will justly and fairly compensate Dr. Rice for the actual damages suffered by her as a result of the defamatory statement made by Dr. Freeman;
>
> b.) Granting punitive damages against Dr. Freeman in such amount as will deter him and others from engaging in similar egregious conduct in the future;
>
> c.) Ordering Defendant Freeman to pay court costs; and
>
> d.) For such other relief as this Court deems just and proper under the circumstances.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

## COUNT VI -- SEX DISCRIMINATION IN VIOLATION OF TITLE VII OF THE FEDERAL CIVIL RIGHTS ACT AGAINST DEFENDANT SLU

For Count VI of her Petition against Defendant St. Louis University, Sex Discrimination in Violation of Title VII of the Federal Civil Rights Act, 42 USC § 2000e-2, et seq. Plaintiff Mandy Rice, D.O., states as follows:

155.    Dr. Rice hereby incorporates by reference, as if fully set forth herein, the allegations of paragraphs 1 through 148 of this Petition.

156.    In violation of Title VII of the Federal Civil Rights Act, 42 USC § 2000e-2, et seq. Plaintiff, while an employee of Defendant Saint Louis University, was subject to unlawful discrimination based on her gender.

157.    Defendant Saint Louis University, at all times relevant hereto, is and has been an "employer" within the meaning of the Title VII of the Federal Civil Rights Act, 42 USC § 2000e.

158.    At all times relevant hereto, Defendant Saint Louis University has employed greater than fifteen employees.

159.    This Court, pursuant to Title VII of the Federal Civil Rights Act, 42 USC § 2000e, has original subject matter jurisdiction over Plaintiff's Title VII of the Federal Civil Rights Act, 42 USC § 2000e, et seq., claims.

160.    Further, insofar as Defendants, at all times relevant hereto, conducted and continue to conduct business in the City of Saint Louis, Missouri, Plaintiff was employed by Saint Louis University in the City of Saint Louis, Missouri, and the unlawful practices were committed in the City of Saint Louis, Missouri, venue is proper in this Court.

161.    Prior to her residency in general surgery at Saint Louis University, Plaintiff was a pediatric intensive care registered nurse in San Antonio, Texas.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

162.   Following her time as a pediatric intensive care registered nurse, Plaintiff completed medical school at The University of North Texas Health Science Center, where she received her Doctor of Osteopathic ("D.O.") medicine degree.

163.   Following her graduation from The University of North Texas Health Science Center, Plaintiff entered into a general surgery residency program at Saint Louis University.

164.   Plaintiff received universally good evaluations from her attending physicians through her third year of residency, and she was otherwise qualified to perform the job as a surgical resident at Saint Louis University.

165.   During the fourth year of Plaintiff's residency, Plaintiff began experiencing discriminatory behavior based on her past profession as a registered nurse, (a female dominated profession), specifically from Drs. Catherine Wittgen and Carl Freeman. Further, Dr. Rice was subject to criticism by Drs. Wittgen, Freeman voiced to other attendings in the general surgery residency program for being too nice, compassionate, nurturing, and caring (all of which are stereotypically female characteristics.  This criticism constituted gender stereotype priming which caused other faculty members to be more critical of Dr. Rice in oral and written evaluations of Dr. Rice's performance as a resident.

166.   By way of example of discriminatory gender stereotyping behavior to which Dr. Rice was subjected by Dr. Wittgen, on or about September 9, 2016, Dr. Rice was describing for the scrub tech and circulating nurse assigned to a surgery she was to perform how she wanted the patient to be positioned and prepped for an amputation. Dr. Wittgen entered the room and angrily told Dr. Rice to, "Stop being a nurse!  Go be a surgeon and scrub."

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

167.   On another occasion, on or about November 7, 2016, Dr. Wittgen told several people in a public setting that "I think that Mandy is too much of a nurse to be a surgeon," and that she would "give (Dr. Rice) until April."

168.   In January 2017, during a meeting with Dr. Freeman, he told Dr. Rice that she was "too much of a nurse."  Plaintiff responded that she found this statement to be discriminatory and biased.  From that point on, Dr. Freeman accused Plaintiff of being "too nice."

169.   Thereafter, Plaintiff received a letter from the trauma service physicians dated February 24, 2017.  In that letter, Dr. Freeman's overarching critique was that Plaintiff was "too nice," which "could interfere with leadership," and might also make it difficult for the attending physicians to "decipher through that."

170.   During the course of Plaintiff's residency, numerous members of the surgery faculty at SLU, including but not limited to Dr. Carl Freeman, Dr. Kevin Mahoney, Dr. Catherine Wittgen, Dr. Theresa Schwartz, and Dr. Grace Montenegro, used the word "nurse" in a derogatory context when conversing with and/or referring to Plaintiff.

171.   At least partially as a result of Plaintiff's past employment as a registered nurse, members of the surgical faculty at SLU have improperly stereotyped Plaintiff, determining that Plaintiff's behavior does not conform with SLU's stereotypes regarding how a surgical resident should behave, in that she displayed stereotypically female traits when SLU expected all of its surgical residents, both male and female, to eschew feminine traits and to instead display stereotypically male behavior.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

172.   Plaintiff, while employed by Defendants, was the subject of adverse action and discrimination by Defendants on the basis of her sex, on a continuous basis, from her fourth year of surgical residency, which began on July 1, 2016, until her termination.

173.   This adverse action includes but is not limited to harassment, abuse and bullying from attending physicians whom Plaintiff performed rotations with, as well as poor performance reviews and subjecting her to remediation.

174.   The Defendants' acts of discrimination against Dr. Rice, based on her sex, include, but are not limited to:

a.)   Dr. Rice being subjected to abusive and bullying behavior and language directed at her to which similarly situated male residents were not subjected, including but not limited to abuse and bullying of Dr. Rice by Dr. Montenegro in or about March 2018 which created a hostile environment;

b.)   Making inappropriate comments to Dr. Rice, relating to her sex, that were not made to similarly situated male surgical residents or female residents who behaved in a more stereotypically male manner;

c.)   Placing Plaintiff in a position where performing her job would be more difficult, and placing her in such a position because of her sex, and not subjecting male employees to this same practice;

d.)   Criticizing and stereotyping Plaintiff because of her sex, past career as a registered nurse, and exhibition of stereotypically female characteristics but not criticizing other similarly situated male

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

surgical residents or female residents who behaved in a more stereotypically male manner;

e.) Terminating Plaintiff because of her sex, or otherwise relying on sex stereotypes in terminating Plaintiff's employment, but not terminating other similarly situated male surgical residents/or female residents who behaved in a more stereotypically male manner.

175. On or about May 4, 2018, Plaintiff was terminated from her residency program at Saint Louis University.

176. After being terminated, Plaintiff filed a timely charge of discrimination, on or about August 5, 2018 with the Equal Employment Opportunity Commission ("EEOC"), and the Missouri Commission on Human Rights ("MCHR").

177. On August 28, 2019 the EEOC issued a notice of Right to Sue. A copy of the same is attached hereto and incorporated by reference as **Exhibit 13**.

178. This action is timely commenced, as it has been filed within ninety (90) days of the issuance of the Right to Sue letter.

179. As a direct and proximate cause of the actions and conduct set forth herein, because of Plaintiff's sex, Plaintiff has suffered and will continue to suffer damages.

WHEREFORE, Plaintiff, Mandy Rice, D.O., prays this Court grant judgment in her favor and against Defendants:

a.) Granting actual damages in such an amount as will justly and fairly compensate Plaintiff for the actual damages suffered by her as a result of Defendants' actions;

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

b.) Granting punitive damages against Defendants in such amount as will deter Defendants and others from engaging in similar egregious conduct in the future;

c.) Ordering Defendants to pay Plaintiff's reasonable attorney's fees;

d.) Ordering Defendants to pay court costs; and

e.) For such other relief as this Court deems just and proper under the circumstances.

## COUNT VII -- VIOLATION OF
## TITLE VII OF THE CIVIL RIGHTS ACT-RETALIATION

For Count VII of her Petition against Defendant SLU, Violation of Title VII of the Civil Rights Act of 1964- Retaliation, Plaintiff Mandy Rice, D.O., states as follows:

180.   Dr. Rice hereby incorporates by reference, as if fully set forth herein, the allegations of paragraphs 1 through 174 of this Petition.

181.   As detailed above, Saint Louis University and its employees discriminated against Plaintiff, and said behavior was based on Plaintiff's sex.

182.   Specifically, Dr. Rice was subject to repeated bullying and abusive behavior by Dr. Montenegro in or about March 2018, culminating in particularly abusive behavior directed by Dr. Montenegro toward Dr. Rice on or about March 12, 2018.  This type of behavior was not directed by Dr. Montenegro toward similarly situated male residents.

183.   Dr. Rice complained about the abusive and bullying behavior to SLU Hospital and SLU on or about March 13, 2018.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

184.   On or about March 14, 2018, after Dr. Montenegro learned about the complaint made by Dr. Rice concerning Dr. Montenegro's behavior, Dr. Montenegro confronted Dr. Rice outside an operating room, cursing Dr. Rice and telling her she (Dr. Montenegro) was so mad at Dr. Rice, she couldn't look Dr. Rice in the face.  Dr. Montenegro then informed Dr. Rice that Dr. Rice was "failing this rotation right now."

185.   Thereafter, SLU and its employees retaliated against Dr. Rice for complaining about Dr. Montenegro's behavior in at least the following ways:

1.)   She was not allowed to continue as chief resident of the "Silver Service" for the remainder of her scheduled rotation on that Service;

2.)   Dr. Schwartz wrote a false, highly negative review of Dr. Rice's performance as chief resident of the "Silver Service" and would no longer permit Dr. Rice to operate with her;

3.)   Dr. Rice was removed from the chief residency position in Silver Service and reassigned to a rotation with the Transplant Service and other changes were made to Plaintiff's rotation schedule which deprived her of surgical opportunities required to become Board eligible; and

4.)   Even though SLU and Rice had executed a 5th year residency contract in early March 2018, Rice was informed in early May 2018 that her contract would not be renewed, and she would not be allowed to advance to the 5th year of residency in the surgery program;

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

5.)     Upon information and belief, SLU, through its employees, provided a negative evaluation of Dr. Rice to the Missouri Board of Registration for the Healing Arts; and

6.)     Upon information and belief, SLU, through its employees, provided a negative review of Dr. Rice to various surgical residency programs to which Dr. Rice made application.

186.    This retaliation was directed against Rice because she participated in protected activity when she complained she had been subjected by Dr. Montenegro to abuse, bullying and harassment because she was a woman.

WHEREFORE, Plaintiff, Mandy Rice, D.O., prays this Court grant judgment in her favor and against Defendants:

a.)     Granting actual damages in such an amount as will justly and fairly compensate Plaintiff for the actual damages suffered by her as a result of Defendants' actions;

b.)     Granting punitive damages against Defendants in such amount as will deter Defendants and others from engaging in similar egregious conduct in the future;

c.)     Ordering Defendants to pay Plaintiff's reasonable attorney's fees;

d.)     Ordering Defendants to pay court costs; and

e.)     For such other relief as this Court deems just and proper under the circumstances.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

## COUNT VIII – SEX DISCRIMINATION IN VIOLATION OF
## THE MISSOURI HUMAN RIGHTS ACT

For Count VIII of her Petition, Violation of the Missouri Human Rights Act-Discrimination, Plaintiff Mandy Rice, D.O., states as follows:

187.   Dr. Rice hereby incorporates by reference, as if fully set forth herein, the allegations of paragraphs 1 through 185 of this Petition.

188.   The acts of sex discrimination to which Plaintiff was subjected, as set forth above, violate the Missouri Human Rights Act, Chapter 213 R.S.Mo., including § 213.055 R.S.Mo.

189.   On or about August 5, 2018, Plaintiff filed her charge of discrimination and retaliation with the Missouri Commission on Human Rights ("Missouri Commission").

190.   By letter dated September 6, 2019, (a copy of which is attached hereto as **Exhibit 14**)   counsel for Plaintiff requested a Right to Sue letter from the Missouri Commission

191.   The Missouri Commission responded that it could not provide the records requested by Plaintiff because the case was still open (this letter is attached hereto as **Exhibit 15**).

192.   Plaintiff's counsel then sent a second letter to the Missouri Commission, dated September 18, 2019 requesting a right to sue letter (a copy of which is attached hereto as **Exhibit 16**).

193.   To date, the Missouri Commission has failed and refused to issue a Right to Sue letter.  Instead, a representative of the Missouri Commission informed a paralegal working for Plaintiff's counsel during a telephone call that SLU was asserting it

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

is a religious organization and therefore not subject to the Missouri Human Rights Act's prohibitions against discrimination in employment.

194.    Pursuant to §213.111.1 R.S.Mo., once 180 day have passed from the date of filing of a charge and the person filing the charge requests a right to sue letter, "the Commission must cease all activity on a complaint and issue a right-to-sue letter." *Lampley v. Missouri Commission on Human Rights*, 570 S.W.3d 16, 26 (Mo.banc 2019). If a charge has been pending with the Missouri Commission for more than 180 days, and a charging party requests a right to sue letter, issuance of such letter is a ministerial act. Thus, the Missouri Commission is without authority to refuse to issue the right to sue letter requested by Dr. Rice, as over a year had passed from when she first filed her charge with it.

195.    Although the Missouri Commission has not yet issued a right to sue letter to Dr. Rice, the statute of limitations on her Title VII claim will expire approximately one week from the date on which this suit was filed. Since Dr. Rice has requested the issuance of a right to sue letter, and issuance of this letter is a ministerial act which the Commission has no authority to refuse to do, Dr. Rice's claim under the Missouri Human Rights Act is timely and ripe, and the fact that the Commission has refused to grant a properly requested right to sue letter does not bar the filing of Dr. Rice's claims under the Missouri Human Rights Act.

WHEREFORE, Plaintiff, Mandy Rice, D.O., prays this Court grant judgment in her favor and against Defendants:

   a.)    Granting actual damages in such an amount as will justly and fairly
          compensate Plaintiff for the actual damages suffered by her as a result of
          Defendants' actions;

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

b.)     Granting punitive damages against Defendants in such amount as will

deter Defendants and others from engaging in similar egregious conduct

in the future;

c.)     Ordering Defendants to pay Plaintiff's reasonable attorney's fees;

d.)     Ordering Defendants to pay court costs; and

e.)     For such other relief as this Court deems just and proper under the

circumstances.

## COUNT IX -- VIOLATION OF THE MISSOURI
## HUMAN RIGHTS ACT-RETALIATION

For Count VIII of her Petition, Violation of the Missouri Human Rights Act-

Discrimination, Plaintiff Mandy Rice, D.O., states as follows:

196.    Dr. Rice hereby incorporates by reference, as if fully set forth herein, the

allegations of paragraphs 1 through 194 of this Petition.

197.    The aforesaid acts of retaliation undertaken against Dr. Rice violate the

Missouri Human Rights Act, Chapter 213 R.S.Mo., and in particular the provisions of

§213.070.

198.    For the same reason that the Missouri Commission was without authority

to deny a right to sue letter on Dr. Rice's charge of discrimination, it is likewise without

authority to have denied a right to sue letter on her charge of retaliation, and therefore

this claim is timely and ripe, and the claim is not barred by the Missouri Commission's

failure and refusal to issue a right to sue letter to Dr. Rice.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

WHEREFORE, Plaintiff, Mandy Rice, D.O., prays this Court grant judgment in her favor and against Defendants:

a.)    Granting actual damages in such an amount as will justly and fairly compensate Plaintiff for the actual damages suffered by her as a result of Defendants' actions;

b.)    Granting punitive damages against Defendants in such amount as will deter Defendants and others from engaging in similar egregious conduct in the future;

c.)    Ordering Defendants to pay Plaintiff's reasonable attorney's fees;

d.)    Ordering Defendants to pay court costs; and

e.)    For such other relief as this Court deems just and proper under the circumstances.

DANNA MCKITRICK, P.C.

BY:  /s/ David R. Bohm
David R. Bohm, # 35166
David W. Morin, # 61590
7701 Forsyth Blvd., Suite 800
St. Louis, MO  63105-3907
(314) 726-1000/(314) 725-6592 fax
E-Mail: dbohm@dmfirm.com
        dmorin@dmfirm.com

ATTORNEYS FOR PLAINTIFF
MANDY RICE, D.O.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

**1922-CC12062**



**SAINT LOUIS**
**UNIVERSITY.**
887. 1818

1402 South Grand Blvd.
Room M260
St. Louis, MO  63104
Phone:  314-977-9851
Fax: 314-977-9852
www.slu.edu

*Office of Graduate Medical Education*

*School of Medicine*
*Medical Center*

December 22, 2016

Mandy Lyn Rice, D.O.
1636 Jonquil Drive
St. Louis, MO  63119

We are pleased to offer you a reappointment as a Postgraduate Level V trainee in the Surgery (Categorical) Residency Program of the Saint Louis University School of Medicine for the period of 7/1/2017 through 6/30/2018.  The stipend for trainees assigned to the Saint Louis University Group of Hospitals will be as follows:

$57,200 Gross Annual.

Minor differences in the stipend amount or benefits may occur during periods when trainees are assigned to certain of our affiliated teaching hospitals.

This reappointment is subject to the same terms and conditions as were set forth in your initial appointment letter and to the terms, conditions, benefits and responsibilities described in the attached information sheet.

Please complete and sign below indicating your acceptance or refusal of this reappointment.  Your appointment will be held open for twenty-one (21) days from the receipt of this letter, after which, in the absence of your acceptance, this offer will be no longer in effect.  A copy of this letter is attached for your records.

_____
Associate Dean

_____
Program Director

_____
Department Chairperson

I hereby __✓__ (accept) ____ (decline) the offer of a reappointment as a postgraduate trainee of Saint Louis University School of Medicine.

_____
Signature:  Mandy Lyn Rice

_____
Date    1/12/2017

**EXHIBIT**
1

**1922-CC12062**

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

### SAINT LOUIS UNIVERSITY SCHOOL OF MEDICINE
### Graduate Medical Education Policies and Procedures

| Section 2<br>Operation of Programs | Date Revised: February 2001, July 2002, February 2008, April 2010, August 2012, May 2013, September 2014 |
|---|---|
| **2.1 Operation of Residency and Fellowship Programs** | **Page 1 of 9** |

**I.    Orientation**

Housestaff Orientation is held in the Learning Resources Center at Saint Louis University Health Sciences Center two weeks prior to July 1 of each year.  Organization of the orientation program is the responsibility of the Associate Dean for Graduate Medical Education of the School of Medicine in coordination with the Office of Human Resources of the Health Sciences Center, Program Directors, and major affiliated teaching hospitals.

**II.   Evaluation and Record Keeping for Residents**

**1.    Supervision**

The level and method of **supervision** for residents in each program is the responsibility of the program director and must be consistent with the Institutional and Program Requirements for that program as specified by the ACGME.  Guidelines for supervision pertaining specifically to Saint Louis University School of Medicine are found in the University's Compliance Program and Medicare's Rules for the Teaching Physician.

It is recognized that residents have differing levels of training and maturity in the same training program as well as in the levels of general and specialty training in different disciplines.  It is incumbent upon the supervising attending physician to have certain knowledge of the skills, prior experience and capability of the individual resident in order to determine the specific degree of supervision required. The privilege of progressive authority and responsibility, conditional independence, and a supervisory role in patient care delegated to each resident must be assigned by the program director and faculty members.

In the supervision of resident patient management, attending physicians should:

a.    carefully and directly scrutinize all resident historical and physical examination information and other clinical documentation for accuracy and completeness;

b.    know and approve of, either directly or by care patterns, all diagnostic tests ordered by the resident;

c.    assure the proper quality of the management of the patient including the transmittal of information by the resident

d.    with direct supervision immediately available-the supervising physician is physically within the hospital or other site of patient care, and is immediately available to provide Director Supervision;



EXHIBIT

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

| Section 2<br>Operation of Programs | Date Revised: February 2001, July 2002, February 2008, April 2010, August 2012, May 2013, September 2014 |
|---|---|
| 2.1 Operation of Residency and Fellowship Programs | Page 2 of 9 |

e.   with indirect supervision available – the supervising physician is not physically present within the hospital or other site of patient care, but is immediately available by means of telephonic and/or electronic modalities, and is available to provide Direct Supervision; or

f.   with oversight – the supervising physician is available to provide review of procedures/encounters with feedback provided after care is delivered.

2.   **Guidelines for Resident Work Hours**

Graduate medical education requires a commitment to continuity of patient care. Physicians in training must recognize that their obligation to patients is not automatically discharged at any given hour of the day or any particular day of the week. In no case should the resident be absented until proper care and welfare of the patient have been ensured. The program director must ensure assignment and reasonable hours. On-call rooms (not necessarily single rooms but arranged to permit adequate rest and privacy) must be available. There should be adequate backup so that patient care is not jeopardized during or following assigned hours.

With the foregoing guidelines each specialty is expected to recognize and follow the following common accreditation standards:

- Residents must not be scheduled for more than 80 duty hours per week, averaged over a four-week period, with the provision that individual programs may apply to the Graduate Medical Education Committee (GMEC) for an increase in this limit of up to 10 percent, if they can provide a sound educational rationale;

- One day in seven free of patient care responsibilities, averaged over a four-week period. At-home call cannot be assigned on these free days;

- Call no more frequently than every third night, averaged over a four-week period;

- Duty periods of PGY-1 residents will not exceed 16 hours in duration;

- A 24-hour limit on on-call duty, with an added period of up to 4 hours for continuity and transfer of care, educational debriefing and didactic activities; no new patients may be accepted after 24 hours;

- Residents will have at least 14 hours free of duty after 24 hours of in-house duty;

| Section 2<br>Operation of Programs | Date Revised: February 2001, July 2002, February 2008. April 2010, August 2012, May 2013, September 2014 |
|---|---|
| 2.1 Operation of Residency and Fellowship Programs | Page 3 of 9, |

- A 10-hour minimum rest period should be provided between duty periods;

- Residents will not be scheduled for more than 6 consecutive nights of night float; and

- When residents take call from home and are called into the hospital, the time spent in the hospital must be counted toward the weekly duty hour limit.

3.  **Evaluation**
Residents evaluation is to be done at least quarterly in each residency program. Each department/program director is responsible for developing and implementing a system to evaluate the knowledge, skills and professional growth of residents, using defined criteria, that meet or exceed ACGME and specialty board standards utilizing input from faculty supervisors and other appropriate personnel.

The residency program must demonstrate that it has an effective plan forassessing resident performance throughout the program and for utilizing assessment results to improve resident performance. This plan should include: use of dependable measures to assess residents' competence in patient care, medical knowledge, practicebased learning and improvement, interpersonal and communication skills, professionalism, and systems based practice; mechanisms for providing regular and timely performance feedback to residents; and a process involving use of assessment results to achieveprogressive improvements in residents' competence and performance.

Departmental deliberations concerning the performance of individual residents should be confidential. Residents must participate on a regular basis in the evaluation of the quality of education provided in the program.
Discussions concerning the residency program should be periodically reflected in department minutes.

4.  **Records**
Each program director or his designee is responsible for apprising each resident of the assessment of his/her performance and **to maintain a record of the evaluations**for each resident. This record should be accessible to the resident. The resident is expected to co-sign each evaluation to indicate that he/she has received it and discussed it with his/her program director. Concerns about unsatisfactory performance should be communicated in writing to the resident as soon as possible during the academic year with suggestions for improvement. The resident will be provided an opportunity to present his/her side of the issue.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

| Section 2<br>Operation of Programs | Date Revised: February 2001, July 2002, February 2008, April 2010, August 2012, May 2013, September 2014 |
|---|---|
| 2.1 Operation of Residency and Fellowship Programs | Page 4 of 9 |

5.   **Advancement**
Positions of higher responsibility for residents are to be given only upon the basis of evaluation of readiness for advancement.  This assessment/evaluation is to be carried out by a clearly defined method in each residency program.  Rotational and year level goals and objectives are designed to help residents meet the specialty and/or subspecialty Board requirements. Most member Boards of the American Board of Medical Specialties specify the months and type of meaningful patient care that must be successfully completed. Educational remediation and/or leave greater than that amount specified in Resident's Letter of Appointment will result in an extension in training at any PGY level, and a delay in advancement. Each Program should assure that their residents are familiar with the appropriate Board Requirements, and provide them a written policy consistent with their RRC Program Requirements regarding the effects of educational delay and leave on satisfying the criteria for completion of the Residency Program.

6.   **Probation** A resident may be placed on **probation** within a training year by a program director because of inadequate or unsatisfactory performance. Normally, a resident would have had prior notification (see Records above) before taking this action. Any action placing a resident on probation shall be reported immediately to theAssociate Dean for Graduate Medical Education.

**Specific deficiencies must be pointed out in writing to the resident who should be asked to sign the letter of probation and concur with the remediatio plan, which must include assistance by the GME Ombudsman and the appointment of a mutually agreeable faculty advisor.  Other remedial help as appropriate must be provided and a probationary period (typically three (3) months) specified.  Monthly evaluations of performance should be kept by all supervisors** and must be reviewed by the program training committee and/or the program director on completion of the probationary period.
A decision of reinstatement/advancement, or extension of the probationary peiod, retention at the same level, or of dismissal must be made on the basis of the resident's performance with adequate documentation of the basis for the decision. Such documentation must be reviewed and acknowledged by the resident. Residents retained at the same level of training do not advance in stipend level.

7.   **Dismissal**
A resident may be **dismissed** because of inadequate performance (as outlined above) and/or because of unethical or clearly negligent conduct. Dismissal shall be the decision of the Associate Dean for Graduate Medical Education on the recommendation of the program director, the department chairman or division director, as appropriate; with appropriate consultation (faculty, hospital, Human Resources, & University General Counsel.)

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

| Section 2<br>**Operation of Programs** | **Date Revised: February 2001, July 2002, February 2008, April 2010, August 2012, May 2013, September 2014** |
|---|---|
| **2.1 Operation of Residency and Fellowship Programs** | **Page 5 of 9** |

III. **Personnel Records**

Personnel files on active residents are maintained in the department or division with all relevant documentation. A parallel file is maintained in the Graduate Medical Education Office. Since there are frequent requests from hospitals when former residents request staff appointment and privileging, the program director will, at completion or termination of training, provide and sign a summary report of the resident's performance during residency which will be forwarded to requesting institutions by the Academic Records Office of the School of Medicine following receipt of a request and a release of information form signed by the resident. This Final Evaluation Form is shown in Section 2.2. Additional information specific to the residency may be appended. Such information may include numbers and type and degree of participation in surgical procedures, etc. At the completion of the residency or on separation, the departmental resident's file together with the Final Evaluation Form (Section 2.2) is forwarded to the Graduate Medical Education Office. The two files are merged and forwarded to the Academic Records Office for permanent filing.

IV. **Evaluation and Record Keeping for Fellows**

Evaluation of fellows is to be performed at least semi-annually by the program director and his/her staff. **It is the responsibility of the program director to design the appropriate program and evaluation form.** The program director is responsible to communicate and discuss with each fellow the assessment of his/her performance and **to maintain a record of the evaluations** for each fellow. The record should be accessible to the fellow. The fellow is expected to co-sign each evaluation to indicate he/she has received it and has had an opportunity to discuss it with the faculty and/or program director. Conerns about unsatisfactory performance should be communicated in writing as soon as possible with suggestions for improvement. A fellow may be dismissed because of inadequate performance and/or because of unethical or clearly negligent behavior. Dismissal should be the decision of the Associate Dean for Graduate Medical Education on the recommendation from the program director and the department chairman, with appropriate consultation.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

| Section 2<br>Operation of Programs | Date Revised: February 2001, July 2002, February 2008, April 2010, August 2012, May 2013, September 2014 |
|---|---|
| 2.1 Operation of Residency and Fellowship Programs | Page 6 of 9 |

A personnel file is maintained in the department with all relevant documentation.  A parallel file is maintained in the Graduate Medical Education Office, as appropriate.  At the time of completion of the fellowship or separation, the two files are merged and forwarded to the Registrar's Office for permanent filing. **A final letter of evaluation (or Final Evaluation Form) from the program director will be forwarded with the file.**  This letter will be forwarded to requesting institutions by theAcademic Records Office following such request and a release of information form signed by the fellow.

**V.**    **Appointments and Stipends**
Contract information is presented in Section 4.  Specimen letters of appointment are presented.  All residents and fellows shall sign the appropriate letter.  All residents will receive their stipends from the Saint Louis University payroll system.  TheUniversity will be reimbursed by affiliated hospitals and individual departments as appropriate.  The stipend status of fellows in various categories is presented in Section 5.

It is a School of Medicine Graduate Medical Education Policy that reappointments to a training program be on the basis of demonstrated progress through the goals and objectives of the appropriate year level of the Program and/or towards appropriate specialty or subspecialty board certification as evaluated by the faculty, documentedby the Program Director, and regularly shared with the trainee.  Program Directors must provide both trainee (resident, subspecialty resident or fellow) and the GME Office six (6) months written notice of intent to not renew a trainee's appointment.  Graduate Medical Education trainees notified of the intent to not renew their appointment must be allowed full access to due process and the Ombudsman Program (below).

**VI.**    **Malpractice Insurance**
In order to provide the complete education and training experienceestablished by the certifying board of the specialty, programs at Saint Louis University School of Medicine involve more than one institution in various types of settings.  The affiliation network of health care facilities which has been developed for the graduate medical education programs is so structured as to provide the experiences required by the ACGME for program accreditation.  Thus our residents rotate through many health care institutions.

During the course of rotations, professional liability insurance is provided to the residents and fellows.  Such malpractice coverage is provided primarily by the Saint Louis University Self-Insurance Program as detailed in the Health Professional Letter of Indemnity.  This is true in all rotations of residentswith the following exceptions:

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

| Section 2<br>Operation of Programs | Date Revised: February 2001, July 2002, February 2008, April 2010, August 2012, May 2013, September 2014 |
|---|---|
| 2.1 Operation of Residency and Fellowship Programs | Page 7 of 9 |

1.  During rotation through Forest Park Hospital, Forest Park Hospital provides professional liability insurance coverage,

2.  During rotation through St. John's Mercy Medical Center, St. John's provides professional liability insurance coverage,

3.  During rotation through the Veteran's Affairs Medical Center, the Tort Claims Act of the Federal Government provides professional liability insurance coverage.

4.  During assignment at Cardinal Glennon Children's Medical Center, professional liability insurance coverage is provided by SSM Self-Insurance Program.

5.  OB GYN residents at St. Mary's Health Center, professional liability insurance coverage is provided by SSM Self-Insurance Program.

During assignment at Scott Air Force Base, or Saint Louis University Hospital, professional liability insurance coverage is provided by the Saint Louis University Self Insurance Program. The cost of providing medical liability coverage is reimbursed to Saint Louis University by the affiliated institution through which the resident is rotating. Should there be any indication of potential medical liability or malpractice, the resident and the program director should immediately contact the Director, Medical Legal Services Department at Saint Louis University Health Sciences Center. Failure to do so may adversely affect coverage.

On rotation through any of the other hospitals, the resident or fellow should immediately inform the director of education for the residency program rotation of any potential medical liability or malpractice concerns. That individual will inform the appropriate person at the affiliated hospital and will inform the Director of the Medical Legal Services Department at Saint Louis University.

VII.  **Ombudsman Program**
The Ombudsman for Graduate Medical Education is a resource for the trainee. The Ombudsman is knowledgeable about University Processes and Graduate Medical Education. He/She is an impartial, confidential resource for the trainee when having disputes or problems. The services include investigation, listening, coaching, and offering problem-solving options. The Ombudsman does not have the authority to make decisions but can inform and refer the trainee to the person having that authority. The Ombudsman may also assist the trainee in accessing resources to help with adjustment and transition issues associated with training. To confidentially contact the Ombudsman, call (314) 977-9851. (See PP 8.4)

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

| Section 2<br>Operation of Programs | Date Revised: February 2001, July 2002, February 2008, April 2010, August 2012, May 2013, September 2014 |
|---|---|
| 2.1 Operation of Residency and Fellowship Programs | Page 8 of 9 |

VIII.  **Saint Louis University Residents Association(SLURA)**
The organization was designed to give residents a voice in the decision making of the School of Medicine and Clinical Departments regarding residency programs and practices that directly affect the trainee's education and life while a resident/fellow. SLURA provides input and helps guide the decisions that are made about the training programs, acts as an advocate for residents in any matters that need to be addressed with specific programs, departments or hospitals' administration (anonymously if need be), organizes informational meetings of general interest to residents, and works to increase positive publicity for our School's residency programs. There are four (4) resident voting positions on the Graduate Medical Education Committee that are filled by representatives from SLURA. Specific information regarding SLURA, its officers, meetings, and their minutes can be found at their website (www.medschool.slu.edu/slura/).

XI.  **Residents' Code of Professional Conduct**
Saint Louis University School of Medicine, in sponsoring graduate medical education, strives to develop a professional ethic based on personal responsibility. The Code of Professional Conduct establishes minimum expectations of professional conduct. A violation of the Code of Conduct occurs when a resident acts contrary to the values and responsibilities expected of those engaged in the practice of medicine. The Code of Professional Conduct outlines the procedures to respond to infractions. Allegations not resolved by the clinical department or the Ombudsman will be referred to the Graduate Medical Education Professional Conduct Council. The Graduate Medical Education Professional Conduct Council is empowered to investigate violations of the Code of Professional Conduct and to recommend sanctions or remediation. A resident's failure to comply with any recommended sanctions under the Code may result in further disciplinary actions up to and including dismissal.

X.  **Changes in Program Size or Closure**
Whenever a Program is considering a change in the number of trainees at any year level of the Program, the Program Director must notify the GMEC, and complete the Residency Program Assessment Tool or provide similar justification. Any changes in number of trainees, either an increase or a decrease (including closure of the Program) must be communicated to current trainees in writing. While not anticipated, the School of Medicine requires that Programs with approved plans to decrease the number of trainees or close the Program must allow trainees already in the Program to complete their training, or will assist the trainees in enrolling in ACGME accredited programs to continue their training.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

| Section 2<br>Operation of Programs | Date Revised: **February 2001, July 2002, February 2008, April 2010, August 2012, May 2013, September 2014** |
| --- | --- |
| **2.1 Operation of Residency and Fellowship Programs** | Page 9 of 9 |

**XI.   Grievances and Due Process**

Residents are informed in their letter of appointment that any misunderstanding or dispute involving a graduate trainee is to be resolved by and within the clinical departments. The GME Ombudsman is available to assist any trainee through this process. Concerns about systematic and fair application of GME policies and procedures may be brought to the representatives of SLURA.

If a resident or fellow believes, however, that any such matter has not been handled reasonably, recourse is available from administration of the School of Medicine through the Dean's Office. The resident will first grieve to the Program Director via the Clinical Competency Committee, then the Departmental Chair. The Associate Dean for Graduate Medical Education or designee will review the situation, meet separately with the trainee and the Program Director, review all Program and performance documentation, and either reverse or uphold the decision made at the depatmental level or may recommend to the Dean that a hearing be held. Such a hearing would be held by a committee of the faculty external to the Program and Department, appointed by the Dean, who may prescribe such rules for the conduct of the hearing as may be necessary. If dismissal is the issue, prior to the hearing the resident shall be advised of the basis for the proposed dismissal. At the hearing, the trainee shall be afforded opportunity to make such statements and present such evidence as may be desired in reflection of the concerns documented and adverse action recommended. The determination of the committee shall be transmitted to the Associate Dean for Graduate Medical Education, whose ruling on the decision shall be final.

This process is separate, distinct, and in addition to any proceeding associated with the Code of Professional Conduct.

**XII.   Completion of Training**

At the end of the PG-1 year and upon the satisfactory completion of residency or fellowship training, or satisfactory completion of the time of appointment, a certificate will be issued indicating that the resident or fellow has satisfactorily completed the residency or fellowship program. A Final Evaluation Form (see Section 2.2), must be completed for residents and a final letter must be completed for fellows prior to issuance of the terminal certificate. Each Program should assure that their residents are familiar with the appropriate Board Requirements, and provide them a written policy consistent with their RRC Program Requirements regarding the effects of educational delay and leave on satisfying the criteria for completion of the Residency Program.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM



**Accreditation Council for
Graduate Medical Education**

# ACGME
# Common Program Requirements

ACGME approved revisions to Sections I-V: effective 2007, 2013, 2015, 2016
ACGME approved major revision of Section VI: February, 2017; effective: July 1, 2017



**EXHIBIT**

3

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

Common Program Requirements

Note: The term "resident" in this document refers to both specialty residents and subspecialty fellows. Once the Common Program Requirements are inserted into each set of specialty and subspecialty requirements, the terms "resident" and "fellow" will be used respectively.

Where applicable, text in italics describes the underlying philosophy of the requirements in that section. These philosophic statements are not program requirements and are therefore not citable.

Introduction

Int.A.    Residency is an essential dimension of the transformation of the medical student to the independent practitioner along the continuum of medical education. It is physically, emotionally, and intellectually demanding, and requires longitudinally-concentrated effort on the part of the resident.

The specialty education of physicians to practice independently is experiential, and necessarily occurs within the context of the health care delivery system. Developing the skills, knowledge, and attitudes leading to proficiency in all the domains of clinical competency requires the resident physician to assume personal responsibility for the care of individual patients. For the resident, the essential learning activity is interaction with patients under the guidance and supervision of faculty members who give value, context, and meaning to those interactions. As residents gain experience and demonstrate growth in their ability to care for patients, they assume roles that permit them to exercise those skills with greater independence. This concept--graded and progressive responsibility--is one of the core tenets of American graduate medical education. Supervision in the setting of graduate medical education has the goals of assuring the provision of safe and effective care to the individual patient; assuring each resident's development of the skills, knowledge, and attitudes required to enter the unsupervised practice of medicine; and establishing a foundation for continued professional growth.

I.    Institutions

I.A.    Sponsoring Institution

One sponsoring institution must assume ultimate responsibility for the program, as described in the Institutional Requirements, and this responsibility extends to resident assignments at all participating sites. (Core)*

The sponsoring institution and the program must ensure that the program director has sufficient protected time and financial support for his or her educational and administrative responsibilities to the program. (Core)

I.B.    Participating Sites

I.B.1.    There must be a program letter of agreement (PLA) between the program and each participating site providing a required assignment. The PLA must be renewed at least every five years. (Core)

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

The PLA should:

I.B.1.a)    identify the faculty who will assume both educational and supervisory responsibilities for residents; [Detail]

I.B.1.b)    specify their responsibilities for teaching, supervision, and formal evaluation of residents, as specified later in this document; [Detail]

I.B.1.c)    specify the duration and content of the educational experience; and, [Detail]

I.B.1.d)    state the policies and procedures that will govern resident education during the assignment. [Detail]

I.B.2.    The program director must submit any additions or deletions of participating sites routinely providing an educational experience, required for all residents, of one month full time equivalent (FTE) or more through the Accreditation Council for Graduate Medical Education (ACGME) Accreditation Data System (ADS). [Core]

[As further specified by the Review Committee]

II.    Program Personnel and Resources

II.A.    Program Director

II.A.1.    There must be a single program director with authority and accountability for the operation of the program. The sponsoring institution's GMEC must approve a change in program director. [Core]

II.A.1.a)    The program director must submit this change to the ACGME via the ADS. [Core]

[As further specified by the Review Committee]

II.A.2.    The program director should continue in his or her position for a length of time adequate to maintain continuity of leadership and program stability. [Detail]

II.A.3.    Qualifications of the program director must include:

II.A.3.a)    requisite specialty expertise and documented educational and administrative experience acceptable to the Review Committee; [Core]

II.A.3.b)    current certification in the specialty by the American Board of _____, or specialty qualifications that are acceptable to the Review Committee; and, [Core]

II.A.3.c)    current medical licensure and appropriate medical staff appointment. [Core]

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

[As further specified by the Review Committee]

II.A.4.          The program director must administer and maintain an educational environment conducive to educating the residents in each of the ACGME competency areas. (Core)

The program director must:

II.A.4.a)          oversee and ensure the quality of didactic and clinical education in all sites that participate in the program; (Core)

II.A.4.b)          approve a local director at each participating site who is accountable for resident education; (Core)

II.A.4.c)          approve the selection of program faculty as appropriate; (Core)

II.A.4.d)          evaluate program faculty; (Core)

II.A.4.e)          approve the continued participation of program faculty based on evaluation; (Core)

II.A.4.f)          monitor resident supervision at all participating sites; (Core)

II.A.4.g)          prepare and submit all information required and requested by the ACGME. (Core)

II.A.4.g).(1)          This includes but is not limited to the program application forms and annual program updates to the ADS, and ensure that the information submitted is accurate and complete. (Core)

II.A.4.h)          ensure compliance with grievance and due process procedures as set forth in the Institutional Requirements and implemented by the sponsoring institution; (Detail)

II.A.4.i)          provide verification of residency education for all residents, including those who leave the program prior to completion; (Detail)

II.A.4.j)          implement policies and procedures consistent with the institutional and program requirements for resident duty hours and the working environment, including moonlighting, (Core)

and, to that end, must:

II.A.4.j).(1)          distribute these policies and procedures to the residents and faculty; (Detail)

II.A.4.j).(2)          monitor resident duty hours, according to sponsoring institutional policies, with a frequency sufficient to ensure compliance with ACGME requirements; (Core)

II.A.4.j).(3)          adjust schedules as necessary to mitigate excessive

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

|  | service demands and/or fatigue; and, [Detail] |
|---|---|
| II.A.4.j).(4) | if applicable, monitor the demands of at-home call and adjust schedules as necessary to mitigate excessive service demands and/or fatigue. [Detail] |
| II.A.4.k) | monitor the need for and ensure the provision of back up support systems when patient care responsibilities are unusually difficult or prolonged; [Detail] |
| II.A.4.l) | comply with the sponsoring institution's written policies and procedures, including those specified in the Institutional Requirements, for selection, evaluation and promotion of residents, disciplinary action, and supervision of residents; [Detail] |
| II.A.4.m) | be familiar with and comply with ACGME and Review Committee policies and procedures as outlined in the ACGME Manual of Policies and Procedures; [Detail] |
| II.A.4.n) | obtain review and approval of the sponsoring institution's GMEC/DIO before submitting information or requests to the ACGME, including: [Core] |
| II.A.4.n).(1) | all applications for ACGME accreditation of new programs; [Detail] |
| II.A.4.n).(2) | changes in resident complement; [Detail] |
| II.A.4.n).(3) | major changes in program structure or length of training; [Detail] |
| II.A.4.n).(4) | progress reports requested by the Review Committee; [Detail] |
| II.A.4.n).(5) | requests for increases or any change to resident duty hours; [Detail] |
| II.A.4.n).(6) | voluntary withdrawals of ACGME-accredited programs; [Detail] |
| II.A.4.n).(7) | requests for appeal of an adverse action; and, [Detail] |
| II.A.4.n).(8) | appeal presentations to a Board of Appeal or the ACGME. [Detail] |
| II.A.4.o) | obtain DIO review and co-signature on all program application forms, as well as any correspondence or document submitted to the ACGME that addresses: [Detail] |
| II.A.4.o).(1) | program citations, and/or, [Detail] |
| II.A.4.o).(2) | request for changes in the program that would have |

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

significant impact, including financial, on the program or institution. (Detail)

[As further specified by the Review Committee]

II.B.        Faculty

II.B.1.      At each participating site, there must be a sufficient number of faculty with documented qualifications to instruct and supervise all residents at that location. (Core)

The faculty must:

II.B.1.a)    devote sufficient time to the educational program to fulfill their supervisory and teaching responsibilities; and to demonstrate a strong interest in the education of residents; and, (Core)

II.B.1.b)    administer and maintain an educational environment conducive to educating residents in each of the ACGME competency areas. (Core)

II.B.2.      The physician faculty must have current certification in the specialty by the American Board of _____, or possess qualifications judged acceptable to the Review Committee. (Core)

[As further specified by the Review Committee]

II.B.3.      The physician faculty must possess current medical licensure and appropriate medical staff appointment. (Core)

II.B.4.      The nonphysician faculty must have appropriate qualifications in their field and hold appropriate institutional appointments. (Core)

II.B.5.      The faculty must establish and maintain an environment of inquiry and scholarship with an active research component. (Core)

II.B.5.a)    The faculty must regularly participate in organized clinical discussions, rounds, journal clubs, and conferences. (Detail)

II.B.5.b)    Some members of the faculty should also demonstrate scholarship by one or more of the following:

II.B.5.b).(1)    peer-reviewed funding; (Detail)

II.B.5.b).(2)    publication of original research or review articles in peer reviewed journals, or chapters in textbooks; (Detail)

II.B.5.b).(3)    publication or presentation of case reports or clinical series at local, regional, or national professional and scientific society meetings; or, (Detail)

II.B.5.b).(4)    participation in national committees or educational

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

organizations. (Detail)

II.B.5.c)     Faculty should encourage and support residents in scholarly activities. (Core)

[As further specified by the Review Committee]

II.C.     Other Program Personnel

The institution and the program must jointly ensure the availability of all necessary professional, technical, and clerical personnel for the effective administration of the program. (Core)

[As further specified by the Review Committee]

II.D.     Resources

The institution and the program must jointly ensure the availability of adequate resources for resident education, as defined in the specialty program requirements. (Core)

[As further specified by the Review Committee]

II.E.     Medical Information Access

Residents must have ready access to specialty-specific and other appropriate reference material in print or electronic format. Electronic medical literature databases with search capabilities should be available. (Detail)

III.     Resident Appointments

III.A.     Eligibility Criteria

The program director must comply with the criteria for resident eligibility as specified in the Institutional Requirements. (Core)

III.A.1.     Eligibility Requirements – Residency Programs

III.A.1.a)     All prerequisite post-graduate clinical education required for initial entry or transfer into ACGME-accredited residency programs must be completed in ACGME-accredited residency programs, or in Royal College of Physicians and Surgeons of Canada (RCPSC)-accredited or College of Family Physicians of Canada (CFPC)-accredited residency programs located in Canada. Residency programs must receive verification of each applicant's level of competency in the required clinical field using ACGME or CanMEDS Milestones assessments from the prior training program. (Core)

III.A.1.b)     A physician who has completed a residency program that was not accredited by ACGME, RCPSC, or CFPC may enter an ACGME-accredited residency program in the same specialty at the PGY-1

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

level and, at the discretion of the program director at the ACGME-accredited program may be advanced to the PGY-2 level based on ACGME Milestones assessments at the ACGME-accredited program. This provision applies only to entry into residency in those specialties for which an initial clinical year is not required for entry. (Core)

III.A.1.c)   A Review Committee may grant the exception to the eligibility requirements specified in Section III.A.2.b) for residency programs that require completion of a prerequisite residency program prior to admission. (Core)

III.A.1.d)   Review Committees will grant no other exceptions to these eligibility requirements for residency education. (Core)

III.A.2.   Eligibility Requirements – Fellowship Programs

All required clinical education for entry into ACGME-accredited fellowship programs must be completed in an ACGME-accredited residency program, or in an RCPSC-accredited or CFPC- accredited residency program located in Canada. (Core)

III.A.2.a)   Fellowship programs must receive verification of each entering fellow's level of competency in the required field using ACGME or CanMEDS Milestones assessments from the core residency program. (Core)

III.A.2.b)   Fellow Eligibility Exception

A Review Committee may grant the following exception to the fellowship eligibility requirements:

An ACGME-accredited fellowship program may accept an exceptionally qualified applicant**, who does not satisfy the eligibility requirements listed in Sections III.A.2. and III.A.2.a), but who does meet all of the following additional qualifications and conditions: (Core)

III.A.2.b).(1)   Assessment by the program director and fellowship selection committee of the applicant's suitability to enter the program, based on prior training and review of the summative evaluations of training in the core specialty; and (Core)

III.A.2.b).(2)   Review and approval of the applicant's exceptional qualifications by the GMEC or a subcommittee of the GMEC; and (Core)

III.A.2.b).(3)   Satisfactory completion of the United States Medical Licensing Examination (USMLE) Steps 1, 2, and, if the applicant is eligible, 3, and; (Core)

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

| III.A.2.b).(4) | For an international graduate, verification of Educational Commission for Foreign Medical Graduates (ECFMG) certification; and, (Core) |
|---|---|
| III.A.2.b).(5) | Applicants accepted by this exception must complete fellowship Milestones evaluation (for the purposes of establishment of baseline performance by the Clinical Competency Committee), conducted by the receiving fellowship program within six weeks of matriculation. This evaluation may be waived for an applicant who has completed an ACGME International-accredited residency based on the applicant's Milestones evaluation conducted at the conclusion of the residency program. (Core) |
| III.A.2.b).(5).(a) | If the trainee does not meet the expected level of Milestones competency following entry into the fellowship program, the trainee must undergo a period of remediation, overseen by the Clinical Competency Committee and monitored by the GMEC or a subcommittee of the GMEC. This period of remediation must not count toward time in fellowship training. (Core) |

** An exceptionally qualified applicant has (1) completed a non-ACGME-accredited residency program in the core specialty, and (2) demonstrated clinical excellence, in comparison to peers, throughout training. Additional evidence of exceptional qualifications is required, which may include one of the following: (a) participation in additional clinical or research training in the specialty or subspecialty; (b) demonstrated scholarship in the specialty or subspecialty; (c) demonstrated leadership during or after residency training; (d) completion of an ACGME-International-accredited residency program.

[Each Review Committee will decide no later than December 31, 2013 whether the exception specified above will be permitted. If the Review Committee will not allow this exception, the program requirements will include the following statement]:

III.A.2.c) The Review Committee for _____ does not allow exceptions to the Eligibility Requirements for Fellowship Programs in Section III.A.2. (Core)

| III.B. | Number of Residents |
|---|---|
| | The program's educational resources must be adequate to support the number of residents appointed to the program. (Core) |
| III.B.1. | The program director may not appoint more residents than approved by the Review Committee, unless otherwise stated in the specialty-specific requirements. (Core) |
| | [As further specified by the Review Committee] |

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

| III.C. | Resident Transfers |
|---|---|
| III.C.1. | Before accepting a resident who is transferring from another program, the program director must obtain written or electronic verification of previous educational experiences and a summative competency-based performance evaluation of the transferring resident. (Detail) |
| III.C.2. | A program director must provide timely verification of residency education and summative performance evaluations for residents who may leave the program prior to completion. (Detail) |
| III.D. | Appointment of Fellows and Other Learners |
| | The presence of other learners (including, but not limited to, residents from other specialties, subspecialty fellows, PhD students, and nurse practitioners) in the program must not interfere with the appointed residents' education. (Core) |
| III.D.1. | The program director must report the presence of other learners to the DIO and GMEC in accordance with sponsoring institution guidelines. (Detail) |
| | [As further specified by the Review Committee] |

| IV. | Educational Program |
|---|---|
| IV.A. | The curriculum must contain the following educational components: |
| IV.A.1. | Overall educational goals for the program, which the program must make available to residents and faculty; (Core) |
| IV.A.2. | Competency-based goals and objectives for each assignment at each educational level, which the program must distribute to residents and faculty at least annually, in either written or electronic form; (Core) |
| IV.A.3. | Regularly scheduled didactic sessions; (Core) |
| IV.A.4. | Delineation of resident responsibilities for patient care, progressive responsibility for patient management, and supervision of residents over the continuum of the program; and, (Core) |
| IV.A.5. | ACGME Competencies |
| | The program must integrate the following ACGME competencies into the curriculum: (Core) |
| IV.A.5.a) | Patient Care and Procedural Skills |
| IV.A.5.a).(1) | Residents must be able to provide patient care that is compassionate, appropriate, and effective for the treatment of health problems and the promotion of health. Residents: (Outcome) |
| | [As further specified by the Review Committee] |

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

| | |
|---|---|
| IV.A.5.a).(2) | Residents must be able to competently perform all medical, diagnostic, and surgical procedures considered essential for the area of practice. Residents: (Outcome) |
| | [As further specified by the Review Committee] |
| IV.A.5.b) | Medical Knowledge |
| | Residents must demonstrate knowledge of established and evolving biomedical, clinical, epidemiological and social-behavioral sciences, as well as the application of this knowledge to patient care. Residents: (Outcome) |
| | [As further specified by the Review Committee] |
| IV.A.5.c) | Practice-based Learning and Improvement |
| | Residents must demonstrate the ability to investigate and evaluate their care of patients, to appraise and assimilate scientific evidence, and to continuously improve patient care based on constant self-evaluation and life-long learning. (Outcome) |
| | Residents are expected to develop skills and habits to be able to meet the following goals: |
| IV.A.5.c).(1) | identify strengths, deficiencies, and limits in one's knowledge and expertise; (Outcome) |
| IV.A.5.c).(2) | set learning and improvement goals; (Outcome) |
| IV.A.5.c).(3) | identify and perform appropriate learning activities; (Outcome) |
| IV.A.5.c).(4) | systematically analyze practice using quality improvement methods, and implement changes with the goal of practice improvement; (Outcome) |
| IV.A.5.c).(5) | incorporate formative evaluation feedback into daily practice; (Outcome) |
| IV.A.5.c).(6) | locate, appraise, and assimilate evidence from scientific studies related to their patients' health problems; (Outcome) |
| IV.A.5.c).(7) | use information technology to optimize learning; and, (Outcome) |
| IV.A.5.c).(8) | participate in the education of patients, families, students, residents and other health professionals. (Outcome) |
| | [As further specified by the Review Committee] |
| IV.A.5.d) | Interpersonal and Communication Skills |

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

Residents must demonstrate interpersonal and communication skills that result in the effective exchange of information and collaboration with patients, their families, and health professionals. (Outcome)

Residents are expected to:

IV.A.5.d).(1)          communicate effectively with patients, families, and the public, as appropriate, across a broad range of socioeconomic and cultural backgrounds; (Outcome)

IV.A.5.d).(2)          communicate effectively with physicians, other health professionals, and health related agencies; (Outcome)

IV.A.5.d).(3)          work effectively as a member or leader of a health care team or other professional group; (Outcome)

IV.A.5.d).(4)          act in a consultative role to other physicians and health professionals; and, (Outcome)

IV.A.5.d).(5)          maintain comprehensive, timely, and legible medical records, if applicable. (Outcome)

[As further specified by the Review Committee]

IV.A.5.e)          Professionalism

Residents must demonstrate a commitment to carrying out professional responsibilities and an adherence to ethical principles. (Outcome)

Residents are expected to demonstrate:

IV.A.5.e).(1)          compassion, integrity, and respect for others; (Outcome)

IV.A.5.e).(2)          responsiveness to patient needs that supersedes self-interest; (Outcome)

IV.A.5.e).(3)          respect for patient privacy and autonomy; (Outcome)

IV.A.5.e).(4)          accountability to patients, society and the profession; and, (Outcome)

IV.A.5.e).(5)          sensitivity and responsiveness to a diverse patient population, including but not limited to diversity in gender, age, culture, race, religion, disabilities, and sexual orientation. (Outcome)

[As further specified by the Review Committee]

IV.A.5.f)          Systems-based Practice

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

Residents must demonstrate an awareness of and responsiveness to the larger context and system of health care, as well as the ability to call effectively on other resources in the system to provide optimal health care. (Outcome)

Residents are expected to:

IV.A.5.f).(1)  work effectively in various health care delivery settings and systems relevant to their clinical specialty; (Outcome)

IV.A.5.f).(2)  coordinate patient care within the health care system relevant to their clinical specialty; (Outcome)

IV.A.5.f).(3)  incorporate considerations of cost awareness and risk-benefit analysis in patient and/or population-based care as appropriate; (Outcome)

IV.A.5.f).(4)  advocate for quality patient care and optimal patient care systems; (Outcome)

IV.A.5.f).(5)  work in interprofessional teams to enhance patient safety and improve patient care quality; and, (Outcome)

IV.A.5.f).(6)  participate in identifying system errors and implementing potential systems solutions. (Outcome)

[As further specified by the Review Committee]

IV.B.  Residents' Scholarly Activities

IV.B.1.  The curriculum must advance residents' knowledge of the basic principles of research, including how research is conducted, evaluated, explained to patients, and applied to patient care. (Core)

IV.B.2.  Residents should participate in scholarly activity. (Core)

[As further specified by the Review Committee]

IV.B.3.  The sponsoring institution and program should allocate adequate educational resources to facilitate resident involvement in scholarly activities. (Detail)

[As further specified by the Review Committee]

V.  Evaluation

V.A.  Resident Evaluation

V.A.1.  The program director must appoint the Clinical Competency Committee. (Core)

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

| | |
|---|---|
| V.A.1.a) | At a minimum the Clinical Competency Committee must be composed of three members of the program faculty. (Core) |
| V.A.1.a).(1) | The program director may appoint additional members of the Clinical Competency Committee. |
| V.A.1.a).(1).(a) | These additional members must be physician faculty members from the same program or other programs, or other health professionals who have extensive contact and experience with the program's residents in patient care and other health care settings. (Core) |
| V.A.1.a).(1).(b) | Chief residents who have completed core residency programs in their specialty and are eligible for specialty board certification may be members of the Clinical Competency Committee. (Core) |
| V.A.1.b) | There must be a written description of the responsibilities of the Clinical Competency Committee. (Core) |
| V.A.1.b).(1) | The Clinical Competency Committee should: |
| V.A.1.b).(1).(a) | review all resident evaluations semi-annually; (Core) |
| V.A.1.b).(1).(b) | prepare and ensure the reporting of Milestones evaluations of each resident semi-annually to ACGME; and, (Core) |
| V.A.1.b).(1).(c) | advise the program director regarding resident progress, including promotion, remediation, and dismissal. (Detail) |
| V.A.2. | Formative Evaluation |
| V.A.2.a) | The faculty must evaluate resident performance in a timely manner during each rotation or similar educational assignment, and document this evaluation at completion of the assignment. (Core) |
| V.A.2.b) | The program must: |
| V.A.2.b).(1) | provide objective assessments of competence in patient care and procedural skills, medical knowledge, practice-based learning and improvement, interpersonal and communication skills, professionalism, and systems-based practice based on the specialty-specific Milestones; (Core) |
| V.A.2.b).(2) | use multiple evaluators (e.g., faculty, peers, patients, self, and other professional staff); (Detail) |
| V.A.2.b).(3) | document progressive resident performance improvement |

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

|  | appropriate to educational level; and, (Core) |
|---|---|
| V.A.2.b).(4) | provide each resident with documented semiannual evaluation of performance with feedback. (Core) |
| V.A.2.c) | The evaluations of resident performance must be accessible for review by the resident, in accordance with institutional policy. (Detail) |
| V.A.3. | Summative Evaluation |
| V.A.3.a) | The specialty-specific Milestones must be used as one of the tools to ensure residents are able to practice core professional activities without supervision upon completion of the program. (Core) |
| V.A.3.b) | The program director must provide a summative evaluation for each resident upon completion of the program. (Core) |
|  | This evaluation must: |
| V.A.3.b).(1) | become part of the resident's permanent record maintained by the institution, and must be accessible for review by the resident in accordance with institutional policy; (Detail) |
| V.A.3.b).(2) | document the resident's performance during the final period of education; and, (Detail) |
| V.A.3.b).(3) | verify that the resident has demonstrated sufficient competence to enter practice without direct supervision. (Detail) |
| V.B. | Faculty Evaluation |
| V.B.1. | At least annually, the program must evaluate faculty performance as it relates to the educational program. (Core) |
| V.B.2. | These evaluations should include a review of the faculty's clinical teaching abilities, commitment to the educational program, clinical knowledge, professionalism, and scholarly activities. (Detail) |
| V.B.3. | This evaluation must include at least annual written confidential evaluations by the residents. (Detail) |
| V.C. | Program Evaluation and Improvement |
| V.C.1. | The program director must appoint the Program Evaluation Committee (PEC). (Core) |
| V.C.1.a) | The Program Evaluation Committee: |
| V.C.1.a).(1) | must be composed of at least two program faculty members and should include at least one resident; (Core) |

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

| V.C.1.a).(2) | must have a written description of its responsibilities; and, (Core) |
|---|---|
| V.C.1.a).(3) | should participate actively in: |
| V.C.1.a).(3).(a) | planning, developing, implementing, and evaluating educational activities of the program; (Detail) |
| V.C.1.a).(3).(b) | reviewing and making recommendations for revision of competency-based curriculum goals and objectives; (Detail) |
| V.C.1.a).(3).(c) | addressing areas of non-compliance with ACGME standards; and, (Detail) |
| V.C.1.a).(3).(d) | reviewing the program annually using evaluations of faculty, residents, and others, as specified below. (Detail) |
| V.C.2. | The program, through the PEC, must document formal, systematic evaluation of the curriculum at least annually, and is responsible for rendering a written, annual program evaluation. (Core) |
| | The program must monitor and track each of the following areas: |
| V.C.2.a) | resident performance; (Core) |
| V.C.2.b) | faculty development; (Core) |
| V.C.2.c) | graduate performance, including performance of program graduates on the certification examination; (Core) |
| V.C.2.d) | program quality; and, (Core) |
| V.C.2.d).(1) | Residents and faculty must have the opportunity to evaluate the program confidentially and in writing at least annually, and (Detail) |
| V.C.2.d).(2) | The program must use the results of residents' and faculty members' assessments of the program together with other program evaluation results to improve the program. (Detail) |
| V.C.2.e) | progress on the previous year's action plan(s). (Core) |
| V.C.3. | The PEC must prepare a written plan of action to document initiatives to improve performance in one or more of the areas listed in section V.C.2., as well as delineate how they will be measured and monitored. (Core) |
| V.C.3.a) | The action plan should be reviewed and approved by the teaching faculty and documented in meeting minutes. (Detail) |

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

VI.     The Learning and Working Environment

*Residency education must occur in the context of a learning and working environment that emphasizes the following principles:*

- *Excellence in the safety and quality of care rendered to patients by residents today*

- *Excellence in the safety and quality of care rendered to patients by today's residents in their future practice*

- *Excellence in professionalism through faculty modeling of:*

  o *the effacement of self-interest in a humanistic environment that supports the professional development of physicians*

  o *the joy of curiosity, problem-solving, intellectual rigor, and discovery*

- *Commitment to the well-being of the students, residents, faculty members, and all members of the health care team*

VI.A.       Patient Safety, Quality Improvement, Supervision, and Accountability

VI.A.1.          Patient Safety and Quality Improvement

*All physicians share responsibility for promoting patient safety and enhancing quality of patient care. Graduate medical education must prepare residents to provide the highest level of clinical care with continuous focus on the safety, individual needs, and humanity of their patients. It is the right of each patient to be cared for by residents who are appropriately supervised; possess the requisite knowledge, skills, and abilities; understand the limits of their knowledge and experience; and seek assistance as required to provide optimal patient care.*

*Residents must demonstrate the ability to analyze the care they provide, understand their roles within health care teams, and play an active role in system improvement processes. Graduating residents will apply these skills to critique their future unsupervised practice and effect quality improvement measures.*

*It is necessary for residents and faculty members to consistently work in a well-coordinated manner with other health care professionals to achieve organizational patient safety goals.*

VI.A.1.a)          Patient Safety

VI.A.1.a).(1)          Culture of Safety

*A culture of safety requires continuous identification of vulnerabilities and a willingness to transparently deal with them. An effective organization has formal mechanisms to assess the knowledge, skills, and attitudes of its personnel toward safety in order to identify areas for improvement.*

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

VI.A.1.a).(1).(a)     The program, its faculty, residents, and fellows must actively participate in patient safety systems and contribute to a culture of safety. (Core)

VI.A.1.a).(1).(b)     The program must have a structure that promotes safe, interprofessional, team-based care. (Core)

VI.A.1.a).(2)     Education on Patient Safety

Programs must provide formal educational activities that promote patient safety-related goals, tools, and techniques. (Core)

VI.A.1.a).(3)     Patient Safety Events

*Reporting, investigation, and follow-up of adverse events, near misses, and unsafe conditions are pivotal mechanisms for improving patient safety, and are essential for the success of any patient safety program. Feedback and experiential learning are essential to developing true competence in the ability to identify causes and institute sustainable systems-based changes to ameliorate patient safety vulnerabilities.*

VI.A.1.a).(3).(a)     Residents, fellows, faculty members, and other clinical staff members must:

VI.A.1.a).(3).(a).(i)     know their responsibilities in reporting patient safety events at the clinical site; (Core)

VI.A.1.a).(3).(a).(ii)     know how to report patient safety events, including near misses, at the clinical site; and, (Core)

VI.A.1.a).(3).(a).(iii)     be provided with summary information of their institution's patient safety reports. (Core)

VI.A.1.a).(3).(b)     Residents must participate as team members in real and/or simulated interprofessional clinical patient safety activities, such as root cause analyses or other activities that include analysis, as well as formulation and implementation of actions. (Core)

VI.A.1.a).(4)     Resident Education and Experience in Disclosure of Adverse Events

*Patient-centered care requires patients, and when appropriate families, to be apprised of clinical situations that affect them, including adverse events. This is an important skill for faculty physicians to model, and for*

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

*residents to develop and apply.*

| | |
|---|---|
| VI.A.1.a).(4).(a) | All residents must receive training in how to disclose adverse events to patients and families. (Core) |
| VI.A.1.a).(4).(b) | Residents should have the opportunity to participate in the disclosure of patient safety events, real or simulated. (Detail) |
| VI.A.1.b) | Quality Improvement |
| VI.A.1.b).(1) | Education in Quality Improvement |

*A cohesive model of health care includes quality-related goals, tools, and techniques that are necessary in order for health care professionals to achieve quality improvement goals.*

| | |
|---|---|
| VI.A.1.b).(1).(a) | Residents must receive training and experience in quality improvement processes, including an understanding of health care disparities. (Core) |
| VI.A.1.b).(2) | Quality Metrics |

*Access to data is essential to prioritizing activities for care improvement and evaluating success of improvement efforts.*

| | |
|---|---|
| VI.A.1.b).(2).(a) | Residents and faculty members must receive data on quality metrics and benchmarks related to their patient populations. (Core) |
| VI.A.1.b).(3) | Engagement in Quality Improvement Activities |

*Experiential learning is essential to developing the ability to identify and institute sustainable systems-based changes to improve patient care.*

| | |
|---|---|
| VI.A.1.b).(3).(a) | Residents must have the opportunity to participate in interprofessional quality improvement activities. (Core) |
| VI.A.1.b).(3).(a).(i) | This should include activities aimed at reducing health care disparities. (Detail) |
| VI.A.2. | Supervision and Accountability |
| *VI.A.2.a)* | *Although the attending physician is ultimately responsible for the care of the patient, every physician shares in the responsibility and accountability for their efforts in the provision of care. Effective programs, in partnership with their Sponsoring* |

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

*Institutions, define, widely communicate, and monitor a structured chain of responsibility and accountability as it relates to the supervision of all patient care.*

*Supervision in the setting of graduate medical education provides safe and effective care to patients; ensures each resident's development of the skills, knowledge, and attitudes required to enter the unsupervised practice of medicine; and establishes a foundation for continued professional growth.*

VI.A.2.a).(1)     Each patient must have an identifiable and appropriately-credentialed and privileged attending physician (or licensed independent practitioner as specified by the applicable Review Committee) who is responsible and accountable for the patient's care. (Core)

VI.A.2.a).(1).(a)     This information must be available to residents, faculty members, other members of the health care team, and patients. (Core)

VI.A.2.a).(1).(b)     Residents and faculty members must inform each patient of their respective roles in that patient's care when providing direct patient care. (Core)

VI.A.2.b)     *Supervision may be exercised through a variety of methods. For many aspects of patient care, the supervising physician may be a more advanced resident or fellow. Other portions of care provided by the resident can be adequately supervised by the immediate availability of the supervising faculty member, fellow, or senior resident physician, either on site or by means of telephonic and/or electronic modalities. Some activities require the physical presence of the supervising faculty member. In some circumstances, supervision may include post-hoc review of resident-delivered care with feedback.*

VI.A.2.b).(1)     The program must demonstrate that the appropriate level of supervision in place for all residents is based on each resident's level of training and ability, as well as patient complexity and acuity. Supervision may be exercised through a variety of methods, as appropriate to the situation. (Core)

    [The Review Committee may specify which activities require different levels of supervision.]

VI.A.2.c)     Levels of Supervision

    To promote oversight of resident supervision while providing for graded authority and responsibility, the program must use the following classification of supervision: (Core)

VI.A.2.c).(1)     Direct Supervision – the supervising physician is physically

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

present with the resident and patient. (Core)

| | |
|---|---|
| VI.A.2.c).(2) | Indirect Supervision: |
| VI.A.2.c).(2).(a) | with Direct Supervision immediately available – the supervising physician is physically within the hospital or other site of patient care, and is immediately available to provide Direct Supervision. (Core) |
| VI.A.2.c).(2).(b) | with Direct Supervision available – the supervising physician is not physically present within the hospital or other site of patient care, but is immediately available by means of telephonic and/or electronic modalities, and is available to provide Direct Supervision. (Core) |
| VI.A.2.c).(3) | Oversight – the supervising physician is available to provide review of procedures/encounters with feedback provided after care is delivered. (Core) |
| VI.A.2.d) | The privilege of progressive authority and responsibility, conditional independence, and a supervisory role in patient care delegated to each resident must be assigned by the program director and faculty members. (Core) |
| VI.A.2.d).(1) | The program director must evaluate each resident's abilities based on specific criteria, guided by the Milestones. (Core) |
| VI.A.2.d).(2) | Faculty members functioning as supervising physicians must delegate portions of care to residents based on the needs of the patient and the skills of each resident. (Core) |
| VI.A.2.d).(3) | Senior residents or fellows should serve in a supervisory role to junior residents in recognition of their progress toward independence, based on the needs of each patient and the skills of the individual resident or fellow. (Detail) |
| VI.A.2.e) | Programs must set guidelines for circumstances and events in which residents must communicate with the supervising faculty member(s). (Core) |
| VI.A.2.e).(1) | Each resident must know the limits of their scope of authority, and the circumstances under which the resident is permitted to act with conditional independence. (Outcome) |
| VI.A.2.e).(1).(a) | Initially, PGY-1 residents must be supervised either directly, or indirectly with direct supervision immediately available. [Each Review Committee may describe the conditions and the achieved competencies under which PGY-1 residents |

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

|           | progress to be supervised indirectly with direct supervision available.] (Core) |
|-----------|-----------------|
| VI.A.2.f) | Faculty supervision assignments must be of sufficient duration to assess the knowledge and skills of each resident and to delegate to the resident the appropriate level of patient care authority and responsibility. (Core) |
| VI.B.     | Professionalism |
| VI.B.1.   | Programs, in partnership with their Sponsoring Institutions, must educate residents and faculty members concerning the professional responsibilities of physicians, including their obligation to be appropriately rested and fit to provide the care required by their patients. (Core) |
| VI.B.2.   | The learning objectives of the program must: |
| VI.B.2.a) | be accomplished through an appropriate blend of supervised patient care responsibilities, clinical teaching, and didactic educational events; (Core) |
| VI.B.2.b) | be accomplished without excessive reliance on residents to fulfill non-physician obligations; and, (Core) |
| VI.B.2.c) | ensure manageable patient care responsibilities. (Core) |
|           | [As further specified by the Review Committee] |
| VI.B.3.   | The program director, in partnership with the Sponsoring Institution, must provide a culture of professionalism that supports patient safety and personal responsibility. (Core) |
| VI.B.4.   | Residents and faculty members must demonstrate an understanding of their personal role in the: |
| VI.B.4.a) | provision of patient- and family-centered care; (Outcome) |
| VI.B.4.b) | safety and welfare of patients entrusted to their care, including the ability to report unsafe conditions and adverse events; (Outcome) |
| VI.B.4.c) | assurance of their fitness for work, including: (Outcome) |
| VI.B.4.c).(1) | management of their time before, during, and after clinical assignments; and, (Outcome) |
| VI.B.4.c).(2) | recognition of impairment, including from illness, fatigue, and substance use, in themselves, their peers, and other members of the health care team. (Outcome) |
| VI.B.4.d) | commitment to lifelong learning; (Outcome) |
| VI.B.4.e) | monitoring of their patient care performance improvement |

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

|       | indicators; and, (Outcome) |
|-------|---------------------------|

VI.B.4.f)    accurate reporting of clinical and educational work hours, patient outcomes, and clinical experience data. (Outcome)

VI.B.5.    All residents and faculty members must demonstrate responsiveness to patient needs that supersedes self-interest. This includes the recognition that under certain circumstances, the best interests of the patient may be served by transitioning that patient's care to another qualified and rested provider. (Outcome)

VI.B.6.    Programs must provide a professional, respectful, and civil environment that is free from mistreatment, abuse, or coercion of students, residents, faculty, and staff. Programs, in partnership with their Sponsoring Institutions, should have a process for education of residents and faculty regarding unprofessional behavior and a confidential process for reporting, investigating, and addressing such concerns. (Core)

VI.C.    Well-Being

*In the current health care environment, residents and faculty members are at increased risk for burnout and depression. Psychological, emotional, and physical well-being are critical in the development of the competent, caring, and resilient physician. Self-care is an important component of professionalism; it is also a skill that must be learned and nurtured in the context of other aspects of residency training. Programs, in partnership with their Sponsoring Institutions, have the same responsibility to address well-being as they do to evaluate other aspects of resident competence.*

VI.C.1.    This responsibility must include:

VI.C.1.a)    efforts to enhance the meaning that each resident finds in the experience of being a physician, including protecting time with patients, minimizing non-physician obligations, providing administrative support, promoting progressive autonomy and flexibility, and enhancing professional relationships; (Core)

VI.C.1.b)    attention to scheduling, work intensity, and work compression that impacts resident well-being; (Core)

VI.C.1.c)    evaluating workplace safety data and addressing the safety of residents and faculty members; (Core)

VI.C.1.d)    policies and programs that encourage optimal resident and faculty member well-being; and, (Core)

VI.C.1.d).(1)    Residents must be given the opportunity to attend medical, mental health, and dental care appointments, including those scheduled during their working hours. (Core)

VI.C.1.e)    attention to resident and faculty member burnout, depression, and substance abuse. The program, in partnership with its Sponsoring

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

Institution, must educate faculty members and residents in identification of the symptoms of burnout, depression, and substance abuse, including means to assist those who experience these conditions. Residents and faculty members must also be educated to recognize those symptoms in themselves and how to seek appropriate care. The program, in partnership with its Sponsoring Institution, must: (Core)

VI.C.1.e).(1)  encourage residents and faculty members to alert the program director or other designated personnel or programs when they are concerned that another resident, fellow, or faculty member may be displaying signs of burnout, depression, substance abuse, suicidal ideation, or potential for violence; (Core)

VI.C.1.e).(2)  provide access to appropriate tools for self-screening; and, (Core)

VI.C.1.e).(3)  provide access to confidential, affordable mental health assessment, counseling, and treatment, including access to urgent and emergent care 24 hours a day, seven days a week. (Core)

VI.C.2.  There are circumstances in which residents may be unable to attend work, including but not limited to fatigue, illness, and family emergencies. Each program must have policies and procedures in place that ensure coverage of patient care in the event that a resident may be unable to perform their patient care responsibilities. These policies must be implemented without fear of negative consequences for the resident who is unable to provide the clinical work. (Core)

VI.D.  Fatigue Mitigation

VI.D.1.  Programs must:

VI.D.1.a)  educate all faculty members and residents to recognize the signs of fatigue and sleep deprivation; (Core)

VI.D.1.b)  educate all faculty members and residents in alertness management and fatigue mitigation processes; and, (Core)

VI.D.1.c)  encourage residents to use fatigue mitigation processes to manage the potential negative effects of fatigue on patient care and learning. (Detail)

VI.D.2.  Each program must ensure continuity of patient care, consistent with the program's policies and procedures referenced in VI.C.2, in the event that a resident may be unable to perform their patient care responsibilities due to excessive fatigue. (Core)

VI.D.3.  The program, in partnership with its Sponsoring Institution, must ensure adequate sleep facilities and safe transportation options for residents who

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

may be too fatigued to safely return home. (Core)

| VI.E. | Clinical Responsibilities, Teamwork, and Transitions of Care |

VI.E.1.    Clinical Responsibilities

The clinical responsibilities for each resident must be based on PGY level, patient safety, resident ability, severity and complexity of patient illness/condition, and available support services. (Core)

[Optimal clinical workload may be further specified by each Review Committee.]

VI.E.2.    Teamwork

Residents must care for patients in an environment that maximizes communication. This must include the opportunity to work as a member of effective interprofessional teams that are appropriate to the delivery of care in the specialty and larger health system. (Core)

[Each Review Committee will define the elements that must be present in each specialty.]

VI.E.3.    Transitions of Care

VI.E.3.a)    Programs must design clinical assignments to optimize transitions in patient care, including their safety, frequency, and structure. (Core)

VI.E.3.b)    Programs, in partnership with their Sponsoring Institutions, must ensure and monitor effective, structured hand-over processes to facilitate both continuity of care and patient safety. (Core)

VI.E.3.c)    Programs must ensure that residents are competent in communicating with team members in the hand-over process. (Outcome)

VI.E.3.d)    Programs and clinical sites must maintain and communicate schedules of attending physicians and residents currently responsible for care. (Core)

VI.E.3.e)    Each program must ensure continuity of patient care, consistent with the program's policies and procedures referenced in VI.C.2, in the event that a resident may be unable to perform their patient care responsibilities due to excessive fatigue or illness, or family emergency. (Core)

VI.F.    Clinical Experience and Education

*Programs, in partnership with their Sponsoring Institutions, must design an effective program structure that is configured to provide residents with educational and clinical experience opportunities, as well as reasonable*

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

*opportunities for rest and personal activities.*

VI.F.1.     Maximum Hours of Clinical and Educational Work per Week

Clinical and educational work hours must be limited to no more than 80 hours per week, averaged over a four-week period, inclusive of all in-house clinical and educational activities, clinical work done from home, and all moonlighting. (Core)

VI.F.2.     Mandatory Time Free of Clinical Work and Education

VI.F.2.a)     The program must design an effective program structure that is configured to provide residents with educational opportunities, as well as reasonable opportunities for rest and personal well-being. (Core)

VI.F.2.b)     Residents should have eight hours off between scheduled clinical work and education periods. (Detail)

VI.F.2.b).(1)     There may be circumstances when residents choose to stay to care for their patients or return to the hospital with fewer than eight hours free of clinical experience and education. This must occur within the context of the 80-hour and the one-day-off-in-seven requirements. (Detail)

VI.F.2.c)     Residents must have at least 14 hours free of clinical work and education after 24 hours of in-house call. (Core)

VI.F.2.d)     Residents must be scheduled for a minimum of one day in seven free of clinical work and required education (when averaged over four weeks). At-home call cannot be assigned on these free days. (Core)

VI.F.3.     Maximum Clinical Work and Education Period Length

VI.F.3.a)     Clinical and educational work periods for residents must not exceed 24 hours of continuous scheduled clinical assignments. (Core)

VI.F.3.a).(1)     Up to four hours of additional time may be used for activities related to patient safety, such as providing effective transitions of care, and/or resident education. (Core)

VI.F.3.a).(1).(a)     Additional patient care responsibilities must not be assigned to a resident during this time. (Core)

VI.F.4.     Clinical and Educational Work Hour Exceptions

VI.F.4.a)     In rare circumstances, after handing off all other responsibilities, a resident, on their own initiative, may elect to remain or return to the clinical site in the following circumstances:

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

| | |
|---|---|
| VI.F.4.a).(1) | to continue to provide care to a single severely ill or unstable patient; (Detail) |
| VI.F.4.a).(2) | humanistic attention to the needs of a patient or family; or, (Detail) |
| VI.F.4.a).(3) | to attend unique educational events. (Detail) |
| VI.F.4.b) | These additional hours of care or education will be counted toward the 80-hour weekly limit. (Detail) |
| VI.F.4.c) | A Review Committee may grant rotation-specific exceptions for up to 10 percent or a maximum of 88 clinical and educational work hours to individual programs based on a sound educational rationale. |
| VI.F.4.c).(1) | In preparing a request for an exception, the program director must follow the clinical and educational work hour exception policy from the *ACGME Manual of Policies and Procedures*. (Core) |
| VI.F.4.c).(2) | Prior to submitting the request to the Review Committee, the program director must obtain approval from the Sponsoring Institution's GMEC and DIO. (Core) |
| VI.F.5. | Moonlighting |
| VI.F.5.a) | Moonlighting must not interfere with the ability of the resident to achieve the goals and objectives of the educational program, and must not interfere with the resident's fitness for work nor compromise patient safety. (Core) |
| VI.F.5.b) | Time spent by residents in internal and external moonlighting (as defined in the ACGME Glossary of Terms) must be counted toward the 80-hour maximum weekly limit. (Core) |
| VI.F.5.c) | PGY-1 residents are not permitted to moonlight. (Core) |
| VI.F.6. | In-House Night Float |
| | Night float must occur within the context of the 80-hour and one-day-off-in-seven requirements. (Core) |
| | [The maximum number of consecutive weeks of night float, and maximum number of months of night float per year may be further specified by the Review Committee.] |
| VI.F.7. | Maximum In-House On-Call Frequency |
| | Residents must be scheduled for in-house call no more frequently than every third night (when averaged over a four-week period). (Core) |

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

| VI.F.8. | At-Home Call |
|---|---|
| VI.F.8.a) | Time spent on patient care activities by residents on at-home call must count toward the 80-hour maximum weekly limit. The frequency of at-home call is not subject to the every-third-night limitation, but must satisfy the requirement for one day in seven free of clinical work and education, when averaged over four weeks. (Core) |
| VI.F.8.a).(1) | At-home call must not be so frequent or taxing as to preclude rest or reasonable personal time for each resident. (Core) |
| VI.F.8.b) | Residents are permitted to return to the hospital while on at-home call to provide direct care for new or established patients. These hours of inpatient patient care must be included in the 80-hour maximum weekly limit. (Detail) |

***

*Core Requirements: Statements that define structure, resource, or process elements essential to every graduate medical educational program.
Detail Requirements: Statements that describe a specific structure, resource, or process, for achieving compliance with a Core Requirement. Programs and sponsoring institutions in substantial compliance with the Outcome Requirements may utilize alternative or innovative approaches to meet Core Requirements.
Outcome Requirements: Statements that specify expected measurable or observable attributes (knowledge, abilities, skills, or attitudes) of residents or fellows at key stages of their graduate medical education.

**1922-CC12062**

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM



**Accreditation Council for
Graduate Medical Education**

# ACGME

# Institutional Requirements

ACGME approved: June 9, 2013; Effective: July 1, 2013 for new sponsoring institutions making new applications and July 1, 2014 for existing sponsoring institutions (including both multiple- and single- program sponsors)
ACGME approved focused revision: September 28, 2014; effective: July 1, 2015



EXHIBIT

4

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

**ACGME Institutional Requirements**

I.        Structure for Educational Oversight

I.A.            Sponsoring Institution

I.A.1.              Residency and fellowship programs accredited by the Accreditation Council for Graduate Medical Education (ACGME) must function under the ultimate authority and oversight of one Sponsoring Institution. Oversight of resident/fellow assignments and of the quality of the learning and working environment by the Sponsoring Institution extends to all participating sites. (Core)*

I.A.2.              The Sponsoring Institution must be in substantial compliance with the ACGME Institutional Requirements and must ensure that each of its ACGME-accredited programs is in substantial compliance with the ACGME Institutional, Common, and specialty/subspecialty-specific Program Requirements, as well as with ACGME Policies and Procedures. (Outcome)

I.A.3.              The Sponsoring Institution must maintain its ACGME institutional accreditation. Failure to do so will result in loss of accreditation for its ACGME-accredited program(s). (Outcome)

I.A.4.              The Sponsoring Institution and each of its ACGME-accredited programs must only assign residents/fellows to learning and working environments that facilitate patient safety and health care quality. (Outcome)

I.A.5.              The Sponsoring Institution must identify a:

I.A.5.a)              Designated Institutional Official (DIO): The individual who, in collaboration with a Graduate Medical Education Committee (GMEC), must have authority and responsibility for the oversight and administration of each of the Sponsoring Institution's ACGME-accredited programs, as well as for ensuring compliance with the ACGME Institutional, Common, and specialty/subspecialty-specific Program Requirements; and, (Core)

I.A.5.b)              Governing Body: The entity which maintains authority over the Sponsoring Institution and each of its ACGME-accredited programs. (Core)

I.A.6.              A written statement must document the Sponsoring Institution's commitment to GME by providing the necessary financial support for administrative, educational, and clinical resources, including personnel, and which must be reviewed, dated, and signed at least once every five years by the DIO, a representative of the Sponsoring Institution's senior administration, and a representative of the Governing Body. (Core)

I.A.7.              Any Sponsoring Institution or participating site that is a hospital must maintain accreditation to provide patient care. (Core)

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

| I.A.7.a) | Accreditation for patient care must be provided by: |
|---|---|
| I.A.7.a).(1) | the Joint Commission; or, (Core) |
| I.A.7.a).(2) | an entity granted "deeming authority" for participation in Medicare under federal regulations; or, (Core) |
| I.A.7.a).(3) | an entity certified as complying with the conditions of participation in Medicare under federal regulations. (Core) |
| I.A.8. | When a Sponsoring Institution or major participating site that is a hospital loses its accreditation for patient care, the Sponsoring Institution must notify and provide a plan for its response to the Institutional Review Committee (IRC) within 30 days of such loss. Based on the particular circumstances, the IRC may request the ACGME invoke its "Procedure for Alleged Egregious or Catastrophic Events" policy. (Core) |
| I.A.9. | When a Sponsoring Institution's or participating site's license is denied, suspended, or revoked, or when a Sponsoring Institution or participating site is required to curtail activities, or is otherwise restricted, the Sponsoring Institution must notify and provide a plan for its response to the IRC within 30 days of such loss or restriction. Based on the particular circumstances, the IRC may request that the ACGME invoke its "Procedure for Alleged Egregious or Catastrophic Events" policy. (Core) |
| I.B. | GMEC |
| I.B.1. | Membership |
| I.B.1.a) | A Sponsoring Institution with multiple ACGME-accredited programs must have a GMEC that includes at least the following voting members: (Core) |
| I.B.1.a).(1) | the DIO; (Core) |
| I.B.1.a).(2) | a representative sample of program directors (minimum of two) from its ACGME-accredited programs; (Core) |
| I.B.1.a).(3) | a minimum of two peer-selected residents/fellows from among its ACGME-accredited programs; and, (Core) |
| I.B.1.a).(4) | a quality improvement or patient safety officer or designee. (Core) |
| I.B.1.b) | A Sponsoring Institution with one program must have a GMEC that includes at least the following voting members: |
| I.B.1.b).(1) | the DIO; (Core) |
| I.B.1.b).(2) | the program director when the program director is not the |

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

DIO; (Core)

I.B.1.b).(3)  a minimum of two peer-selected residents/fellows from its ACGME-accredited program or the only resident/fellow if the program includes only one resident/fellow; (Core)

I.B.1.b).(4)  the individual or designee responsible for monitoring quality improvement or patient safety if this individual is not the DIO or program director; and, (Core)

I.B.1.b).(5)  one or more individuals from a different department than that of the program specialty (and other than the quality improvement or patient safety member), within or from outside the Sponsoring Institution, at least one of whom is actively involved in graduate medical education. (Core)

I.B.2.  Additional GMEC members and subcommittees: In order to carry out portions of the GMEC's responsibilities, additional GMEC membership may include others as determined by the GMEC. (Detail)

I.B.2.a)  Subcommittees that address required GMEC responsibilities must include a peer-selected resident/fellow. (Detail)

I.B.2.b)  Subcommittee actions that address required GMEC responsibilities must be reviewed and approved by the GMEC. (Detail)

I.B.3.  Meetings and Attendance: The GMEC must meet a minimum of once every quarter during each academic year. (Core)

I.B.3.a)  Each meeting of the GMEC must include attendance by at least one resident/fellow member. (Core)

I.B.3.b)  The GMEC must maintain meeting minutes that document execution of all required GMEC functions and responsibilities. (Core)

I.B.4.  Responsibilities: GMEC responsibilities must include:

I.B.4.a)  Oversight of:

I.B.4.a).(1)  the ACGME accreditation status of the Sponsoring Institution and each of its ACGME-accredited programs; (Outcome)

I.B.4.a).(2)  the quality of the GME learning and working environment within the Sponsoring Institution, each of its ACGME-accredited programs, and its participating sites; (Outcome)

I.B.4.a).(3)  the quality of educational experiences in each ACGME-accredited program that lead to measurable achievement of educational outcomes as identified in the ACGME

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

| | | |
|---|---|---|
| | | Common and specialty/subspecialty-specific Program Requirements; (Outcome) |
| I.B.4.a).(4) | | the ACGME-accredited program(s)' annual evaluation and improvement activities; and, (Core) |
| I.B.4.a).(5) | | all processes related to reductions and closures of individual ACGME-accredited programs, major participating sites, and the Sponsoring Institution. (Core) |
| I.B.4.b) | review and approval of: | |
| I.B.4.b).(1) | | institutional GME policies and procedures; (Core) |
| I.B.4.b).(2) | | annual recommendations to the Sponsoring Institution's administration regarding resident/fellow stipends and benefits; (Core) |
| I.B.4.b).(3) | | applications for ACGME accreditation of new programs; (Core) |
| I.B.4.b).(4) | | requests for permanent changes in resident/fellow complement; (Core) |
| I.B.4.b).(5) | | major changes in each of its ACGME-accredited programs' structure or duration of education; (Core) |
| I.B.4.b).(6) | | additions and deletions of each of its ACGME-accredited programs' participating sites; (Core) |
| I.B.4.b).(7) | | appointment of new program directors; (Core) |
| I.B.4.b).(8) | | progress reports requested by a Review Committee; (Core) |
| I.B.4.b).(9) | | responses to Clinical Learning Environment Review (CLER) reports; (Core) |
| I.B.4.b).(10) | | requests for exceptions to duty hour requirements; (Core) |
| I.B.4.b).(11) | | voluntary withdrawal of ACGME program accreditation; (Core) |
| I.B.4.b).(12) | | requests for appeal of an adverse action by a Review Committee; and, (Core) |
| I.B.4.b).(13) | | appeal presentations to an ACGME Appeals Panel. (Core) |
| I.B.5. | The GMEC must demonstrate effective oversight of the Sponsoring Institution's accreditation through an Annual Institutional Review (AIR). (Outcome) | |

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

| I.B.5.a) | The GMEC must identify institutional performance indicators for the AIR, which include: (Core) |
| I.B.5.a).(1) | results of the most recent institutional self-study visit; (Detail) |
| I.B.5.a).(2) | results of ACGME surveys of residents/fellows and core faculty members; and, (Detail) |
| I.B.5.a).(3) | notification of each of its ACGME-accredited programs' accreditation statuses and self-study visits. (Detail) |
| I.B.5.b) | The AIR must include monitoring procedures for action plans resulting from the review. (Core) |
| I.B.5.c) | The DIO must submit a written annual executive summary of the AIR to the Governing Body. (Core) |
| I.B.6. | The GMEC must demonstrate effective oversight of underperforming program(s) through a Special Review process. (Core) |
| I.B.6.a) | The Special Review process must include a protocol that: (Core) |
| I.B.6.a).(1) | establishes criteria for identifying underperformance; and, (Core) |
| I.B.6.a).(2) | results in a report that describes the quality improvement goals, the corrective actions, and the process for GMEC monitoring of outcomes. (Core) |

## II.     Institutional Resources

| II.A. | Institutional GME Infrastructure and Operations: The Sponsoring Institution must ensure that: |
| II.A.1. | the DIO has sufficient financial support and protected time to effectively carry out his or her educational, administrative, and leadership responsibilities; (Core) |
| II.A.2. | the DIO engages in professional development applicable to his or her responsibilities as an educational leader; and, (Core) |
| II.A.3. | sufficient salary support and resources are provided for effective GME administration. (Core) |
| II.B. | Program Administration: The Sponsoring Institution, in collaboration with each ACGME-accredited program, must ensure that: |
| II.B.1. | the program director(s) has (have) sufficient financial support and protected time to effectively carry out his/her (their) educational, administrative, and leadership responsibilities, as described in the Institutional, Common, and specialty/subspecialty-specific Program |

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

Requirements; (Core)

II.B.2.     the program(s) receives (receive) adequate support for core faculty members to ensure both effective supervision and quality resident/fellow education; (Core)

II.B.3.     the program director(s) and core faculty members engage in professional development applicable to their responsibilities as educational leaders; (Core)

II.B.4.     the program coordinator(s) has (have) sufficient support and time to effectively carry out his/her (their) responsibilities; and, (Core)

II.B.5.     resources, including space, technology, and supplies, are available to provide effective support for each of its ACGME-accredited programs. (Core)

II.C.     Resident/Fellow Forum: The Sponsoring Institution with more than one program must ensure availability of an organization, council, town hall, or other platform that allows residents/fellows from within and across the Sponsoring Institution's ACGME-accredited programs to communicate and exchange information with each other relevant to their ACGME-accredited programs and their learning and working environment. (Core)

II.C.1.     Any resident/fellow from one of the Sponsoring Institution's ACGME-accredited programs must have the opportunity to raise a concern to the forum. (Core)

II.C.2.     Residents/fellows must have the option, at least in part, to conduct their forum without the DIO, faculty members, or other administrators present. (Core)

II.C.3.     Residents/fellows must have the option to present concerns that arise from discussions at the forum to the DIO and GMEC. (Core)

II.D.     Resident Salary and Benefits: The Sponsoring Institution, in collaboration with each of its ACGME-accredited programs and participating sites, must provide all residents/fellows with financial support and benefits to ensure that they are able to fulfill the responsibilities of their ACGME-accredited program(s). (Core)

II.E.     Educational Tools

II.E.1.     Communication resources and technology: Faculty members and residents/fellows must have ready access to adequate communication resources and technological support. (Core)

II.E.2.     Access to medical literature: Faculty members and residents/fellows must have ready access to specialty/subspecialty-specific electronic medical literature databases and other current reference material in print or electronic format. (Core)

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

II.F.      Support Services and Systems

II.F.1.    The Sponsoring Institution must provide support services and develop health care delivery systems to minimize residents'/fellows' work that is extraneous to their ACGME-accredited program(s)' educational goals and objectives, and to ensure that residents'/fellows' educational experience is not compromised by excessive reliance on residents/fellows to fulfill non-physician service obligations. These support services and systems must include: (Core)

II.F.1.a)           peripheral intravenous access placement, phlebotomy, laboratory, pathology and radiology services and patient transportation services provided in a manner appropriate to and consistent with educational objectives and to support high quality and safe patient care; and, (Core)

II.F.1.b)           medical records available at all participating sites to support high quality and safe patient care, residents'/fellows' education, quality improvement and scholarly activities. (Core)

II.F.2.    The Sponsoring Institution must ensure a healthy and safe learning and working environment that provides for:

II.F.2.a)           access to food while on duty at all participating sites; (Core)

II.F.2.b)           safe, quiet, and private sleep/rest facilities available and accessible for residents/fellows to support education and safe patient care; and, (Core)

II.F.2.c)           security and safety measures appropriate to the participating site. (Core)

III.       Resident/Fellow Learning and Working Environment

III.A.     The Sponsoring Institution and each of its ACGME-accredited programs must provide a learning and working environment in which residents/fellows have the opportunity to raise concerns and provide feedback without intimidation or retaliation and in a confidential manner as appropriate. (Core)

III.B.     The Sponsoring Institution is responsible for oversight and documentation of resident/fellow engagement in the following: (Core)

III.B.1.   Patient Safety: The Sponsoring Institution must ensure that residents/fellows have:

III.B.1.a)          access to systems for reporting errors, adverse events, unsafe conditions, and near misses in a protected manner that is free from reprisal; and, (Core)

III.B.1.b)          opportunities to contribute to root cause analysis or other similar risk-reduction processes. (Core)

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

| III.B.2. | Quality Improvement: The Sponsoring Institution must ensure that residents/fellows have: |
|---|---|
| III.B.2.a) | access to data to improve systems of care, reduce health care disparities, and improve patient outcomes; and, [Core] |
| III.B.2.b) | opportunities to participate in quality improvement initiatives. [Core] |
| III.B.3. | Transitions of Care: The Sponsoring Institution must: |
| III.B.3.a) | facilitate professional development for core faculty members and residents/fellows regarding effective transitions of care; and, [Core] |
| III.B.3.b) | ensure that participating sites engage residents/fellows in standardized transitions of care consistent with the setting and type of patient care. [Core] |
| III.B.4. | Supervision: The Sponsoring Institution must oversee: |
| III.B.4.a) | supervision of residents/fellows consistent with institutional and program-specific policies; and, [Core] |
| III.B.4.b) | mechanisms by which residents/fellows can report inadequate supervision in a protected manner that is free from reprisal. [Core] |
| III.B.5. | Duty Hours, Fatigue Management, and Mitigation: The Sponsoring Institution must oversee: |
| III.B.5.a) | resident/fellow duty hours consistent with the Common and specialty/subspecialty-specific Program Requirements across all programs, addressing areas of non-compliance in a timely manner; [Core] |
| III.B.5.b) | systems of care and learning and working environments that facilitate fatigue management and mitigation for residents/fellows; and, [Core] |
| III.B.5.c) | an educational program for residents/fellows and core faculty members in fatigue management and mitigation. [Core] |
| III.B.6. | Professionalism: The Sponsoring Institution must provide systems for education in and monitoring of: |
| III.B.6.a) | residents'/fellows' and core faculty members' fulfillment of educational and professional responsibilities, including scholarly pursuits; [Core] |
| III.B.6.b) | accurate completion of required documentation by residents/fellows; and, [Core] |

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

III.B.6.c)  identification of resident/fellow mistreatment. (Core)

IV.  Institutional GME Policies and Procedures

IV.A.  Resident/Fellow Recruitment

IV.A.1.  Eligibility and Selection of Residents/Fellows: The Sponsoring Institution must have written policies and procedures for resident/fellow recruitment and appointment, and must monitor each of its ACGME-accredited programs for compliance. (Core)

IV.A.2.  An applicant must meet one of the following qualifications to be eligible for appointment to an ACGME-accredited program: (Core)

IV.A.2.a)  graduation from a medical school in the United States or Canada, accredited by the Liaison Committee on Medical Education (LCME); or, (Core)

IV.A.2.b)  graduation from a college of osteopathic medicine in the United States, accredited by the American Osteopathic Association (AOA); or, (Core)

IV.A.2.c)  graduation from a medical school outside of the United States or Canada, and meeting one of the following additional qualifications: (Core)

IV.A.2.c).(1)  holds a currently-valid certificate from the Educational Commission for Foreign Medical Graduates prior to appointment; or, (Core)

IV.A.2.c).(2)  holds a full and unrestricted license to practice medicine in a United States licensing jurisdiction in his or her current ACGME specialty/subspecialty program; or, (Core)

IV.A.2.c).(3)  has graduated from a medical school outside the United States and has completed a Fifth Pathway** program provided by an LCME-accredited medical school. (Core)

IV.A.3.  An applicant invited to interview for a resident/fellow position must be informed, in writing or by electronic means, of the terms, conditions, and benefits of appointment to the ACGME-accredited program, either in effect at the time of the interview or that will be in effect at the time of his or her eventual appointment. (Core)

IV.A.3.a)  Information that is provided must include: financial support; vacations; parental, sick, and other leaves of absence; and professional liability, hospitalization, health, disability and other insurance accessible to residents/fellows and their eligible dependents. (Core)

IV.B.  Agreement of Appointment/Contract

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

IV.B.1.     The Sponsoring Institution must ensure that residents/fellows are provided with a written agreement of appointment/contract outlining the terms and conditions of their appointment to a program. The Sponsoring Institution must monitor each of its programs with regard to implementation of terms and conditions of appointment. [Core]

IV.B.2.     The contract/agreement of appointment must directly contain or provide a reference to the following items: [Core]

IV.B.2.a)     resident/fellow responsibilities; [Core]

IV.B.2.b)     duration of appointment; [Core]

IV.B.2.c)     financial support for residents/fellows; [Ccre]

IV.B.2.d)     conditions for reappointment and promotion to a subsequent PGY level; [Core]

IV.B.2.e)     grievance and due process; [Core]

IV.B.2.f)     professional liability insurance, including a summary of pertinent information regarding coverage; [Core]

IV.B.2.g)     hospital and health insurance benefits for residents/fellows and their eligible dependents; [Core]

IV.B.2.h)     disability insurance for residents/fellows; [Core]

IV.B.2.i)     vacation, parental, sick, and other leave(s) for residents/fellows, compliant with applicable laws; [Core]

IV.B.2.j)     timely notice of the effect of leave(s) on the ability of residents/fellows to satisfy requirements for program completion; [Core]

IV.B.2.k)     information related to eligibility for specialty board examinations; and, [Core]

IV.B.2.l)     institutional policies and procedures regarding resident/fellow duty hours and moonlighting. [Core]

IV.C.     Promotion, Appointment Renewal and Dismissal

IV.C.1.     The Sponsoring Institution must have a policy that requires each of its ACGME-accredited programs to determine the criteria for promotion and/or renewal of a resident's/fellow's appointment. [Core]

IV.C.1.a)     The Sponsoring Institution must ensure that each of its programs provides a resident/fellow with a written notice of intent when that resident's/fellow's agreement will not be renewed, when that

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

resident/fellow will not be promoted to the next level of training, or when that resident/fellow will be dismissed. (Core)

IV.C.1.b)     The Sponsoring Institution must have a policy that provides residents/fellows with due process relating to the following actions regardless of when the action is taken during the appointment period: suspension, non-renewal, non-promotion; or dismissal. (Core)

IV.D.     Grievances: The Sponsoring Institution must have a policy that outlines the procedures for submitting and processing resident/fellow grievances at the program and institutional level and that minimizes conflicts of interest. (Core)

IV.E.     Professional Liability Insurance

IV.E.1.     The Sponsoring Institution must provide residents/fellows with professional liability coverage, including legal defense and protection against awards from claims reported or filed during participation in each of its ACGME-accredited programs, or after completion of the program(s) if the alleged acts or omissions of a resident/fellow are within the scope of the program(s). (Core)

IV.E.2.     The Sponsoring Institution must provide official documentation of the details of liability coverage upon request of the individual. (Core)

IV.F.     Health and Disability Insurance

IV.F.1.     The Sponsoring Institution must provide health insurance benefits for residents/fellows and their eligible dependents beginning on the first day of insurance eligibility. (Core)

IV.F.1.a)     If the first day of health insurance eligibility is not the first day that residents/fellows are required to report, then the residents/fellows must be given advanced access to information regarding interim coverage so that they can purchase coverage if desired. (Core)

IV.F.2.     The Sponsoring Institution must provide disability insurance benefits for residents/fellows beginning on the first day of disability insurance eligibility. (Core)

IV.F.2.a)     If the first day of disability insurance eligibility is not the first day that residents/fellows are required to report, then the residents/fellows must be given advanced access to information regarding interim coverage so that they can purchase coverage if desired. (Core)

IV.G.     Vacation and Leaves of Absence

IV.G.1.     The Sponsoring Institution must have a policy for vacation and other leaves of absence, consistent with applicable laws. (Core)

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

| | |
|---|---|
| IV.G.2. | This policy must ensure that each of its ACGME-accredited programs provides its residents/fellows with accurate information regarding the impact of an extended leave of absence upon the criteria for satisfactory completion of the program and upon a resident's/fellow's eligibility to participate in examinations by the relevant certifying board(s). (Core) |
| IV.H. | **Resident Services** |
| IV.H.1. | Behavioral Health: The Sponsoring Institution must provide residents/fellows with access to confidential counseling and behavioral health services. (Core) |
| IV.H.2. | Physician Impairment: The Sponsoring Institution must have a policy, not necessarily GME-specific, which addresses physician impairment. (Core) |
| IV.H.3. | Harassment: The Sponsoring Institution must have a policy, not necessarily GME-specific, covering sexual and other forms of harassment, that allows residents/fellows access to processes to raise and resolve complaints in a safe and non-punitive environment consistent with applicable laws and regulations. (Core) |
| IV.H.4. | Accommodation for Disabilities: The Sponsoring Institution must have a policy, not necessarily GME-specific, regarding accommodations for disabilities consistent with all applicable laws and regulations. (Core) |
| IV.I. | **Supervision** |
| IV.I.1. | The Sponsoring Institution must maintain an institutional policy regarding supervision of residents/fellows. (Core) |
| IV.I.2. | The Sponsoring Institution must ensure that each of its ACGME-accredited programs establishes a written program-specific supervision policy consistent with the institutional policy and the respective ACGME Common and specialty/subspecialty-specific Program Requirements. (Core) |
| IV.J. | Duty Hours: The Sponsoring Institution must maintain a duty hour policy that ensures effective oversight of institutional and program-level compliance with ACGME duty hour standards. (Core) |
| IV.J.1. | Moonlighting: The Sponsoring Institution must maintain a policy on moonlighting that includes the following: |
| IV.J.1.a) | residents/fellows must not be required to engage in moonlighting; (Core) |
| IV.J.1.b) | residents/fellows must have written permission from their program director to moonlight; (Core) |
| IV.J.1.c) | an ACGME-accredited program will monitor the effect of moonlighting activities on a resident's/fellow's performance in the program, including that adverse effects may lead to withdrawal of |

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

permission to moonlight; and, (Core)

IV.J.1.d)    the Sponsoring Institution or individual ACGME-accredited programs may prohibit moonlighting by residents/fellows. (Core)

IV.K.    Vendors: The Sponsoring Institution must maintain a policy that addresses interactions between vendor representatives/corporations and residents/fellows and each of its ACGME-accredited programs. (Core)

IV.L.    Non-competition: The Sponsoring Institution must maintain a policy which states that neither the Sponsoring Institution nor any of its ACGME-accredited programs will require a resident/fellow to sign a non-competition guarantee or restrictive covenant. (Core)

IV.M.    Disasters: The Sponsoring Institution must maintain a policy consistent with ACGME Policies and Procedures that addresses administrative support for each of its ACGME-accredited programs and residents/fellows in the event of a disaster or interruption in patient care. (Core)

IV.M.1.    This policy should include information about assistance for continuation of salary, benefits, and resident/fellow assignments. (Core)

IV.N.    Closures and Reductions: The Sponsoring Institution must maintain a policy that addresses GMEC oversight of reductions in size or closure of each of its ACGME-accredited programs, or closure of the Sponsoring Institution that includes the following: (Core)

IV.N.1.    the Sponsoring Institution must inform the GMEC, DIO, and affected residents/fellows as soon as possible when it intends to reduce the size of or close one or more ACGME-accredited programs, or when the Sponsoring Institution intends to close; and, (Core)

IV.N.2.    the Sponsoring Institution must allow residents/fellows already in an affected ACGME-accredited program(s) to complete their education at the Sponsoring Institution, or assist them in enrolling in (an)other ACGME-accredited program(s) in which they can continue their education. (Core)

***

**\*Core Requirements:** Statements that define structure, resource, or process elements essential to every graduate medical educational program.
**Detail Requirements:** Statements that describe a specific structure, resource, or process, for achieving compliance with a Core Requirement. Programs in substantial compliance with the Outcome Requirements may utilize alternative or innovative approaches to meet Core Requirements.
**Outcome Requirements:** Statements that specify expected measurable or observable attributes (knowledge, abilities, skills, or attitudes) of residents or fellows at key stages of their graduate medical education.

**\*\*Footnote for IV.A.2.c).(3):** A Fifth Pathway program is an academic year of supervised clinical education provided by an LCME-accredited medical school to students who meet the following conditions: (1) have completed, in an accredited college or university in the United States, undergraduate premedical education of the quality acceptable for matriculation in an accredited United States medical school; (2)

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

have studied at a medical school outside the United States and Canada but listed in the World Health Organization Directory of Medical Schools; (3) have completed all of the formal requirements of the foreign medical school except internship and/or social service; (4) have attained a score satisfactory to the sponsoring medical school on a screening examination; and (5) have passed either the Foreign Medical Graduate Examination in the Medical Sciences, Parts I and II of the examination of the National Board of Medical Examiners, or Steps 1 and 2 of the United States Medical Licensing Examination (USMLE).

**1922-CC12062**

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM



3635 Vista Ave. at Grand Blvd.
P.O. Box 15250
St. Louis, MO 63110-0250
314-577-8317
Fax: 314-268-5466
www.slu.edu

**SAINT LOUIS
UNIVERSITY**

Health Sciences Center
School of Medicine

Department of Surgery
Division of Surgical Education

March 31, 2016

Mandy Rice, MD

Dear Dr. Rice,

Your performance on this year's ABSITE was not acceptable. This was discussed with you at your annual meeting with the program director or associate program director and has been discussed at the Clinical Competency Committee.

The committee has decided to place you academic probation with programmed remediation to correct this deficiency. Failure to comply with the terms of remediation may result in termination from the program.

1) <u>Completion of SCORE on a weekly basis:</u> You will be required to complete the SCORE questions weekly and submit your score to the program coordinator, Kris Forneris each week. You are required to have a passing score of 75%. Note you may take this exam multiple times without penalty. Your top score will count. Many have commented that the readings that accompany SCORE are cumbersome. We would encourage you to read on each weekly subject in a textbook of your choice. Sabiston, Schwartz, and Greenfield are all acceptable choices. If you have any questions, please feel free to ask Dr. Schwartz or Dr. Wittgen.

2) <u>Grand Rounds:</u> You will be required to give a Grand Rounds presentation in the next 6 months on a topic(s) identified as an area of weakness

3) <u>Board Review Course:</u> You are strongly encouraged to attend a board review course. The course will be at your expense.

4) <u>Study Activity:</u> There will be an additional group study activity which will be discussed in the coming weeks. Your attendance is mandatory. Unexcused absences may also be grounds for termination.

It is the Office of Surgical Education and the Clinical Competency Committee's sincere hope that with this assistance that your academic performance will improve and you will be able to pass the General Surgery Qualifying Examination upon completion of your training.

Sincerely

Catherine M Wittgen MD
Professor of Surgery
General Surgery Program Director

Theresa Schwartz MD
Associate Professor of Surgery
General Surgery Associate Program Director



EXHIBIT
5

Resident Signature

**1922-CC12062**

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM



## SAINT LOUIS
## UNIVERSITY
—— EST. 1818 ——

November 14, 2016

**DEPARTMENT OF SURGERY**

*Division of Surgical Education*

Dear Dr Rice

Health Sciences Center
School of Medicine
3635 Vista Ave. at Grand Blvd.
St. Louis, MO 63110-0250

P  314-577-8317
F  314-268-5466

www.slu.edu

This letter is generated at your request to re-iterate your deficiencies as discussed at your semi-annual meeting 2015, your annual meeting 2015, your semi-annual meeting 2016 and by the Clinical Competency Committee meetings of 2015 and 2016.

There is universal agreement that you were an outstanding intern and junior residents and reliably gathered patient information, performed history and physical examinations as well as having established a great rapport with the nursing staff. Your performance as a midlevel resident, however, is of serious concern. Without significant improvement, advancement to the next level of surgical training will not be recommended.

Common issues identified by attending surgeons on the trauma, vascular, blue surgical service include:

1 A "shotgun" approach to giving patient information with an overabundance of random information (milestone: MK 1)

2 Discussions of patient care with attending surgeons with little evidence of you having evaluated the information to support a diagnosis (milestone: PC 1)

3 Failure to generate a clear treatment plan for simple surgical issues without significant attending input (milestone: MK 2)

4 Failure to recognize complications and generate appropriate interventions in a timely fashion without significant attending input (milestone: PC 2)

5 Poor discussion content regarding surgical problems with patients, other consultants and in formal settings.  (milestone: PBLI 1)

6 Poor ability to explain surgical procedures and potential risks and benefits in a concise fashion in simple language to patients and families. (milestone: ISCS 1)

7 Avoidance of performing difficult surgical procedures with specific attendings on high risk patients (milestone: PC 3)

8 Marginal surgical skills with an inability to perform simple tasks expeditiously (milestone: PC 3)



EXHIBIT
6

Higher purpose. Greater good.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

9 Continued poor performance on didactic measures of learning (ABSITE) and failure to comply with remediation as measured by participation in SCORE and TRUE LEARN (milestone: MK1, PROF 3).

These issues are critical in patient management and the ability to practice surgery independently. You have been offered assistance from the learning specialist at St Louis University. All members of the Department of Surgery Clinical Competency Committee have offered to assist you in the other deficiencies outlined. Please let the office of surgical education know if you have any further questions

Sincerely,

Catherine M Wittgen, MD
Professor of Surgery
General Surgery Program Director

Jason Keune, MD
Assistant Professor of Surgery
General Surgery Associate
Program Director

Mandy Rice, DO

1922-CC12062

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

27 December 2016
1636 Jonquil Drive
Webster Groves, MO 63119


Office of Surgical Education
Dept of Surgery
St. Louis University
3635 Vista Ave at Grand Blvd
St Louis, MO 63110-0250


Re: recent letter of deficiencies


Dear Surgical Education Office members,

Thank you for this part of a response to my request to document any concerns for deficiencies, recommendations for improvement, and associated metrics to track that improvement. Although the letter is dated November 14, 2016, I was unaware of its existence until December 14, 2016 when Kris Forneris emailed me to request my signature on a letter, without indication of its nature. As I have been rotating at Mercy the last two months, I was able to retrieve and review the letter on December 21, 2016. It is unfortunate that I was not advised immediately that such a significant communication had been prepared. I would like to make a few points here.

I request specific information regarding each of the nine points outlined in the letter, e.g. dates of observed deficiencies, specific descriptions of the problems, and the person who witnessed each deficiency.

In the letter, issues are noted to be identified by "attending surgeons on the trauma, vascular, (and) blue surgical service(s)." However, on review of formal blue and trauma evaluations, these are overall positive without mention of any of the deficiencies outlined in your office's letter. Therefore, the complaints must be stemming from the vascular service.

I will be happy to respond to each individual allegation when detailed information is provided and will sign the letter at that time.

Thank you for your attention to such an important matter.


Sincerely,

Mandy Lyn Rice, DO, PGY4

**EXHIBIT**

7

**1922-CC12062**

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM



3635 Vista Avenue ar Grand Blvd.
P.O. Box 15250
St. Louis, MO 63110-0250
Phone: 314-577-8802
Fax: 314-268-5194
www.slu.edu

## SAINT LOUIS
## UNIVERSITY

Trauma Surgery

2/24/2017

Dr. Wittgen,

The Trauma service has had the opportunity to work with Dr. Mandy Rice for four months during this academic year. Mandy has served as our day and night Chief Resident during this time, working closely with each of our Trauma Attending surgeons. I have discussed Mandy's performance on the service several times with each of the attending independently and as a group. Mandy works well with hospital staff members; she is very caring / compassionate, hardworking, and pleasant resident to work with. Her operative skills are average to slightly below average for her academic year and fellow residents.

Trauma service attendings' have concerns over Mandy's medical knowledge. We have observed that she frequently gets distracted or fixates on small or minor things and does not see the big picture in the care of trauma patient, placing the trauma patient at possible risk if not for redirection. She has difficulty piecing together different aspects of the trauma patient's disease processes and fully synthesizing a comprehensive plan for the patient. She has difficulty in prioritization as a chief, such as during rounds spending over an hour with one family while missing the discussion and plans for multiple other patients. Again multiple attending' have commented on this problem. She has difficulty with stressful situations and becomes very rigid and is not able to adapt. As stress increases her personality changes and she becomes short tempered and unable to process feedback. She has difficulty as a leader/Chief of the Trauma Service, wanting to please all, which is not possible and this has interfered with the running of the service. Some of the qualities that make her a nice pleasant person actually interfere with her leadership.

After extensive discussions with the trauma attendings', the Trauma Division has concerns with Mandy progressing to a fifth year Chief Resident level with further responsibilities and increased independence in patients care. We feel at least remediation is warranted with formal counseling sessions to help with these deficiencies.

Sincerely,

Carl A Freeman, MD, FACS
Associate Professor of Surgery
Trauma Medical Director
Chief, Division of Trauma

EXHIBIT
8

1922-CC12062

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

EXHIBIT
9

04 March 2017

Dear Trauma Surgeons,

Thank you for taking the time this past week to give me feedback on my recent rotation with you. Although I do concede that my knowledge base has been my weak point in the past, since I learned of the resource of the learning analyst, this is improving. I have been taking advantage of the tools she has shared with me since working with her, starting this past November. My learning has become more effective as a result. I would also point out that in none of my formal evaluations did any attending give me anything less than a 4/6 (basic mastery) for medical knowledge.

However, I would like to officially disagree with several points made in the trauma service consensus evaluation letter given to me on Thursday. Of note, in four months of the trauma rotation most of these significant criticisms were not brought to my attention in order for me to address them. Only this past Thursday, after completing my rotation, have most of these concerns been discussed with me – too late for me to take corrective action during my trauma rotation.

Regarding the statement that my surgical skills are average to below average, from the attendings that provide me autonomy in the operating room (ie – not scrubbing into the case, allowing me to operate without prompts, or allowing me the role of primary surgeon), my operative evaluations have been positive and on par with my peers. These verbal evaluations have come from Drs. Pieper (he also sent the email evaluation), Naughton, and Boecker. My only New Innovations SLU Trauma evaluations are as below:

8/23/2016: 8/9 in evaluations related to surgical skill – Dr. Boecker
9/16/2016: "...Good technical skills," 6/6 in all evaluation fields. – Dr. Boecker.
9/10/2016: 4/6 in technical skill – Dr. Mahoney
11/3/2016: 5/6 for technical skill – Dr. Mahoney
11/3/2016: 5/6 in technical skill – Dr. Boecker
2/3/2017: 5/6 in technical skill – Dr. Tenquist
2/22/2017: 5/6 in technical skill – Dr Boecker
3/1/2017: "On technical surgical skills, Dr. Rice has a very strong interest in learning and is aggressive about pursuing cases and procedures. At this point, I would say she is average in her technical performance. She is able to handle cases that a fourth year resident should be able to perform, but I would not yet hand over a complex technical procedure to her." - Dr. Pieper via email including to Dr. Freeman

You assert that I possibly place the trauma patient at risk if I am not re-directed. Please provide an example. On the contrary, there have been multiple occasions in which I have managed critically-ill patients for hours, even after the attending has left the trauma bay. On 3/1/2017, Dr. Pieper wrote, "Dr.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

Rice has a good understanding of surgical/critical care management for trauma patients. I would say she is above average in this area compared to her peers." I have had no poor patient outcomes or negative feedback on which to base this letter. On "systems based practice" which encompasses the promotion of patient safety and participating in standardized treatment plans and algorithms, I scored 4/6 or 5/6 in this evaluation category by all who evaluated me-- Drs. Tenquist, Boecker and Mahoney.

In regards to the criticism of having difficulty with trauma patient disease processes, in the meeting today, Dr. Rand gave the example of debating the use of IV contrast for acute versus chronic renal failure patients. While, in this example, I knew that the patient was on dialysis, I was not sure if the patient had any remaining kidney function or if her dialysis schedule would need to be altered after administration of contrast. Not yet knowing the new patient's history, meeting her in the trauma bay, I felt that this was worth discussing. If there was concern about my knowledge base in this area, we could have discussed the topic at that time rather than have the uncertainty end up as an issue of final evaluation.

The letter states that I have difficulty fully synthesizing a comprehensive plan for the patient. As I discussed today, my days on trauma service typically went smoothly as I evaluated the trauma patient then called you with my findings and plan. In general, my plans were accepted and care moved forward. In support of this, Dr. Pieper wrote in his evaluation on 3/1/2017 that I have quickly improved in this area and have good reasoning behind my plans.

Regarding the accusation of difficulty in prioritizing as chief, as well as missing rounds and plans for other patients while talking for over an hour with one family, there is only one example of this of which I am aware. This particular family had a history of being very difficult (litigious and was planning to sue the neurosurgeon) and had already been talked to at length by Dr. Rand, then by me, then the next day by Dr. Draper (who, as a result, missed giving a lecture to the trauma service), then by me and Dr. Tenquist together, then by me again the following day for about an hour. In the end, the family voiced gratitude for my explanations and time. Not only was I able to prioritize my other duties, for the whole month of January I successfully juggled the role of chief of trauma ICU in the absence of the fellow, in addition to being chief of the floor service, trauma activations, and operations. This required extensive delegation to other residents, medical students and nurse practitioners to keep the service running smoothly. It was challenging, but there were no major problems or bad patient outcomes. Additionally, it is often that the trauma chief is unavailable for rounds due to duties in the trauma bay, OR, ICU or other patient care situations. This was not unique to me. Being able to speak with patients and families is an important aspect of a chief's duties. In particular, Dr. Pieper commented on 3/1/2017, "Mandy is excellent in communication with patients and their families. She can speak with them in a compassionate manner, and she can explain their condition as well as treatment plan/surgical procedures in a way patients can understand."

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

Regarding the criticisms of rigidity and inability to adapt, I noted that Dr. Mahoney had commented on this topic several times during my first and second months as a fourth year. More recently, however, Dr. Boecker recognized that I was growing in this area and was "learning to adapt," Additionally, in the meeting today, Dr. Naughton read over the trauma consensus letter, which appeared to be his first time to see it, as he verbally dissented from the statement of my being rigid.

In regards to the comment that as stress increases, my personality changes and I become unable to process feedback, I am not sure of the origin of this, unless this is in reference to a few episodes with Dr. Freeman. I recall times, specifically during one of his call weekends, when there were difficult interactions between us. I did become frustrated in the trauma bay when Dr. Freeman was excessively critiquing many minor details of several procedures to the point that multiple people in the trauma bay discussed how frustrating it was after the fact. One physician purposefully distracted him in order to remove him from the room and thus diffuse the tension. In addition, the following day he acted apologetic and we both made jokes about how frustrating it was. To be sure, I have witnessed most attendings' personality change under stress.

Regarding the critique that I want to please all, which could interfere with my leadership ability, I do understand my tendency towards avoiding confrontation with many attendings. I admit to finding some of them more difficult than others, and I do try to avoid discomfort with them when possible. Specifically speaking to interfering with the running of the service, please provide examples of the service suffering as a result of my desire to work smoothly with others, to network, to collaborate and cooperate instead of dictate, when unnecessary. On the contrary, my exquisite ability to communicate and network with other services has led to continual, unsolicited positive feedback from staff, residents and attendings from the departments of radiology, ED, medicine, anesthesia and other surgical services over these four months as trauma chief. As an example, I received a text on 2/19/2017 from the administrative ER chief resident, "I always like when you're on, and I've learned a lot from you over the days. Thought you should know that we all really appreciate when you are on. Very easy to work with." In addition, Dr. Pieper wrote on 3/1/2017, "Dr. Rice is an excellent teacher to her junior residents and students, both on procedures and medical/surgical diagnoses and treatments." I would also refer you to the medical students' evaluations of me on Oasis which are positive for my ability to teach and lead the service. One student even stated that she changed her path from medicine to surgery after her experience with me on trauma. Again, the many roles that I filled in the month of January while the trauma fellow was off service speak to my ability to coordinate and lead.

A recurring theme in our meeting Thursday was a problem with my "niceness," which Dr. Freeman then stated may be interfering with the attendings' ability to assess me and my progression. This critique is vague and needs clarification. I don't believe that my personality has resulted in a problem or poor patient outcome and in fact I believe there is overwhelming evidence to the contrary.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

In summary, I believe that the statements in your letter, the concern for my progression to fifth year, and the call for remediation with formal counseling sessions are generally unfounded. Furthermore, the very late voicing of many of your concerns, after the completion of four months on trauma service, robs me of my ability to have been able to address them during our time together and to have made improvements. The submission of your letter to my residency file greatly threatens my progression to fifth year. This comes at an especially critical time as I need to be gathering letters of recommendation and starting applications for trauma/surgical critical care fellowship.

I urge you to formally rescind your consensus trauma evaluation letter.

Sincerely,

Mandy Rice, DO



Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

1922-CC12062

SAINT LOUIS
UNIVERSITY
— EST. 1818 —

DEPARTMENT OF SURGERY

Division of Surgical Education

Health Sciences Center
School of Medicine
3635 Vista Ave. at Grand Blvd.
St. Louis, MO 63110-0250

P  314-977-8817
F  314-268-5150
www.slu.edu

April 3, 2017

Mandy Rice, DO
Resident, Department of Surgery

Dear Dr. Rice,

The clinical competency committee has recognized some progress in your clinical competency since your last mid-year evaluation. You have not, however, demonstrated sufficient mastery of the key milestones in General Surgery for you to progress to a PGY-5 chief resident level. The committee has unanimously recommended that your training at a PGY-4 level be extended for an additional year in order to provide the time and opportunity to achieve the necessary competency for promotion. You will continue your probationary status as a PGY 4 General Surgery Resident at St. Louis University with the following remediation plan:

1) Attend the course entitled "Effective Communication, Overview and Skills Training" offered by the Behavioral Medicine Institute in affiliation with St. Louis University. Kris Fenelis will provide you with the details.

2) Work with Sara Bennett, the learning specialist, to improve your assimilation of information and test taking skills. You will be receiving an individualized learning plan from her office this month.

3) Continue to meet with Dr. Schwartz as she schedules to discuss your progress.

4) Complete all SCORE/TRUELEARN didactic sessions as scheduled.

5) Meet with Dr. Michael Hanley who will function in the role of ombudsman to assist in academic processes. It is recommended that you contact his office within the next week to arrange an initial appointment. His office phone number is 977-8760.

6) Your rotation schedule for next year will be specifically structured to provide you with ample opportunities in the core areas of general surgery to improve your patient care, leadership skills, and technical skills.

If you need any other assistance with scheduling or coordinating these activities, please do not hesitate to contact the Office of Surgical Education at 577-8317 ext 3.

Sincerely,

Kathryn Bass, MD
Professor of Surgery
General Surgery Residency Director

Jason Keune, MD
Assistant Professor of Surgery
General Surgery Associate Residency Director

Julie Gammack, MD
Associate Dean for Graduate Medical Education

Higher purpose. Greater good.

EXHIBIT
10

**1922-CC12062**

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM



**SAINT LOUIS**
UNIVERSITY.
— * EST. 1818 * —

*1402 South Grand Blvd.*
*Room M269*
*St. Louis, MO  63104*
*Phone: 314-977-9851*
*Fax: 314-977-9852*
*www.slu.edu*

*Office of Graduate Medical Education*

June 21, 2017

*School of Medicine*
*Medical Center*

**Mandy Lyn Rice, D.O.**
**1636 Jonquil Drive**
**St. Louis, MO  63119**

We are pleased to offer you a reappointment as a Postgraduate Level **V** trainee in the **Surgery (Categorical) Residency Program** of the Saint Louis University School of Medicine for the period of **7/1/2017** through **6/30/2018**. The **Postgraduate Level V** reflects the stipend amount the trainee will receive; however, the trainee is re-appointed at the **Program Level Year IV**. The stipend for trainees assigned to the Saint Louis University Group of Hospitals will be as follows:

**$57,200 Gross Annual.**

Minor differences in the stipend amount or benefits may occur during periods when trainees are assigned to certain of our affiliated teaching hospitals.

This reappointment is subject to the same terms and conditions as were set forth in your initial appointment letter and to the terms, conditions, benefits and responsibilities described in the attached information sheet.

Please complete and sign below indicating your acceptance or refusal of this reappointment. Your appointment will be held open for twenty-one (21) days from the receipt of this letter, after which, in the absence of your acceptance, this offer will be no longer in effect. A copy of this letter is attached for your records.

_____          _____
Associate Dean                            Program Director

_____
Department Chairperson

I hereby ✓ (accept) ____ (decline) the offer of a reappointment as a postgraduate trainee of Saint Louis University School of Medicine.

Signature: **Mandy Lyn Rice**                    Date: 7/6/2017

**EXHIBIT**
11

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM





EXHIBIT

_12_

## SAINT LOUIS UNIVERSITY

EST. 1818

DEPARTMENT OF
SURGERY

*Chairman's Office*

Health Sciences Center
School of Medicine
PO Box 15250, 3rd Fl - DT
Saint Louis, MO 63110-0250

P 314-577-8352
F 314-268-5228
www.surgery@slu.edu

www.slu.edu

May 2, 2018

**HAND DELIVERY**

Mandy Rice, D.O.
Resident, General Surgery
Saint Louis University School of Medicine

Dear Dr. Rice,

The Clinical Competency Committee met on April 11, 2018 to discuss your progress in our general surgery program. After serious deliberation about your milestones and performance, it is the opinion of the training program faculty that insufficient progress has been made for progression to the fifth chief year of residency. This is based on multiple evaluations, including, but not limited to, those in New Innovations, and the opinion of faculty who have worked with you during the remediation year.

As the remediation year has not resulted in you achieving the necessary skills to be promoted to the fifth chief year, your employment contract for training in the general surgery program will not be renewed and you will not be offered continuation of training at Saint Louis University.

At this time, your current employment contract with Saint Louis University ends on June 30, 2018. Per School of Medicine policy, you are being provided the required 6-month notice of non-renewal of your employment from the date of this notification letter. Should you decide that you wish to remain employed with Saint Louis University beyond June 30, 2018, a new contract will be issued that will end 6 months from receipt of this letter. If you choose to remain for the duration of this period, you will continue to receive stipend and benefits. To prepare this new contract in a timely manner, we request notification by May 31, 2018 of your intent to remain employed with Saint Louis University beyond June 30, 2018.

00074924-1

Higher purpose. Greater good.

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

May 2, 2018
Page 2

Please note that per the Due Process Policy of the Office of Graduate Medical Education, you may choose to appeal this non-renewal of training contract.[1] You must first appeal to the Clinical Competency Committee, then the Departmental Chair, then to the Office of Graduate Medical Education.

We will provide you with assistance in completing necessary documentation for future training, licensure, or employment opportunities.

Sincerely,

Donald L. Jacobs, M.D.
C. Rollins Hanlon Professor and Chairman
Department of Surgery

c:      Julie Gammack, M.D.
        Catherine Wittgen, M.D.

---

[1] *See* https://sites.google.com/a/slu.edu/graduate-medical-education-policies-and procedures/clerkship-lectures-handouts/operation-of-residency-and-fellowship-programs.

00074924-1

**1922-CC12062**

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To: Mandy Lyn Rice<br>715 Gaywood Drive<br>Pittsburgh, PA 15235 | From: St. Louis District Office<br>1222 Spruce Street<br>Room 8.100<br>Saint Louis, MO 63103 |
|---|---|

| | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) | |
|---|---|---|

| EEOC Charge No. | EEOC Representative<br>Tonya R. Hauert,<br>Investigator | Telephone No. |
|---|---|---|
| 560-2018-02420 | | (314) 539-7930 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed **WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

_signature_

**Lloyd J. Vasquez, Jr.,**
**District Director**

8-28-19
(Date Mailed)

Enclosures(s)

cc: **Danielle Uy**
**Sr. Associate General Counsel**
**ST. LOUIS UNIVERSITY**
**221 N. Grand Blvd.**
**Dubourg Hall, #219**
**Saint Louis, MO 63130**

**EXHIBIT**
**13**

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

Enclosure with EEOC
Form 161 (11/16)

### INFORMATION RELATED TO FILING SUIT
### UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS   --   Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Courts often require that a copy of your charge must be attached to the complaint you file in court. If so, you should remove your birth date from the charge. Some courts will not accept your complaint where the charge includes a date of birth. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS   --   Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 -- *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION   --   Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do **not** relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE   --   All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice.** (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

**1922-CC12062**

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

**DANNA McKITRICK, P.C.**
ATTORNEYS AT LAW

7701 Forsyth Blvd.          314.726.1000
Suite 800                  636.946.2203
St. Louis, MO 63105        314.725.6592 fax

David R. Bohm
Direct (314) 889-7135
E-Mail: dbohm@dmfirm.com

September 6, 2019

Missouri Commission on Human Rights
3315 W Truman Blvd., Rm # 212
P.O. Box 1129
Jefferson City, MO 65109-1129

RE:  **Complainant:**   **Mandy Lyn Rice**
     **Respondent:**    **Saint Louis University**
     **MCHR File No.:**  **SE-8\18-29447**

To Whom it May Concern:

The undersigned represents Mandy Lyn Rice with respect to the above-referenced charge that was filed with the Missouri Commission on Human Rights.  I am hereby requesting a right to sue letter be issued to her by the Commission, pursuant to §213.111 R.S.Mo.  Thank you for your attention to this matter.

Very truly yours,

DANNA MCKITRICK, P.C.

DAVID R. BOHM

DRB/tjh


EXHIBIT
14

**1922-CC12062**

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM



MISSOURI DEPARTMENT OF LABOR AND INDUSTRIAL RELATIONS

# MISSOURI COMMISSION ON HUMAN RIGHTS

MICHAEL L. PARSON
GOVERNOR

ANNA S. HUI
DEPARTMENT DIRECTOR

MELODY A. SMITH, ED.D,
ACTING COMMISSION CHAIR

DR. ALISA WARREN
EXECUTIVE DIRECTOR

September 13, 2019

Danna McKitrick, P.C.
7701 Forsyth Blvd. -- Suite 800
St. Louis, MO 63105

**RE: Mandy Lyn Rice vs. St. Louis University**
**FE-08/18-29447**

Dear Mr. Bohm,

Upon receiving your request for a copy on the above referenced case file, this letter is to inform you that this case is still currently open.  We are not able to furnish you with copies until the case is closed.  Please request your file copy at that time.

Thank you.

Sincerely,



*Thank you,*

*Lorella (Lori) Branch*
**Receptionist/ Records Clerk**

MISSOURI
COMMISSION ON
HUMAN RIGHTS

P  573-751-1971 |  F 573-751-2905
3315 W Truman Blvd, Suite 212  Jefferson City  MO  65102-1129
lorella.branch@labor.mo.gov | www.labor.mo.gov/mohumanrights

☒
3315 W. TRUMAN BLVD.
P.O. BOX 1129
JEFFERSON CITY, MO 65102-1129
PHONE: 573-751-3325
FAX: 573-751-2905

☐
111 N. 7TH STREET, SUITE 903
ST. LOUIS, MO 63101-2100
PHONE: 314-340-7590
FAX: 314-340-7238

☐
P.O. BOX 1300
OZARK, MO 65721
FAX: 417-485-6024

☐
1410 GENESSEE, SUITE 260
KANSAS CITY, MO 64102
FAX: 816-889-3582

☐
106 ARTHUR STREET
SUITE D
FAX: 573-472-5321
SIKESTON, MO 63801-5454

Relay Missouri:  1-800-735-2966 (TDD)    1-800-735-2466 (Voice)
www.dolir.mo.gov/hr  mchr@dolir.mo.gov

**EXHIBIT**
15

1922-CC12062

Electronically Filed - City of St. Louis - November 20, 2019 - 03:18 PM

# DANNA MCKITRICK, P.C.
## ATTORNEYS AT LAW

David W. Morin
Direct (314) 889-7141
E-Mail: dmorin@dmfirm.com

7701 Forsyth Blvd.        314.726.1000
Suite 800                 636.946.2203
St. Louis, MO 63105       314.725.6592 fax

September 18, 2019

Lorella Branch
Missouri Commission on Human Rights
3315 W Truman Blvd., Suite 212
Jefferson City, MO 65109-1129

RE:   **Complainant:**   **Mandy Lyn Rice**
      **Respondent:**    **Saint Louis University**
      **MCHR File No.:**  **FE-8\18-29447**

Dear Ms. Branch:

Please allow this correspondence to serve as a follow-up to my office's correspondence of September 6, 2019. At that time, my office requested a right to sue letter be issued to our client, Mandy Lyn Rice, by the Commission, pursuant to §213.111 RSMo. Again, our office is requesting a right to sue letter pursuant to the aforementioned statutory provision.

Thank you for your attention to this matter.

Very truly yours,

DANNA MCKITRICK, P.C.

DAVID W. MORIN

DWM/tjh

EXHIBIT
16