**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| MANDY RICE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:19-cv-03166 SEP |
| ) | |
| ST. LOUIS UNIVERSITY, et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendants' Partial Motion for Summary Judgment. Doc. [17].  The Motion is fully briefed and ready for disposition.  For the reasons stated below, Defendants' Motion is granted.

**I.     BACKGROUND**

The Court has already discussed the facts of this case at some length in its Memorandum and Order granting Defendants' Motion to Dismiss.  Doc. [63].  In the interest of judicial economy, the Court will recite now only those facts relevant to the pending motion.  Because this matter is before the Court on Defendant's Motion for Summary Judgment, these facts are construed in Plaintiff's favor.  *Duban v. Waverly Sales Co.*, 760 F.3d 832, 835 (8th Cir. 2014) ("The court should review all of the evidence in the record and draw all reasonable inferences in favor of the nonmoving party, without making credibility determinations or weighing the evidence.") (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

In 2013, Plaintiff Mandy Rice ("Dr. Rice") was offered a residency position in Defendant St. Louis University's ("SLU") Surgery Residency Program.  Dr. Rice accepted the position by signing a "residency agreement," which included an addendum (described in the appointment letters as an "information sheet," *see, e.g.*, Doc. [19-2] at 1, 2) entitled "Responsibilities and Benefits Overview."  Dr. Rice and SLU executed similar residency agreements after each academic term, although it is not clear whether the same addendum was attached to subsequent agreements.

By all accounts, the first few years of Dr. Rice's residency proceeded uneventfully. But by the end of her third year and continuing into her fourth, problems arose: Dr. Rice received poor scores on the American Board of Surgery Inservice Training Examination and was placed on academic probation; she reported being mistreated by attending physicians and faculty members; and the relationship between Dr. Rice and SLU deteriorated.

*September 6, 2016, Incident*

In September of 2016, Dr. Rice was enrolled in Dr. Michael Williams's vascular clinic. On September 6, Dr. Rice asked Dr. Williams if she could be excused from the clinic that afternoon so she could prepare for her upcoming Morbidity and Mortality ("M&M") presentation. Dr. Williams agreed. Later that day, Dr. Rice went to Dobbs Tire and Auto Centers to have her car tire repaired. Dr. Rice then met her husband at Fuzzy's Taco Shop for an early dinner. In the middle of their dinner, Dr. Williams called to check in with Dr. Rice before leaving the hospital for the day. During the call Dr. Williams heard background noise and asked Dr. Rice where she was. Precisely what Dr. Rice said next is contested: According to Defendants, Dr. Rice told Dr. Williams "she and her husband were going shopping and having an early dinner, and . . . she used the word 'mall' during their conversation." Doc. [19] ¶ 27. Dr. Rice denies telling Dr. Williams she was going shopping and denies using the word "mall," Doc. [38] at 7; she claims that she and Dr. Williams spoke about "mundane patient care matters," Doc. [38] at 33. For present purposes, the Court assumes that Dr. Rice's characterization of the conversation is accurate. *Duban*, 760 F.3d at 835. Regardless, it is undisputed that Dr. Williams relayed his version of the events to Dr. Catherine Wittgen, the Residency Program Director, telling her that Dr. Rice had skipped his lecture to go shopping at the mall.

*February 24, 2017, Letter*

In January of 2017, Dr. Rice was assigned to the Trauma Service, which was overseen by Dr. Carl Freeman. On March 2, 2017, Dr. Rice was called into a meeting with Dr. Freeman and four other attending physicians from the Trauma Service. Dr. Rice alleges that at the meeting, Dr. Freeman handed Dr. Rice what he described as a "consensus" letter from the Trauma Service. The letter was addressed to Dr. Wittgen, and it purported to memorialize the Trauma Service's concerns that Dr. Rice's personality traits were interfering with her progress as a

surgeon. The letter suggested that remediation was appropriate to help facilitate Dr. Rice's progress.

*April 3, 2017, CCC Meeting*

On April 3, 2017, just over a month after Dr. Rice received the Trauma Service's letter, the Clinical Competency Committee ("CCC") met to discuss Dr. Rice's performance during her fourth year of residency. At the meeting, Dr. Williams brought up the September 6th incident, stating that Dr. Rice had skipped his lecture to go shopping with her husband, which Dr. Williams suggested reflected poorly on Dr. Rice's professionalism. The CCC also discussed the Trauma Service's February 24th letter, and it considered Dr. Freeman's remediation suggestion. Ultimately, the CCC determined that Dr. Rice was unfit to advance to a fifth year of residency and drafted a letter informing Dr. Rice that she would have to repeat her fourth year.

Dr. Rice then met with Dr. Wittgen and other faculty members on April 7, 2017. The faculty members discussed several examples of Dr. Rice's deficiencies in order to explain the CCC's decision. In doing so, Dr. Wittgen recounted Dr. Williams's story that Dr. Rice had skipped Dr. Williams's clinic to go shopping at the mall with her husband.

At the end of Dr. Rice's repeat fourth year, her contract with SLU was terminated. Prior to her termination, Dr. Rice sued Defendants in the Circuit Court for the City of St. Louis, alleging breach of contract, defamation, and promissory estoppel. Dr. Rice's breach of contract claims were premised on SLU's alleged failure to comply with its own internal policies and its accreditation requirements. After protracted litigation, Dr. Rice voluntarily dismissed her claims without prejudice.

Dr. Rice then filed a new lawsuit in the Circuit Court, alleging breach of contract, defamation, and discrimination, and Defendants removed the case to this Court under 28 U.S.C. §§ 1331 and 1441. Defendants now move for summary judgment on Dr. Rice's breach of contract and defamation claims.

**II.    STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure 56, a court must grant a motion for summary judgment if it finds "that there is no genuine issue as to any material fact and that the moving

3

party is entitled to judgement as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact exists if a reasonable jury could return a verdict for" the non-movant. *Cockram v. Genesco, Inc.*, 680 F.3d 1046, 1051 (8th Cir. 2012) (quoting *Clark v. Matthews Int'l Corp.,* 639 F.3d 391, 397 (8th Cir. 2011)).

The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (internal quotations marks omitted). The burden then shifts to the non-movant to "present specific evidence, beyond 'mere denials or allegations [that] . . . raise a genuine issue for trial.'" *Farver v. McCarthy*, 931 F.3d 808, 811 (8th Cir. 2019) (quoting *Wingate v. Gage Cty. Sch. Dist.*, 528 F.3d 1074, 1079 (8th Cir. 2008)).

## III.   DISCUSSION

### A.  Breach of Contract

Defendants move for summary judgment on Counts I and II of the Petition (Doc. [5]). Both counts allege that SLU mishandled certain aspects of Dr. Rice's residency in violation of the residency agreement. Count I alleges SLU breached the terms of the residency agreement by failing to comply with its own Graduate Medical Education Policies ("GME Policies"); Count II alleges SLU breached the agreement by failing to comply with the Accreditation Council for Graduate Medical Education Requirements ("ACGME Requirements"). Dr. Rice argues that the GME Policies and ACGME Requirements were made applicable to her residency agreement through an "information sheet" that was attached as an addendum to that agreement.

Defendants believe they are entitled to summary judgment on these counts for two independent reasons: first, because Dr. Rice's claims are barred by Missouri's policy against educational malpractice suits, Doc. [18] at 12; and second, because Dr. Rice failed to make a prima facie showing of breach of contract, *id*. at 15. Because the Court agrees that Dr. Rice failed to make a prima facie case for her breach of contract claims, it will not address whether Dr. Rice's claims are barred by Missouri policy. *See Ziehr v. United States*, No. 10-00299-CV-S-DGK, 2011 WL 13291655, at *4 (W.D. Mo. June 17, 2011) ("Federal courts should avoid

4

state-law questions that are 'peculiarly within the province of the local courts,' when deciding them would be unnecessary.") (quoting *Harris County Com'rs Court v. Moore*, 420 U.S. 77, 83-84 (1975)).

"To make a claim for breach of contract, the plaintiff must show the existence of a contract or agreement and the terms of that agreement, that the plaintiff performed or tendered performance, that the defendant did not perform, and that the plaintiff was thereby damaged." *Western Sur. Co. v. Intrust Bank, N.A.*, 20 S.W.3d 566, 571 (Mo. Ct. App. 2000) (internal quotation marks and citation omitted). According to Defendants, Dr. Rice has not established that either GME Policies or ACGME Requirements were part of her residency agreement. Dr. Rice contends that those guidelines were either incorporated by reference into her residency agreement or, alternatively, implied terms in the agreement. Doc. [5] ¶¶ 5, 19.

Defendants argue that Dr. Rice forfeited her argument that GME Policies and ACGME Requirements were impliedly part of her residency agreement by failing to include it in her Petition. Doc. [47] at 7. Certainly, Dr. Rice cannot "amend her complaint through summary judgment briefing." *Bylo v. K-Mart Corp.*, No. 4:13CV2083 SNLJ, 2015 WL 1347153, at *1 (E.D. Mo. Mar. 23, 2015). But Dr. Rice did include this alternative argument in her Petition, albeit in abbreviated form. *See* Doc. [5] ¶ 19 ("In any event, both the SLU GME Policies and Procedures and the ACGME requirements are a part of the contract . . . ."). Though vague, Dr. Rice's allegation "satisfie[s] the essential requirement of notice to justify consideration of the issue[]." *Morgan Distrib. Co., Inc. v. Unidynamic Corp.*, 868 F.2d 992, 995 (8th Cir. 1989). Therefore, the Court will address both arguments.

        1. *Incorporation by Reference*

Contract interpretation is a question of law. *Theroff v. Dollar Tree Stores, Inc.*, 591 S.W.3d 432, 436 (Mo. banc 2020). "The cardinal principle for contract interpretation is to ascertain the intention of the parties and to give effect to that intent." *Intertel, Inc. v. Sedgwick Claims Mgmt. Servs., Inc.*, 204 S.W.3d 183, 196 (Mo. Ct. App. 2006) (citing *Butler v. Mitchell-Hugeback, Inc.*, 895 S.W.2d 15, 21 (Mo. banc 1995)). "If the contract is unambiguous, it will be enforced according to its terms. If ambiguous, it will be construed against the drafter . . . ." *Triarch Indus., Inc. v. Crabtree*, 158 S.W.3d 772, 776 (Mo. banc 2005).

5

Under Missouri law, "matters incorporated into a contract by reference are as much a part of the contract as if they had been set out in the contract in haec verba." *Dunn Indus. Group, Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 435 n.5 (Mo. banc 2003). "The intent to incorporate," however, "must be clear." *State ex rel. Hewitt v. Kerr*, 461 S.W.3d 798, 810 (Mo. banc 2015); *see also Intertel, Inc.*, 204 S.W.3d at 196 ("So long as the contract makes clear reference to the document and describes it in such terms that its identity may be ascertained beyond doubt, the parties to a contract may incorporate contractual terms by reference to a separate, noncontemporaneous document . . . .").

As Defendants point out, Missouri courts have consistently held that "mere reference" to another document does not establish a clear intent to incorporate that document. *See, e.g.*, *Dunn Indus. Group*, 112 S.W.3d at 436 ("Mere reference to the construction contract in the guaranty is insufficient to establish that Dunn bound itself to the arbitration provision of the construction contract"); *Kohner Properties, Inc. v. SPCP Group VI, LLC*, 408 S.W.3d 336, 343 (Mo. Ct. App. 2013) (citing *Dunn Indus. Group*, 112 S.W.3d at 435-36).

For her argument that the residency agreement incorporated both GME Policies and ACGME Requirements, Dr. Rice relies on an addendum to her first residency agreement. That addendum provides in relevant part that Dr. Rice's assignments, rotation schedules, and duty hours "must comply" with GME Policies and ACGME Requirements. Doc. [19-2] at 20. It also provides that concerns about the application of GME policies and procedures may be brought to SLU's Residents' Association. *Id*. at 21.

Assuming *arguendo* that the addendum itself is an enforceable part of the residency contract, Dr. Rice's breach of contract claims nevertheless fail as a matter of law, because the addendum does not demonstrate a "clear intent" to incorporate GME Policies and ACGME Requirements in their entireties into Dr. Rice's contract. "[W]hen a contract references another instrument, the language of that instrument becomes a part of the agreement *only to the extent specified by the reference*." *AB Realty One, LLC v. Miken Techs., Inc.*, 466 S.W.3d 722, 732 (Mo. Ct. App. 2015) (citing *Wilson Mfg. Co. v. Fusco*, 258 S.W.3d 841, 845 (Mo Ct. App. 2008)) (emphasis added). At most, then, the addendum might be read as intending to incorporate specific provisions of the guidelines—i.e., those governing resident "assignments, rotation schedules, and duty hours" and perhaps any GME provisions relating to the procedure for

6

bringing resident concerns. The Court does not decide whether those specific provisions are incorporated by reference, however, because those provisions alone could not sustain Dr. Rice's breach of contract claims. Dr. Rice does not claim that SLU breached its contract with her by improperly scheduling her assignments, rotations, or duty hours[1]; nor does her breach of contract claim have anything to do with the process for bringing GME compliance concerns. Thus, Dr. Rice does not allege breach of any provision that might arguably have been incorporated by reference into her residency contract under Missouri law.

   2. *Implied Terms*

Dr. Rice advances two arguments for considering GME Policies and ACGME Requirements to be "implied terms" of her residency agreement. First, Dr. Rice asks the Court to follow other jurisdictions in finding that, though "[t]he terms of the contract . . . are rarely delineated," "the relationship between a student and an education institution is contractual in nature." Doc. [37] at 18 (quoting *Chang v. Purdue University*, 985 N.E.2d 35, 46 (Ind. Ct. App. 2013)). Defendants argue that Dr. Rice's request is foreclosed by established Missouri precedent. Doc. [47] at 7.

The Court agrees with Defendants. Unlike other jurisdictions, Missouri courts have not recognized any implied contract between students and universities. *See Lucero v. Curators of University of Missouri*, 400 S.W.3d 1, 4-5 (Mo. Ct. App. 2013). Since "it is not the role of a federal court to expand state law in ways not foreshadowed by state precedent," the Court rejects Dr. Rice's first theory. *Ashley County, Ark. v. Pfizer, Inc.*, 552 F.3d 659, 673 (8th Cir. 2009) (quoting *City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415, 421 (3d Cir. 2002)).

Dr. Rice next contends that GME Policies and ACGME Requirements were "part of the contract" because "SLU promised Dr. Rice . . . that SLU would comply with its own GME Policies and Procedures and the ACGME Requirements." Doc. [5] ¶¶ 19, 5; Doc. [37] at 5. Dr. Rice has not introduced evidence of such a promise, but even if she had, that evidence would be barred by the parol evidence rule.

---

[1] Dr. Rice does claim that SLU breached ACGME Requirements by retaliating against her in various ways, including by assigning her a "unique rotation schedule." Doc. [5] ¶¶ 93, 116, 130. But she does not allege that SLU failed to comply with ACGME assignments, rotations, and duty hours standards.

7

In Missouri, "[e]xtrinsic evidence of a prior or contemporaneous agreement is generally not admissible to vary, add to, or contradict the terms of an unambiguous and complete written document . . . ." *Union Elec. Co. v. Fundways, Ltd.*, 886 S.W.2d 169, 170 (Mo. Ct. App. 1994). "If the document appears to be a complete agreement on its face, it is conclusively presumed to be the final and complete agreement between the parties." *Rosenfeld v. Boniske*, 445 S.W.3d 81, 87 (Mo. Ct. App. 2014); *see also Jake C. Byers, Inc. v. J.B.C. Investments*, 834 S.W.2d 806, 812 (Mo. Ct. App. 1992) ("[O]nly when the written contract is incomplete on its face may extrinsic oral evidence be introduced to show the complete and final agreement.").

Nothing about Dr. Rice's residency agreement or the attached information sheet indicates that the written documents were incomplete. The agreement sets out the duration of the contract and Dr. Rice's stipend, and it states that Dr. Rice's "reappointment is subject to the same terms and conditions as were set forth in [her] initial letter and to the terms, conditions, benefits and responsibilities described in the attached information sheet." Dr. Rice alleges that she did not receive the information sheet, but that would only render the agreement incomplete as to the information sheet. That would not license Dr. Rice to introduce evidence of a separate extra-textual promise that SLU would comply with GME Policies and ACGME Requirements.

Finally, Dr. Rice tries to avoid summary judgment by noting that one of the Defendants "admitted that the ACGME program requirements for graduate medical education and general surgery have been in effect throughout Plaintiff's residency . . . and that SLU is required to comply with these requirements." Doc. [37] at 24. That "admission" is of no consequence. SLU, like all other accredited institutions, must comply with certain requirements to maintain its accreditation. Dr. Rice still "must 'point to an identifiable contractual promise that [SLU] failed to honor'" if she wishes to avoid summary judgment on her breach of contract claims. *Lucero*, 400 S.W.3d at 5 (quoting *Miller v. Loyola Univ. of New Orleans*, 829 So. 2d 1057, 1060 (La. Ct. App. 2002)). Because she has not done so, Dr. Rice's breach of contract claims fail, and Defendants are entitled to summary judgment as to Counts I and II.

### B. Defamation

Defendants also move for summary judgment on Counts IV and V of Dr. Rice's Petition, both defamation claims. In Count IV, Dr. Rice accuses Drs. Wittgen and Williams of defaming her by stating falsely that she had gone to a shopping mall on September 6, 2016, after being

8

excused from vascular clinic to prepare for a presentation.[2]  In Count V, Dr. Rice accuses Dr. Freeman of defaming her when he presented to the CCC the February 24, 2017, letter from the Trauma Service attendings and falsely implied that it represented a "consensus" among the attendings.

"The elements of defamation in Missouri are:  1) publication, 2) of a defamatory statement, 3) that identifies the plaintiff, 4) that is false, 5) that is published with the requisite degree of fault, and 6) damages the plaintiff's reputation."  *Overcast v. Billings Mut. Ins. Co.*, 11 S.W.3d 62, 70 (Mo. banc 2000).  Defendants argue that Dr. Rice's claims fail to satisfy the first element of defamation—i.e., publication—because there is no evidence that Drs. Wittgen, Williams, or Freeman made the allegedly defamatory statements to anyone other than members of the "educational evaluative process" at SLU.  Doc. [18] at 17.  According to Defendants, this makes their statements "intra-corporate communications" that do not qualify as "publications" for the purposes of a defamation claim under Missouri law.  *Id.*

Defendants are correct that, in Missouri, "communications between officers of the same corporation in the due and regular course of the corporate business, or between different offices of the same corporation, are not publications to third persons."  *Hellesen v. Knaus Truck Lines*, 370 S.W.2d 341, 344 (Mo. 1963); *see also Lovelace v. Van Tine*, 545 S.W.3d 381, 383-84 (Mo. Ct. App. 2018) (explaining "intra-corporate immunity").  Thus, if Defendants' communications qualify as "communications between officers of the same corporation in the due and regular course of the corporate business," *Hellesen*, 370 S.W.2d at 344, or, as Missouri courts have put it elsewhere, as a "business . . . merely communicating with itself," *Van Tine*, 545 S.W.3d at 383 (quoting *Blake v. May Dept. Stores Co.*, 882 S.W.2d 688, 690 (Mo. Ct. App. 1994)), they cannot be defamatory as a matter of law.  *See Gray v. AT & T Corp.*, 357 F.3d 763, 766 (8th Cir. 2004) ("Missouri courts have broadly interpreted the intra-corporate immunity rule.").

Defendants' communications qualify for intra-corporate immunity under Missouri precedent.  The Missouri Court of Appeals has squarely held that universities qualify as

---

[2] There appears to be some confusion about when Dr. Wittgen made the statements in question.  Dr. Rice's complaint suggests Dr. Wittgen repeated Dr. Williams's story at the April 3rd CCC meeting, Doc. [5] ¶ 142, whereas the Statements of Material Facts say it was at the April 7th meeting.  *See* Doc. [19] ¶¶ 61, 62; Doc. [38] at 17.  The difference is inconsequential here, because on both accounts the information was communicated by the same person to the same body.

9

corporations for the purpose of the rule. *See Dean v. Wissmann*, 996 S.W.2d 631, 634-35 (Mo. Ct. App. 1999). In the same decision, that Court expressly endorsed the rule that "statements by faculty to each other about student [misconduct]" are "the legal equivalent of speaking only to one's self and are not publications." *Id.* at 635 (quoting *Walter v. Davidson*, 104 S.E.2d 113, 116 (Ga. 1958)). That principle is directly applicable to this case.

It is undisputed that Drs. Wittgen, Williams, and Freeman were faculty members of the SLU residency program in which Dr. Rice was enrolled at all times relevant to this lawsuit. Indeed, they were no ordinary faculty members: Dr. Wittgen is identified in Dr. Rice's Petition as "the program director of the Residency Program," Doc. [18-1] ¶ 12; *see also* Doc. [38] at 30, and the "supervising attending" on the vascular service to which Dr. Rice was temporarily assigned as chief resident, Doc. [18-1] ¶ 28; Doc. [38] at 31. Dr. Rice also refers repeatedly to Dr. Wittgen's responsibilities for providing her with feedback, evaluation, and discipline. *See* Doc. [18-1] ¶¶ 22, 31, 35, 37, 38. Similarly, Dr. Rice identifies Dr. Freeman as the chief of the Trauma Service during her residency, Doc. [5] ¶ 54, and she notes that Dr. Williams was not only a faculty member but also a member of the CCC, Doc. [5] ¶ 38. Defendants undoubtedly qualify as an "officers" of the SLU residency program for the purpose of the intra-corporate immunity rule. *Blake v. May Dep't Stores Co.*, 882 S.W.2d 688, 691 (Mo. Ct. App. 1994) ("Prior court decisions have not applied a narrow definition of 'officer.'"), *quoted in Van Tine*, 545 S.W.3d at 384.

A more significant question for the purpose of the intra-corporate immunity doctrine is whether the recipients of Defendants' allegedly defamatory statements qualify as "officers" of the SLU residency program. As clarified in a recent Missouri Court of Appeals decision, what matters most for the application of intra-corporate immunity is "the role of the person *receiving* the statement, rather than the person making the statement," because "[e]mployees must be able to bring personnel matters to the attention of supervisors without risk of liability." *Van Tine*, 545 S.W.3d at 384 (emphasis in original).

On the record before the Court, the members of the CCC do qualify as "officers" for the purposes of Missouri's intra-corporate immunity doctrine. Dr. Rice admits in her Petition that "one of the CCC's responsibilities is to evaluate residents on a semiannual basis," Doc. [5] ¶ 32,

10

and that it has a "duty to 'advise the program director regarding resident progress, including promotion, remediation, and dismissal,'" *id.* ¶ 74 (quoting ACGME Common Program Requirements §V.A.1.b).(1).(c)); *see also* Doc. [38] at 34 (explaining that the CCC "evaluates residents and makes recommendations to the Program Director regarding evaluation of residents' progress and competence . . . ."). Dr. Rice also repeatedly refers to the CCC's evaluations of her performance. *E.g.*, Doc. [5] ¶¶ 32-33, 49, 69-74.

These facts, most of which come directly from Dr. Rice's own filings, are more than enough to ground Defendants' claim there is no genuine issue of material fact as to whether members of the CCC qualify as supervisors, and that Defendants' communications to them in the context of evaluating Dr. Rice's performance are therefore protected by intra-corporate immunity. *See Gray*, 357 F.3d at 766 (citing participation in a team that investigated plaintiff's conduct as evidence of supervisory responsibility). Indeed, Missouri courts have identified the purpose of Defendants' meetings with the CCC—namely, to assess and evaluate program personnel, including Dr. Rice—as squarely within the purview of the intra-corporate immunity doctrine. *See Blake v. May Dep't Stores Co.*, 882 S.W.2d 688, 690 (Mo. Ct. App. 1994) ("Solving personnel problems is in the due and regular course of corporate business.").

In light of these facts, the burden shifts to Dr. Rice to "present specific evidence, beyond 'mere denials or allegations [that] . . . raise a genuine issue for trial'" that would undermine Defendants' entitlement to summary judgment. *Farver*, 931 F.3d at 811 (quoting *Wingate*, 528 F.3d at 1079). Dr. Rice fails to do so. She does not challenge Defendants' contention that their statements were not repeated to anyone outside the residency program. In fact, she admits as much. Doc. [38] ¶¶ 48, 66. Instead, Dr. Rice argues only that "Defendants have submitted no evidence, and cited no case law, to support this claim that all of the faculty members are supervisors." Doc. [37] at 25. That statement alone—which does not even rise to the level of a "denial" or "allegation," much less "specific evidence"—is insufficient to create a genuine issue of material fact, especially given the evidence Dr. Rice herself has provided of the supervisory functions performed by all parties to the communications.[3] Accordingly, the allegedly

---

[3] The rest of Dr. Rice's response to Defendants' intra-corporate immunity argument misses the mark. Dr. Rice's argument that "[e]ven if all attending physicians (faculty members) qualify as supervisors, intra-corporate immunity provides only a qualified privilege," conflates two distinct doctrines that protect corporate communications in the defamation context: "intra-corporate immunity," which dictates that

11

defamatory statements were all "intra-corporate communications" that do not qualify as "publications" under Missouri defamation law, and Dr. Rice's defamation claims against Defendants Wittgen, Freeman, and Williams all fail.

## IV.   CONCLUSION

For the reasons stated above, Defendants are entitled to judgment as a matter of law as to Counts I, II, IV, and V.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. [17]) is **GRANTED**.

**IT IS FURTHER ORDERED** that Counts I, II, IV, and V of the Petition (Doc. [5]) are **DISMISSED** with prejudice.

Dated this 4th day of June, 2020.

_Sarah E. Pitlyk_
Sarah E. Pitlyk
United States District Judge

---

communications among officers and supervisory employees are not "publications" for defamation purposes, and a qualified privilege that protects *some* intra-corporate communications to non-supervisors. *See Lovelace v. Van Tine*, 545 S.W.3d 381, 384 (Mo. Ct. App. 2018) (explaining the difference between intra-corporate immunity and qualified privilege for other intra-corporate communications). Here, Defendants claim—correctly—that their communications qualify for the categorical immunity provided by the first doctrine, not the qualified privilege afforded by the latter. *See* Doc. [18] at 17. Therefore, much of Dr. Rice's response is inapposite. *See* Doc. [37] at 25, 27 (citing qualified privilege cases *Rice v. Hodapp*, 919 S.W.2d 240, 244 (Mo. banc 1996); *Carter v. Willert Home Products, Inc.*, 714 S.W.2d 506, 513 (Mo. banc 1986); *Topper v. Midwest Div. Inc.*, 306 S.W.3d 117, 129 (Mo. Ct. App. 2010)).