**Complaint to the Equal Employment Opportunity Commission (EEOC),
the Missouri Commission on Human Rights, and the
City of St. Louis Civil Rights Enforcement Agency**

**Charge of Discrimination against St. Louis University**

| | |
|---|---|
| **Date:** | August 5, 2018 |
| **Complainant:** | Mandy Lyn Rice |
| **Address:** | 1636 Jonquil Dr., St. Louis, MO, 63119 |
| **Phone:** | (817) 846-9431 |
| **Email:** | mandyrice.do@gmail.com |
| **Other contact:** | Micheal Todd Rice, same address, (817) 680-5071 |
| **Employer:** | St. Louis University |
| **Address:** | 1 N. Grand Blvd., St. Louis, MO 63103 |
| **Phone:** | (314) 977-2506 |
| **Employees:** | Approximately 8,000 (per SLU website) |
| **Charge:** | Discrimination on the basis of sex |
| **Event dates:** | Beginning in July 2016, and ongoing |

Please reference the EEOC Form 5 filed simultaneously.

## INTRODUCTION

Physician residency training occurs after the completion of medical school. It is a specialty-specific, multi-year, structured program of combined academic study and paid, clinical employment. Residencies are designed to prepare trainees to pass their respective specialty board examinations and practice independently in their fields of medicine. Residents are simultaneously students and employees. Funding for their graduate medical education is primarily sourced from federal Medicare tax dollars. Given these factors, a resident's civil rights complaints may fall under both Title VII employment and Title IX education protections.[1] Additionally, the Patient Protection and Affordable Care Act (PPACA), section 1557, addresses discrimination in programs or activities which receive funding from the Department of Health and Human Services, which administrates Medicare.

---

1     . United States Court of Appeals, Third Circuit. Jane Doe v. Mercy Catholic Medical Center, No. 16-1247 (2017).

1                                    **EXHIBIT**         Initials _____

                                          **C**

Prior to entering medical school in Fort Worth, Texas in 2009, and then surgical residency in St. Louis, Missouri in 2013, Dr. Mandy Lyn Rice, DO (Doctor of Osteopathic Medicine), had been a pediatric intensive care and critical care transport registered nurse (RN) in San Antonio, Texas. After deciding to pursue general surgery as her specialty at the beginning of her third year of medical school, Dr. Rice interviewed at multiple residency programs around the country, including at St. Louis University (SLU) Hospital with Dr. Catherine Wittgen, the SLU general surgery residency program director.

Surgery is historically known to be a male-dominated field of medicine which tends to impose strong male-typical behaviors on its trainees and practicing surgeons. Those traits include being authoritative, outspoken, aggressive, competitive, and power-seeking[2]. However, in medical school, Dr. Rice had female surgeon and physician mentors who modeled strength in their femininity. She had never been exposed to toxic gender stereotyping as she would later encounter in residency at SLU.

In Dr. Rice's residency interview at SLU in December of 2012, Dr. Wittgen actively promoted her support of female surgeons in training. Dr. Rice relied upon this pro-female supportive environment in a male dominant field when making her decision to rank SLU as her number one choice in the National Residency Match Program. Once Dr. Rice had matched to SLU and begun the designated categorical, 5-year surgical residency program in June 2013, the learning and work environments would prove to be very different from those with which Dr. Wittgen had induced Dr. Rice.

Dr. Rice observed harmfully-applied, male-typical traits by female leadership and some female residents early on at SLU, including bullying and intimidation of those deemed out of favor by Dr. Wittgen or her close associates. Dr. Rice, herself, would become a target by her fourth year of residency. This anti-female trait sexism was directed at her by the repeated derogatory use of the "nurse" label by both male and female surgery faculty, such as Dr. Carl Freeman, Dr. Kevin Mahoney, Dr. Catherine Wittgen, Dr. Theresa Schwartz and Dr. Grace Montenegro. Many statements made to Dr. Rice made it clear that it was unacceptable to the faculty for Dr. Rice to demonstrate female-typical traits of kindness, compassion, nurturing, proactive communication, an inclusive team approach, and consideration of others as having equal importance.

Dr. Rice was told she was "too much of a nurse to be a surgeon" by multiple surgical faculty and on multiple occasions. This was a clear denunciation of her female characteristics. Once Dr. Rice confronted this accusation and exposed it as being discriminatory, the claim was altered to her being "too nice to be a surgeon." These accusations implied that her female characteristics made her unfit for a historically male dominant field. The spreading of those accusations among faculty and staff led to broad **gender stereotype priming**, in which gender stereotypes would be activated in others' minds (especially those who would evaluate Dr. Rice and determine her

---

2   . Greenberg CC. Association for Academic Surgery Presidential Address: Sticky Floors and Glass Ceilings. J Surg Research. 2017 Nov;219:1-10.

remediation and ultimate termination) to perceive her as unfit for the surgeon role associated with strong male traits[3].

In stark contrast to Dr. Rice's aforementioned discrimination within the surgery department, she was very well received throughout the rest of the hospital. She was lauded on an almost daily basis throughout other departments, by other faculty physicians, residents, nurses, medical students, and hospital staff for the very traits for which she was being criticized in her own department. Many people called Dr. Rice their favorite surgical resident over her nearly five years there. Several have written email evaluations and letters of support for Dr. Rice, which were submitted to her residency file. She was told by some that they would prefer to work with her over any other surgeon at SLU. As evidence of this rapport, Dr. Rice received the SLU Hospital Caring Physician of the Year Award in 2014, after also having been nominated for the same when she was an Intern in 2013. It is likely that Dr. Rice's positive reception for her personality and traits throughout the hospital served as a source of resentment for some faculty who were biased against those typically female traits.

Dr. Wittgen, the SLU general surgery residency program director, created Dr. Rice's semi-annual summary performance evaluation (the Milestones evaluation required by the Accreditation Council of Graduate Medical Education - ACGME) in March of 2016, and marked it with "critical deficiencies." These critiques were contradictory to existing individual faculty evaluations to that date and to the many personal interviews that Dr. Rice would seek out with other faculty in an attempt to clarify her performance and standing. Furthermore, this was even in contrast to Dr. Wittgen's own verbal feedback to Dr. Rice in this same timeframe.

In April 2017, the surgery residency program's Clinical Competency Committee (CCC) determined to remediate Dr. Rice to repeat her fourth year of surgery based on these unsupported evaluations, perpetuated sex discrimination of Dr. Rice as a former nurse, opinions submitted to the CCC primarily from those who accused her of being "too much of a nurse," and upon the untrue defamatory statement that she had abandoned her clinical duties while on the vascular surgery rotation to go shopping at the mall with her husband - another female stereotype activity. The CCC and Dr. Wittgen's decision to remediate Dr. Rice must be seen as retaliation for her rebuttals against these false statements, her confrontation of her accusers, and her refusal to be submissive to the male trait environment.

Dr. Rice had written a letter to the CCC members **[Exhibit A]** prior to their April 2017 meeting to explain much of the above and to request that they review her entire record. Nevertheless, the CCC did not review her entire record, spoke only of some perceptions and hearsay about Dr. Rice, then determined to remediate her - to make her repeat her 4th year of residency. Dr. Rice appealed that decision to the Chair of the Department of Surgery, Dr. Donald Jacobs, then to the Associate Dean of Graduate Medical Education, Dr. Julie Gammack, then to an appointed SLU Resident Grievance Council, and finally to the Dean of the Medical School, Dr. Kevin

---

3      . Burgess DJ, etal. Does Stereotype Threat Affect Women in Academic Medicine? Acad Med. 2012 Apr;87(4):506-512.

Behrns. The remediation was upheld at each stage of appeal, and there was never any recognition by these members of SLU leadership and faculty of any discrimination or failures of policies or procedures. In contrast, the temporary Ombudspersons for Residents at SLU - Dr. Sara Barnett (a PhD learning analyst) and Dr. Michael Railey (the Associate Dean for Diversity and Student Affairs, and a Family Medicine physician) - found numerous faults with the faculty, treatments, and processes in Dr. Rice's case.

As Dr. Rice sought clarifications and guidance from faculty, confronted the sexist discrimination, corrected and rebutted false statements, and defended herself, she was defamed throughout the department, harassed, treated poorly and retaliated against by many surgical faculty physicians. A case was steadily built against her for ultimate termination (non-renewal of her contract to finish her fifth and final year of residency), which was decided on April 11th and announced to her on May 4, 2018.

Over time, multiple faculty surgeons across multiple subspecialties told Dr. Rice that Dr. Wittgen had approached them to request that they provide harsh critiques against her. This treatment selected Dr. Rice out from her cohorts for heightened scrutiny, exposed her to a level of evaluation different from that of her peers, and created bias by implicitly communicating to the faculty that Dr. Rice had problems. Her evaluations generally deteriorated after this targeting began. Dr. Rice never failed a rotation, never had a poor patient outcome, no complaint was ever filed against her, and verbal feedback from faculty was generally positive throughout this time. Additionally, her formal written evaluations tended to become discordant, some saying that Dr. Rice needed to show more leadership and self-confidence while others criticized her for not being teachable and humble. These types of discordant evaluations in physician training are documented to often be gender influenced[4].

Dr. Rice's surgical rotation schedule was manipulated by Dr. Wittgen to place her in situations in which Dr. Rice would be disadvantaged. For example, Dr. Yosef "Jose" Greenspon (a pediatric surgery faculty) and Dr. Clinton Capiello (a pediatric surgery fellow) both told Dr. Rice in September 2017, that Dr. Wittgen had sent her back for an unnecessary return to the pediatric surgery rotation at Cardinal Glennon Hospital in order for her to be failed. Ultimately, Dr. Rice passed that rotation, receiving verbal feedback from Drs. Greenspon and Capiello that she was doing very well.

The reality in Medicine is that surgeons (including female surgeons) generally expect female trainees to abandon female gender schemas and adopt that of males[5]. Dr. Wittgen and multiple other female faculty surgeons appear to have abandoned their female traits to adopt the male ones that they perceive will benefit their careers. Rather than permit female trainees to maintain their own personality styles, they seem to punish new females that exhibit the traits that they, themselves, no longer demonstrate. To belong and succeed in surgery, they require the new

---

4        . Mueller AS, et al. Gender Differences in Attending Physicians' Feedback to Residents: A Qualitative Analysis. J Grad Med Educ. 2017 Oct;577-585
5        . Greenberg CC, et al.

4                                                                                                                        Initials _____

female to become an acting male. Dr. Rice refused to abandon her personality traits to become a different person. It is not necessary to be a man in order to be a successful surgeon. Dr. Rice retained a typically female gender schema while learning to meet the true demands and acquire the skills necessary to be a surgeon. As a result, she was discriminated against, harassed, retaliated against, and ultimately terminated for those typically female traits by Dr. Catherine Wittgen, Dr. Carl Freeman, Dr. Grace Montenegro, Dr. Theresa Schwartz, those influenced by them, as well as the complicit leadership of Saint Louis University.

**CHARGES OF DISCRIMINATION**

I. **Count One:** Sex Discrimination
   A. On a Wednesday in July 2016, Dr. Kevin Mahoney, a surgery faculty, stopped Dr. Rice in the hallway after her presentation to the department of surgery that morning to tell her that she presents "too much like a nurse" and "too nice".
   B. On or about 9/1/2016, Dr. Rice was in the OR directing the staff in the preparation of a surgical patient for amputation. Dr. Wittgen yelled at Dr. Rice, "Stop being a nurse! Go be a surgeon and scrub!" Witnesses include Julia Fitzger, anesthesia assistant, and Johanna Manbeck, circulating RN.
   C. During the September/October 2016 vascular rotation with Dr. Wittgen, as she and Dr. Rice walked into the ICU, an ICU nurse approached Dr. Rice to tell her "good morning" and give her a hug. Dr. Wittgen said, "this is not a sorority!"
   D. On 11/7/2016, vascular surgery fellow, Dr. Mai Doan, witnessed Dr. Wittgen tell Lori Voyles (Dr. Wittgen's secretary) and Dr. Jennifer Sanford (another vascular fellow) in the presence of residents and medical students at a high school career day at SLU Hospital, that "I think Mandy is too much of a nurse to be a surgeon. I will give her until April" - referencing the upcoming April, 2017, CCC meeting in which Dr. Rice's promotion to her final year of training would be determined.
   E. On or about 2/6/2017, while on trauma rotation with Dr. Carl Freeman (the director of trauma surgery at SLU), he tells Dr. Rice in his office that she is "too much of a nurse" and says that he had been in a meeting with Dr. Wittgen in which Dr. Rice's being "too much of a nurse" was a topic of discussion. Dr. Rice stated to Dr. Freeman that this was a discriminatory statement against her. He did not say it at any point after that. Instead, he and others would say that Dr. Rice is "too nice to be a surgeon."
   F. On or about 3/2/2017, Dr. Freeman presented Dr. Rice with an end-of-rotation "consensus letter" **[Exhibit B]** which he purported to be the consensus opinion of the trauma surgeons regarding Dr. Rice's performance for the previous two months' rotation with them. There is evidence that contradicts this being a consensus. Several trauma surgeons gave Dr. Rice written and verbal feedback which contradicts Dr. Freeman's letter. On this date, Dr. Rice was brought in for a meeting by Dr. Freeman to be given this letter (the first of this type of consensus letter and group meeting known to occur in the department - and which did not occur with any of Dr. Rice's cohorts subsequently to her knowledge). Dr. Freeman again told Dr. Rice that she was "too nice."
   G. Also present at the meeting of 3/2/2017 were Drs. Freeman, Rand, Tenquist, Naughton, program director Kris Forneris, and temporary resident ombudsperson Sara Barnett. Two of the surgeons in attendance did not endorse the letter and showed that they had not even read it, yet. Just five days before, when Dr. Rice had specifically requested personalized feedback from Dr. Naughton, he told her that "everything went smoothly." Immediately after the meeting, Dr. Naughton told Dr. Rice in the hallway, "That was terrible. Let's talk later." Dr. Barnett told

Dr. Rice that the meeting had been a "witch hunt." At an earlier exchange during that trauma rotation, Dr. Matthew Pieper (a trauma surgeon) told Dr. Rice that Dr. Wittgen had spoken with the trauma surgeons near the beginning of Dr. Rice's rotation and discussed with them what Wittgen perceived to be Dr. Rice's deficiencies. He also said that the trauma surgeons spoke amongst themselves afterward and wondered how "Dr. Rice had gotten on Dr. Wittgen's bad side" because the deficiencies that Wittgen described were not consistent with what they had witnessed in Dr. Rice during her last rotations with them 6 months prior. Dr. Rice submitted a rebuttal **[Exhibit C]** to Dr. Freeman's "consensus" letter.

H. On 4/7/2017, in a meeting called by Dr. Wittgen to discuss the CCC's findings against Dr. Rice, Wittgen told Dr. Rice that one of the reasons she will not be advanced was due to a concern for a lack of leadership as evidenced by Dr. Rice leaving Dr. Michael William's vascular clinic in order to go to the mall with her husband on 9/6/2016. Dr. Rice adamantly denied that as patently false and questioned its origination. She was suspicious that the lie had come from Jennifer Sanford, but Dr. Wittgen denied this. Dr. Rice had been formally released from clinic that day by Dr. Williams, but remained on campus working on a presentation. She even met with vascular fellow, Dr. Jennifer Sanford, around 3pm that day to discuss patients. Aside from being false and defamatory, an accusation of going to the mall is sexist and a female stereotype. Wittgen denied that Sanford had started that rumor, but Sanford had a history of hostility and attempting to sabotage Dr. Rice. Additionally, Dr. Julie Gammack (Associate Dean of Graduate Medical Education) was present at this meeting. She admitted to Dr. Rice that her resident file and evaluations had not been reviewed. Instead, CCC member perceptions of Dr. Rice were discussed. These perceptions would have to have been significantly influenced by the discussion of Dr. Rice as a former nurse. Also in attendance at this meeting were Dr. Michael Railey as Ombudsman and Kris Forneris, surgery residency program coordinator. Dr. Rice had been sent out of the room at the beginning of the meeting, once Dr. Railey had attempted to stand up for Dr. Rice by stating she had been bullied. Dr. Rice stood in the hallway for 7 minutes while the others in the room "shut him down" (according to what was later described to her by Dr. Railey). Once Dr. Rice returned to the room, Dr. Railey was not allowed to speak for the remainder of the meeting.

I. On 4/10/2017, Dr. Henry Randall (faculty surgeon and director of transplant surgery) requested to meet with Dr. Rice. With Dr. Rice's permission, he had spoken with Dr. Michael Railey (associate dean of diversity and student affairs) about Dr. Rice's experiences in the SLU surgery program. Dr. Randall told Dr. Rice that she needed to get an attorney.

J. In meetings with Dr. Theresa Schwartz (faculty surgeon and intermittent mentor to Dr. Rice - appointed March 2017), specifically on dates of 5/10/2017 and 5/26/2017, she told Dr. Rice that the CCC remediation decisions were based on the Freeman "consensus" letter and on the "vascular opinion," which was that of vascular surgeon Dr. Wittgen and likely Dr. Michael Williams.

7

Initials _____

- K. On July 6, 2017, Dr. Rice signed a contract **[EXHIBIT D]** with SLU leadership for the period of 7/1/2017 to 6/30/2018, to repeat the Post Graduate Year IV (PGY-4) of her residency. However, she would be receiving the higher PGY-5 stipend. This new contract was given to her despite the fact that she and SLU representatives had already signed a contract **[EXHIBIT E]** on 1/12/2017 for her PGY-5 final year of training, at the end of which she would have completed residency and become board eligible for the American Board of Surgery.
- L. On 9/5/2017, Dr. Tatyana Demidovich (a pediatric anesthesiologist at Cardinal Glennon Hospital) approached Dr. Rice to say "we all support you," as Dr. Rice's mistreatment was broadly known. Dr. Demidovich said that the anesthesiologists ridiculed the surgeons' saying that Dr. Rice was "too much of a nurse to be a surgeon." Instead, the anesthesiologists joked that "Mandy is too mean to be nurse, so she had to become a surgeon."
- M. On or about 9/8/2017, while on the pediatric surgery service, Dr. Jose Greenspon invited Dr. Rice into his office to tell her that the pediatric surgery attendings at Cardinal Glennon believe she is doing "an amazing job," that Dr. Wittgen had spoken to them about Dr. Rice, but that Wittgen would not get the bad evaluations that she wanted, that the residency program "has done you wrong." On or about 9/22/2017, Dr. Greenspon had another meeting with Dr. Rice in which he reported having sent an email to the assistant surgery residency program director, Dr. Jason Keune, to inform him that Dr. Rice would not be failed. He gave Dr. Rice overall positive verbal feedback in that meeting. By the time of Dr. Greenspon's formal written evaluation of Dr. Rice on 9/28/2017, his report of her was mediocre. On 11/22/2017, after almost two months of not working with Dr. Rice at all, Dr. Greenspon submitted an evaluation of Dr. Rice with worse scores, even though they had no interaction whatsoever in that interim timeframe. The director of the pediatric surgery fellowship program at Cardinal Glennon Hospital, Dr. Colleen Fitzpatrick, wrote a generally poor evaluation of Dr. Rice for that rotation. Previously, on or about 9/6/2017, Dr. Clint Capiello, a pediatric surgery fellow, told Dr. Rice that Dr. Fitzpatrick had told him that Fitzpatrick does whatever Dr. Wittgen wanted because Wittgen is difficult to argue with and things don't go well for a person that would disagree with her.
- N. The denigration of female stereotype traits in Dr. Rice were ongoing, and obviously shared between faculty as multiple of them would use the same phraseologies. For example, in Dr. Freeman's "consensus" letter, he criticized Dr. Rice for taking too much time speaking with families. Dr. Rice's background as a former nurse would continue to be a topic of conversation among faculty and was evident as late as 3/19/2018, when Dr. Montenegro called out of the OR and spoke to Dr. Lombardo (urology surgeon) and an OR nurse, Shannon, while Dr. Rice prepared a patient for surgery. Dr. Rice had never spoken to Shannon before, but as soon as she came back into the OR, Shannon asked Dr. Rice about her nursing background.

II.  **Count Two:** Harassment

8                                                                 Initials _____

A. On or about 9/9/2016 in a meeting requested by Dr. Rice to discuss the Milestones evaluations for which she sought clarification, Dr. Wittgen told Dr. Rice to "wipe that puppy dog look off of your face," instead proceeded to interrogate Dr. Rice on vascular surgery topics, and ultimately refused to discuss the Milestones, saying "we're moving on and not rewriting any of it."
B. On or about 4/20/2017, Dr. Theresa Schwartz told Dr. Rice that at the CCC meeting of 4/3/2017 that the members had talked about Dr. Rice having been a nurse, how nursing education involved "hand holding and sweet talk, like 'this is how we do things, okay?'" said in a mocking tone. She described ridiculing conversation about Dr. Rice in the CCC meeting.
C. In an email of 4/6/2017 to Dr. Rice, Dr. Sara Barnett (learning analyst and resident ombudsperson) wrote that "No one should have to go through this to become a surgeon."
D. An email of 4/21/2017 from Dr. Michael Railey (associate dean for diversity and student affairs) is one of his multiple emails and interactions with Dr. Rice which is supportive. He wrote of Dr. Rice being a "stronghold" against people in high places at SLU and of the "unprofessional(ism) and mistreatment" there.
E. In July 2017, a surgery resident, Ea-Sle "Iris" Chang, told Dr. Rice that during a recent surgery clinic with Dr. Montenegro and others, Montenegro was checking her email and said, "Dr. Rice's lawyer just emailed me!" (It was a SLU lawyer, not Dr. Rice's representation)
F. After Dr. Rice initiated litigation which, in part, addresses Dr. Freeman's treatment of Dr. Rice, he would not look her in the face, would not continue a conversation with her on the trauma phone when she answered, and would turn around and walk the other way when he saw her in the hallway.
G. On 2/27/2018, Dr. Grace Montenegro (faculty colorectal surgeon) accidentally texted Dr. Rice a message about Dr. Rice which was intended for Dr. Theresa Schwartz. It read, "I can't wait to tell you what I told her yesterday in our debrief about running the service." This was likely an exchange between the two faculty which ridiculed Dr. Rice.
H. On 3/4/2018, Obi Okoye (surgery resident) called Dr. Rice to relay a conversation that he had with Adrienne Smith (a medical assistant in the surgery clinics of Drs. Schwartz, Montenegro and others). Ms. Smith had left SLU for another job because of the toxic environment and told Dr. Okoye that she was very troubled to have heard the surgeons gossip and criticize Dr. Rice and Dr. Okoye in their absence.
I. In March 2018, Helene Burke (a nurse practitioner for colorectal and breast surgeons at SLU) told Dr. Rice that Drs. Schwartz, Montenegro and Luu (all surgery faculty) frequently gossip about Dr. Rice. Burke said that the environment with those surgeons is so toxic that the nurse practitioners relocated their work area away from the surgeons' offices. Rhonda Lebbing is another nurse practitioner that had spoken to Dr. Rice. It is known that she had submitted a complaint regarding Dr. Wittgen because Wittgen was so toxic that residents were afraid to talk to her regarding consults and patient care.

J. On 3/12/2018, Dr. Grace Montenegro was especially abusive to Dr. Rice, as well as a scrub tech and a circulating nurse, throughout a multi-hour colorectal surgery. Montenegro yelled at Dr. Rice and others, repeatedly used the word "fuck" and its derivations and generally destroyed the morale of the working environment. Dr. Rice made a formal complaint **[Exhibit F]** to the hospital and wrote formal complaints to other agencies, as a result. The OR staff also wrote a formal complaint to the hospital.

K. On 3/19/2018, there was a combined surgical case with colorectal and urology surgical services. While in the OR with Dr. Rice, Dr. Montenegro asked Dr. Lindsey Lombardo (urology surgeon) and Shannon (an OR nurse) to step outside. After several minutes, Shannon returned to the OR and immediately began to ask Dr. Rice about her nursing past as if Dr. Rice had been the main topic of conversation between the three women. Dr. Rice had never before spoken to Shannon privately, let alone about her past history as an RN. During that case, Dr. Montenegro whispered to Shannon about Dr. Rice, but those details could not be heard. Additionally that day, in Dr. Rice's presence, Dr. Lombardo rubbed Dr. Montenegro's shoulders and told her to take a deep breath, which Dr. Rice was certain was a reference to Dr. Montenegro still being angry at Dr. Rice for having filed a complaint against her. Around that time frame, Francesca Sciortino (a urology nurse practitioner) approached Dr. Rice to say that Drs. Montenegro and Lombardo had been speaking ill of Dr. Rice regarding the recent complaint filed against Dr. Montenegro.

III. **Count Three:** Retaliation

A. On 11/13/2016, Dr. Jason Keune, the assistant surgery residency program director, submitted an evaluation of Dr. Rice which with average to below average ratings, for a rotation from December of 2015 - 11 months prior. Also, the actual interaction that he had with Dr. Rice while on that rotation was negligible. The ACGME requires that evaluations be submitted timely. Keune submitted his evaluation 3 days after Dr. Rice had requested a meeting with him and challenged him on Dr. Wittgen's recent scoring of Dr. Rice's Milestones with "critical deficiencies," requesting substantiation.

B. On 10/31/2017, Dr. Felix Boecker, a trauma surgery faculty, submitted an evaluation of Dr. Rice which included the statement, "It is difficult to evaluate Mandy because I do not want to become the subject of another lawsuit." His evaluation of her was average. Six months prior, his evaluation of her, both written and verbal, had been very positive. He had treated her with kindness at that time and even encouraged her to keep fighting the surgery department for her position and career.

C. During the Interview Season of Oct-Dec 2017, Dr. Rice was neither included in the Interview Season emails nor invited to participate in any of the Interview activities. She was left off of the Residency email list-serve for these activities. She had previously been included on the email list with the remainder of her surgery resident colleagues.

D. On or about 3/4/2018, Dr. Mai Doan (vascular surgery fellow) told Dr. Rice that in the July-August 2017 timeframe, Dr. Michael Williams (vascular surgery faculty and member of the CCC) told Dr. Doan that Dr. Wittgen would try to get Dr. Rice fired. Dr. Doan told him that this would surely be recognized as retaliation.

E. On 3/14/2018, Dr. Grace Montenegro confronted Dr. Rice outside of an OR, a day after Dr. Rice had filed a complaint for Dr. Montenegro's dysfunctional behavior. Montenegro told Dr. Rice, "I'm so fucking mad at you I can't look you in the face!" and "I don't even know what to say to you. You are failing this rotation right now!" This verbal abuse was witnessed by the OR nurse manager, Kristin Dinges, who called the SLU Hospital Chief Medical Officer, Dr. Nirav Patel, to report it. Dr. Rice subsequently met with him and with the Chief Nursing Officer, Patti Kelley. They told Dr. Rice that she is the type of physician they wish they could retain at SLU Hospital and that it was unbelievable that SLU medical school had not responded to Dr. Rice's complaints and situation over the past months. Dr. Patel said, "I can't believe they haven't taken care of this!" On this day, NP Helene Burke told Dr. Rice that Dr. Montenegro was fuming about Dr. Rice while not in her presence, discussing her anger and Dr. Rice's lawsuit. "What is this lawsuit about, anyway?" Ms. Burke told Dr. Rice that she thought Dr. Montenegro was trying to get information out of her, but she did not engage.

F. On 3/19/2018, within a few days of Dr. Grace Montenegro being reprimanded by SLU Hospital for complaints made by Dr. Rice and OR staff regarding Dr. Montenegro's unprofessional and abusive behavior, Dr. Theresa Schwartz wrote a scathing and unfounded email to/about Dr. Rice **[Exhibit G]**. Generally, Schwartz called Dr. Rice the worst resident that she's seen, wrote that she doesn't trust Dr. Rice with her patients, and other excessive and unsubstantiated claims. Despite Schwartz's "distrust," Dr. Rice saw one of Schwartz's patients in the ER on 3/20/2018 without Dr. Schwartz as she did not answer her phone when Dr. Rice had called her about the patient. So Dr. Rice managed the patient on her own and sent her home with instructions. Schwartz thanked Dr. Rice by text later that day for her care of her patient.

G. On 3/22/2018, Dr. Montenegro refused to work with Dr. Rice in the OR. Dr. Rice had received a consult for an urgent surgical problem in the ER that day. She had worked-up the patient and made a plan with Dr. Montenegro for surgery that evening. Before that time however, Dr. Montenegro had a meeting regarding her abusive behavior of the previous week. It apparently did not go well for her, and after this meeting she was so angry at Dr. Rice that she would not return her texts. She told the administrative chief resident, Dr. Christine Henderson, to tell Dr. Rice that she was not allowed to operate on her patient. This was discussed with Dr. Rice in a meeting with two Chief residents, Dr. Henderson and Dr. John Patrick McCormmick, who encouraged her to take the weekend off as they would need time to figure out what to do next. It was on that Sunday that the email was received regarding the Rotation changes for Dr. Henderson to replace Dr. Rice on the Silver surgery Service.

H. On 3/24/2018, a Saturday, Dr. Rice wrote an email rebuttal **[Exhibit H]** to Dr.

11                                                                Initials _____

Schwartz's mischaracterizations. The next day, on Sunday, without anyone calling or communicating with Dr. Rice, she received an email without explanation from Kris Forneris (the program coordinator) with a schedule showing that Dr. Rice would be removed from her current service (Silver Surgery - colorectal and breast surgery) as chief resident and be placed on Transplant Surgery starting that Monday. No explanation was offered by any attending or the program director. When Dr. Rice talked that day to the administrative chief resident, Dr. Christine Henderson, she had received no details either.

I. On or about 5/10/2018, Dr. Carl Freeman refused to allow Dr. Rice into the OR. Dr. Rice was chief resident on the Acute Care Surgery service. Dr. Eddie Hsueh was her attending surgery faculty that week, however he was at another institution when a patient presented to the Emergency Department at SLU requiring urgent surgery. She had acute mesenteric ischemia requiring immediate operation. Dr. Rice prepared the patient for surgery, along with the Vascular Service, after she had been consulted. As Dr. Hsueh was unavailable, he asked Dr. Rice to find another general surgery faculty to do the case with her, starting with the Trauma Service. Dr. Freeman was the Trauma surgeon on call. Dr. Rice called him and asked him for help, which he agreed to. Before the case could start, however, he came down to the ER to meet the patient and, seeing Dr. Rice on the hallway, he abruptly turned around and walked away. At this time, Dr. Rice's junior resident, Dr. Jenni Keller, turned to Dr. Rice to inform her that Dr. Rice was not allowed into Dr. Freeman's OR. Keller was relaying the message according to Dr. Michael Williams and Dr. Freeman. When Dr. Rice told Dr. Hsueh about this over the phone, he yelled, "that's bullshit!"

J. In the month of May 2018, Dr. Rice was chief resident of the Acute Care Surgery (ACS) service. The faculty surgeons that cover that service spend a week in the role of rotating attending. For the last week of May 2018, Dr. Montenegro was scheduled to cover the ACS service, where Dr. Rice was chief resident. Dr. Rice received a schedule by email showing that for the week that Dr. Montenegro would be rotating on ACS, that Dr. Rice would be moved off service to work at the Veterans Affairs Hospital, then be moved back to SLU Hospital to be chief resident of ACS again the following week. This was also planned for a week during the month of June. There was no explanation given to Dr. Rice by any faculty or administrative chief resident as to why Dr. Rice was being relocated twice.

K. Dr. Rice was called in for a meeting on May 4, 2018, with Dr. Jason Keune (assistant surgery residency program director), Dr. Julie Gammack (associate dean of graduate medical education), and a new resident ombudsperson that Dr. Rice had never previously met - Lisa Israel, M.Ed. In that meeting, Dr. Rice was informed that she would not receive a contract for her fifth year of surgical residency, which is necessary to become eligible for board certification in surgery. Non-renewal of contract for residency training is a **termination**, not only of employment, but likely of the lengthy training path to become a board certified surgeon. Dr. Rice lacked 12 months or fewer in order to complete residency after

spending many years of education and significant debt in the pursuit to become a board certified surgeon. Dr. Keune told Dr. Rice that the non-renewal decision had been made at the last Clinical Competency Committee (CCC) meeting on April 11, 2018, and handed her a letter **[EXHIBIT I]** to that effect. Some of the faculty on the CCC include Drs. Freeman, Nazzal, Schwartz, Montenegro, Fitzpatrick, Troop and Williams. Most of the CCC judges of Dr. Rice's termination are accused here of prior and ongoing discrimination, harassment and retaliation. The roles of Drs. Freeman, Schwartz and Montenegro are well documented in this complaint. Dr. Williams was involved in the hearsay that was spread about Dr. Rice going to the mall. Dr. Fitzpatrick has been documented to avoid disagreement with Dr. Wittgen's wishes.

L. On May 10, 2018, Dr. Rice emailed a Notice of Departure to Dr. Wittgen and others **[EXHIBIT J]**. The ACGME requires residency program to allow residents to work for 6-months after notice of termination. However, Dr. Rice chose this day to be her last as the result of increasing retaliation, a toxic work environment, the disruption of her education by her own surgery faculty attendings, and the very short time frame left her to attempt to find another surgery residency program before the new academic year began on July 1, 2018.

M. While Dr. Rice attempts to find a position in another surgery residency program, she can work as a general practice physician. To that end, she applied for a Missouri medical license, which requires only one year of residency completion. The granting of the license typically takes 2 weeks after all materials are submitted, but also requires the Missouri Board of Healing Arts to contact the applicant's residency training program. Dr. Rice's application was complete on 5/24/2018. As of 8/4/2018, a license has not been issued. It is unknown what Dr. Wittgen submitted about Dr. Rice. This delay in the granting of medical licensure may be the result of ongoing retaliation by Dr. Wittgen and others at St. Louis University.

N. Dr. Rice has sent residency application materials to approximately 60 programs around the United States in an attempt to finish her surgical training. The ACGME requires an applicant's potential residency program to contact the current or recent residency program. Thus, a resident can be functionally blacklisted nationally since every potential program will receive the input of the current or recent residency program director before the transfer resident is offered an interview. It is unknown what information Dr. Wittgen has shared about Dr. Rice with potential residency program directors. Dr. Rice has had one phone interview with Dr. Lori Wilson of Howard University and only one official in-person interview, at St. Agnes Hospital in Baltimore.

O. On June 12, 2018, Dr. Rice interviewed at St. Agnes. During that personal interview, Dr. Kowdley, the residency program director, focused on Dr. Rice's former career as a nurse, asked her if she would act like a nurse and be quick to write up someone for an infraction, and if she would go back to a nursing job if she didn't find a new residency. The lack of residency training interview

invitations and the line of questioning from Dr. Kowdley appear to be the result of ongoing retaliation from Dr. Wittgen and/or others at St. Louis University.

Initials _____

**CONCLUSION**

Dr. Mandy Lyn Rice submits this complaint and supporting documents in a charge against St. Louis University for sex discrimination, harassment and ongoing retaliation. She reserves the right to seek redress through all available avenues, to include Title VII, Title IX and the PPACA section 1557 protections against discrimination. Dr. Rice requests that this complaint be investigated and that appropriate interventions be taken to restore her opportunity to complete the employment and training necessary to become a board eligible surgeon.

_____          _____

Signature of Complainant                                                    Date

State of _____

County and or City of _____

On this _____day of _____ in the year_____ before me, _____,

a Notary Public in and for said state, personally appeared _____,

known to me to be the person who executed the within Complaint, and acknowledged to me

that she executed the same for the purposes therein stated.

_____

Seal                                                                                                        Notary Public

Initials _____

## Exhibit Index

Exhibit A..............................Dr. Rice's Letter to the Clinical Competency Committee

Exhibit B.............................Dr. Freeman's Trauma "Consensus" Letter

Exhibit C............................Dr. Rice's Rebuttal to Dr. Freeman's Letter

Exhibit D................................Employment Contract, PGY-5 Replacement, PGY-4 Remediation

Exhibit E................................Employment Contract, Original, PGY-5

Exhibit F.............................Dr. Rice's Complaint Regarding Dr. Montenegro

Exhibit G............................Dr. Schwartz's Email Regarding Dr. Rice

Exhibit H.............................Dr. Rice's Rebuttal to Dr. Schwartz

Exhibit I..............................Notice of Contract Non-renewal

Exhibit J..................................Dr. Rice's Notice of Departure

Initials _____

## Witness List

1. Nirav Patel, MD (SLU Hospital Chief Medical Officer). 323-206-1686, nirav.h.patel@health.slu.edu

2. Mai Doan, MD (SLU vascular surgery alumna). 832-693-4209, maikdoan@gmail.com

3. Michael Railey, MD (Associate Dean for Diversity and Student Affairs, prior temporary resident ombudsman). 314-578-6225, michael.railey@health.slu.edu

4. Ea-sle "Iris" Chang, MD (surgery resident). 216-255-1403, easle.chang@gmail.com

5. Tatyana Demidovich, MD (Cardinal Glennon pediatric anesthesiology faculty). 314-577-8750, tatyana.demidovich@health.slu.edu

6. Sara Barnett, PhD (SLU learning analyst, prior temporary resident ombudsperson). 618-580-3261, sarahawkbarnett@gmail.com

7. Rhonda Lebbing, RN, Vascular Surgery NP. 314-681-4288

8. Helene Burke, RN, General Surgery NP. 314-518-6442

9. Francesa Sciortino, RN, Urology NP. 314-753-7162

10. Patti Kelley, RN (SLU Hospital Chief Nursing Officer). 314-420-5976

11. Kristin Dinges, RN, (SLU OR nurse manager). 618-920-7991. kristin.dinges@ssmsluh.com

12. Johanna Manbeck, Circulating and Scrub RN. 618-210-9274

13. Melissa Devore, Circulating and Scrub RN. 314-322-7181, mcd1993@gmail.com

Initials _____

14. Julia Fitzer, Anesthesiologist Assistant at SLU. julia.n.fitzer@gmail.com

15. Michael Williams, MD (SLU faculty vascular surgeon, member of CCC). 314-577-8317, michael.williams@health.slu.edu

16. Clint Capiello, MD (SLU pediatric surgery alumnus). 908-309-4676

Initials _____