```
                                    ┌─────────────────────┐
                                    │                     │
                                    │      EXHIBIT        │
                                    │                     │
                                    │         F           │
                                    │                     │
                                    └─────────────────────┘
```

## IN THE CIRCUIT COURT OF ST. LOUIS CITY
## STATE OF MISSOURI

| | |
|---|---|
| **MANDY RICE, D.O.,** ) | |
| ) | |
| **Plaintiff,** ) | **Case No. 1722-CC11181** |
| ) | |
| **vs.** ) | **Div. 1** |
| ) | |
| **ST. LOUIS UNIVERSITY,** ) | |
| **CATHERINE M. WITTGEN, M.D. AND** ) | |
| **CARL A. FREEMAN, M.D.** ) | |
| ) | |
| **Defendants.** ) | |

### PLAINTIFF'S MOTION FOR LEAVE TO AMEND PETITION AND TO JOIN
### ADDITIONAL DEFENDANT WITH SUGGESTIONS IN SUPPORT

COMES NOW Plaintiff, by and through undersigned counsel, and hereby moves the Court, pursuant to Rules 55.33 and 52.04 of the Missouri Rules of Civil Procedure, for entry of an order allowing Plaintiff to file her First Amended Petition and to join additional defendant. Plaintiff's proposed First Amended Petition is attached hereto as **Exhibit A**.

In support thereof, Plaintiff states:

1. Plaintiff filed her Petition on August 25, 2017 against defendants St. Louis University, Catherine M. Wittgen, M.D. and Carl A. Freeman, M.D.

2. Since the original Petition was filed, events have transpired which necessitates the addition of additional claims for retaliation in Plaintiff's count for breach of contract.

3. Rule 55.33(a) states, in part, that "…leave [to amend] shall be freely given when justice so requires."

4. In *Dueker v. Gill,* 175 S.W.3d 662, 671-72 (Mo. Ct. App. 2005), the Court stated:

Rule 55.3(a) instructs us that a petition may be amended by leave of the court, and that such 'leave shall be freely given when justice so requires.' The right to amend a pleading, however, is not absolute. Factors that should be considered in deciding whether to allow leave to amend a petition are: (1) hardship to the moving party if leave is not granted; (2) reasons for failure to include any new matter in earlier pleadings; (3) timeliness of the application; (4) whether an amendment could cure the inadequacy of the moving party's pleading; and (5) injustice resulting to the party opposing the motion, should it be granted

[citations omitted]... [T]he purpose of the grant of an amendment is to allow a party to assert a matter unknown or neglected from inadvertence at the time of the original pleading.

Rule 55.04(a) instructs us that a person shall be joined in the action if: (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been joined, the court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may be made a defendant.

5.   Further, documents received from Defendants through the discovery process have

Provided Plaintiff with information concerning Dr. Michael Williams' involvement in defamation

of Plaintiff.

6.   Plaintiff's amendments are justified by the rules and principles espoused above.

7.   Plaintiff seeks an order of this Court granting her leave to file a First Amended Petition

attached hereto as **Exhibit A.**

8.   Defendants will not be prejudiced by the filing of a First Amended Petition.

WHEREFORE, Plaintiff requests leave of court to join Dr. Michael Williams as an

additional defendant, to file a First Amended Petition in the form attached hereto as Exhibit A, and

for such further relief as the Court deems just and proper.

DANNA MCKITRICK, P.C.

BY:   /s/ David W. Morin
David R. Bohm, #35166
David W. Morin, #61590
7701 Forsyth Blvd., Suite 800
St. Louis, MO  63105-3907
(314) 726-1000/(314) 725-6592 fax
E-Mail:  dbohm@dmfirm.com
        dmorin@dmfirm.com
ATTORNEYS FOR PLAINTIFF

## **CERTIFICATE OF SERVICE**

The undersigned does hereby certify that I caused true and correct copies of the foregoing document to be served upon the parties receiving notice through the Court's ECF system by filing with the Court's ECF system on this 14th day of December, 2018.

/s/ David W. Morin _____

2055368.docx

**IN THE TWENTY-SECOND JUDICIAL CIRCUIT**
**STATE OF MISSOURI**
**(CITY OF ST. LOUIS)**

| | |
|---|---|
| MANDY RICE, D.O., | ) |
| | ) Case No. |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| ST. LOUIS UNIVERSITY, | ) |
| A Missouri Benevolent Corporation, | ) |
| | ) |
| | ) |
| CATHERINE M. WITTGEN, M.D., | ) |
| | ) |
| CARL A. FREEMAN, M.D., and | ) |
| | ) |
| MICHAEL WILLIAMS, M.D., | ) |
| | ) |
| **HOLD FOR SERVICE** | ) |
| | ) |
| Defendants. | ) |

## AMENDED PETITION FOR BREACH OF CONTRACT, PROMISSORY ESTOPPEL, DEFAMATION AND INJUNCTIVE RELIEF

Plaintiff, Mandy Rice, D.O., for her Petition, states as follows:

### Summary

1.     Plaintiff, Mandy Rice, D.O., was, until on or about May 10, 2018 a resident in the surgery program ("Residency Program") at St. Louis University Medical School ("SLU"). Shortly before completing her fourth year (July 1, 2016 through June 30, 2017) in the SLU Residency Program, and after already having signed a contract for her fifth (and final) year in the Residency Program, Dr. Rice was informed, without good cause, that she would be required to repeat the fourth year of the Residency Program. Dr. Rice pursued the process for appealing this decision through the grievance process provided under SLU's Graduate Medical Education Policies and Procedures, but

1

ultimately the decision to make her repeat the fourth year of residency was upheld by SLU's Associate Dean for Graduate Medical Education ("GME").  SLU then punitively, in retaliation for Dr. Rice challenging her being made to repeat a year of residency, assigned Dr. Rice to a unique rotation schedule substantially different from that of every other 4th year resident.

2.      For the repeat 4th year of residency (July 1, 2017 through June 30, 2018), Dr. Rice was assigned to several rotations which she had successfully completed in her third year of residency.  As a result, Dr. Rice was unable to obtain surgical experience required to become a Board eligible surgeon.

3.      During one of her rotations in March 2018, Dr. Rice was repeatedly verbally abused in the operating room by Dr. Grace Montenegro, an attending physician at St. Louis University Hospital ("Hospital"), and a SLU faculty member.  After one surgery in which she was subject to particularly abusive language by Dr. Montenegro, Dr. Rice (and several nurses in the operating room) reported this abuse to the Chief Medical Officer at Hospital, Dr. Nirav Patel.  This situation was apparently also reported by others to SLU.  Upon information and belief, Dr. Montenegro was given a warning by Dr. Patel on behalf of Hospital, and also by SLU, as a result of her abusive behavior toward Dr. Rice.  Thereafter, in retaliation for the report she made concerning Dr. Montenegro's abusive behavior and/or filing this lawsuit, Dr. Rice was removed from her rotation at Hospital and reassigned to John Cochran's Veterans Administration Hospital ("VA Hospital"), denying her opportunities to participate in performing surgeries necessary to qualify for Board certification.

4.      Shortly thereafter, and several months before she was to complete her repeat fourth year of training in the Residency Program, Dr. Rice was informed by SLU that it would not renew her residency contract for the fifth year of the residency program. SLU made the decision not to renew Dr. Rice's, without good cause, and in retaliation for Dr. Rice filing this lawsuit and reporting Dr. Montenegro's abusive behavior. Although SLU offered to allow Dr. Rice to remain employed by it for six months, she would not have been offered the opportunity for meaningful surgical experience during this time period, and if allowed to perform any surgical related work at all, would have continued to suffer retaliation from SLU and attending physicians in the Residency Program. In other words, she was constructively discharged by SLU from her employment. As a result, she submitted her resignation to SLU on or about May 10, 2018.

5.      SLU's GME Policies and Procedures are incorporated by reference in the residency agreement entered into between SLU and Dr. Rice. The Common Program Requirements and Institutional Requirements of the Accreditation Council for Graduate Medical Education ("ACGME") are incorporated by reference in the SLU GME Policies and Procedures. Alternatively, SLU promised Dr. Rice at the time that she executed her initial residency contract, and each subsequent yearly residency agreement, that SLU would comply with its own GME Policies and Procedures and the ACGME Requirements, which promise Dr. Rice relied upon in selecting SLU for her residency, and in continuing to renew her residency contract each year.

6.      SLU failed in many respects, as outlined more fully below, to comply with its own policies and procedures and the ACGME Common Program Requirements and

3

Institutional Requirements (hereinafter collectively "ACGME Requirements"), including

by: (a) failing to provide Dr. Rice with timely evaluations of, and feedback concerning

her performance throughout her residency; (b) placing her on probation in March 2016,

during her third year of residency, for low scores on the American Board of Surgery

Inservice Training Examination ("ABSITE") (a national standardized examination for

surgical residents) without specifying a term for said probation; (c) in failing to put her in

contact with SLU's ombudsman and failing to provide her with a mentor, educational

assistance, and monthly feedback at the time she was initially placed on probation in

March 2016; (d) in considering improper, false and defamatory statements in making its

decision to require Dr. Rice to repeat the 4th year of her residency; (e) by assigning Dr.

Rice to a rotation schedule for the repeat 4th year of residency which was not the

standard schedule of rotations for a 4th year resident, which did not offer her the

opportunity to gain surgical experience required to be eligible for Board certification, in

retaliation for appealing the decision to make her repeat the 4th year of the Residency

Program; (f) in removing Dr. Rice from a surgical rotation at Hospital and reassigning

her for the duration of the rotation to the VA Hospital, in retaliation for reporting that she

had been subjected to serious and repeated verbal abuse by Dr. Montenegro; and (g)

by not renewing Dr. Rice's residency contract for the 2018-2019 residency year, and

failing to promote her to the 5th year of residency, in retaliation for her filing this lawsuit

and/or complaining that she had been subject to repeated and serious verbal abuse by

Dr. Montenegro.   Each of these actions by SLU constituted a breach of the residency

contract between SLU and Dr. Rice; and/or otherwise breached the promise that SLU

had made to Dr. Rice when she initially entered into a residency agreement with SLU

4

and upon her execution of annual residency contracts thereafter, that SLU would comply with its own GME Policies and Procedures and ACGME Requirements.

## Parties and Venue

7.     Plaintiff, Mandy Rice, D.O. ("Dr. Rice"), is a natural person residing in St. Louis County, Missouri.

8.     Dr. Rice was, between on or about July 1, 2013 through May 10, 2018, employed as a medical resident in the general surgery residency program operated by SLU.

9.     St. Louis University is a Missouri benevolent corporation, with its principal place of business located in the City of St. Louis.

10.     One of the divisions of St. Louis University is its medical school, which operates a number of medical residency programs, including its general surgery residency program, which employs medical school graduates to further their medical education, provide practical training, and provide medical services to patients at Hospital and other hospitals in the St. Louis area.  The medical school is located in the City of St. Louis, and the surgery residency training program places residents in rotations in different departments of various hospitals, including St. Louis University Hospital, Cardinal Glennon Hospital, and John Cochran Veterans' Hospital, all of which are located in the City of St. Louis.

11.     At all times relevant to this lawsuit, Catherine Wittgen, M.D. was the program director of the Residency Program.  Dr. Wittgen works primarily within the vascular surgery department at Hospital, which is where her office is located.

5

12. Dr. Carl Freeman is a faculty member in the Residency Program, an attending physician at Hospital, and a trauma surgeon. He works at Hospital, and has an office located there.

13. Dr. Michael Williams is a faculty member in the Residency Program, an attending physician at Hospital, and a vascular surgeon. He works at Hospital, and has an office located there.

14. Venue is proper in this Circuit, in that Defendants may be found here, and all of the events giving rise to this lawsuit occurred within the City of St. Louis.

## Facts Common to All Counts

15. Dr. Rice became a Registered Nurse after graduating from San Antonio College in 1999. She soon thereafter decided she wanted to pursue a career as a physician and surgeon, and she began taking necessary classes and engaging in activities in her position as a nurse not ordinarily performed by nurses, to prepare herself for a career as a physician and surgeon.

16. Dr. Rice graduated from the medical school at the University of North Texas Health Science Center in Fort Worth, Texas in 2013.

17. Thereafter, Dr. Rice was accepted in the Surgery (Categorical) Residency program at SLU, starting on July 1, 2013, at which time she signed a residency agreement with SLU for the first year of residency. The Surgery Residency program is a 5-year program, and residents generally enter into a new residency agreement with SLU each year. Subsequently, Dr. Rice and SLU entered into a new residency agreement ("Agreement") each year for her second through fifth years of residency. A copy of the contract which Dr. Rice entered into with SLU on or about December 22,

2016 for her fifth year of residency ("as a Postgraduate Level V trainee") is attached hereto as **Exhibit 1**.

18.     Each of these agreements were subject to certain terms and conditions which were supposed to be set forth on an information sheet attached to the Agreement. However, no such information sheet was attached to the copy of Dr. Rice's fifth year agreement recently provided to her by SLU.  Upon information and belief, the information sheet provided, among other things, that the Agreement was subject to, or incorporated, the terms of the SLU GME Policies and Procedures (section 2.1 of the GME Policies and Procedures, which contains the provisions thereof relevant to this suit, is attached hereto as **Exhibit "2"**) and the ACGME Requirements (attached hereto as **Exhibits "3"** and **"4"**).   The ACGME Institutional Requirements, § IV.B.2.e) specifically require that the residency agreement directly contain or make reference to "grievance and due process" procedures.

19.     Dr. Rice received universally good evaluations from her attending physicians through her third year of residency.

20.     However, near the end of her third year, on or about March 31, 2016, Dr. Rice was placed on academic probation by SLU due to poor scores on the American Board of Surgery Inservice Training Examination ("ABSITE").  This is despite the fact that other residents in the SLU Surgery program have been allowed to advance and even graduate with poor ABSITE scores, and that SLU has allowed residents with poor ABSITE scores to transfer from other residency programs, without placing them on probation.  The letter placing her on probation is attached hereto as **Exhibit "5"**.

7

21.     ACGME and the American Medical Association recognize six core competencies – patient care, medical knowledge, practice-based learning and improvement, interpersonal and communication skills, professionalism and systems-based practice.  Prior to being placed on probation in March 2016, Dr. Rice had never been disciplined for, or told by her program director, Dr. Wittgen, or any other attending physician, that she had any deficiencies in any of the six core competencies.

22.     Contrary to the requirements of §2.6 of the SLU GME Policies and Procedures: (1) the March 2016 probation letter made no reference to the GME Ombudsman, and Dr. Rice was not referred to the ombudsman at the time she was placed on probation (2) Dr. Rice was not appointed a mutually agreed upon faculty advisor or mentor at the time she was placed on probation, (3) no specific probationary period was specified in the letter, and (4) Dr. Rice did not receive monthly evaluations of her performance by her supervisors while on probation. Additionally, the letter states that Dr. Rice was strongly encouraged to attend a board review course at her own expense, which she had recently done in November 2015.  Dr. Wittgen would later erroneously state in a meeting on or about June 13, 2017, which reviewed the outcome of the appeals process with several faculty members, that the surgery department had paid for the review course, as, upon information and belief, SLU had done for other residents with low in-service test scores.

23.     Dr. Rice received passing scores on her rotations during her third year of residency and was advanced to the fourth year of residency for the year starting July 1, 2016.

24.     Surgery residents rotate through a number of different surgical services each year (normally working for 1-2 months in each rotation).  During the fourth and fifth years, surgery residents generally serve as the "chief resident" for the service in which they are placed during each rotation.

25.     Attending physicians at SLU are supposed to evaluate residents on a timely basis following the completion of each rotation by the resident.  These evaluations are to be input into a computer program called "New Innovations," and be available for review, on demand, by the resident, the program director and others associated with the program.

26.     Dr. Rice's fourth year of residency started on July 1, 2016, at which time she was assigned as chief resident to the SLU trauma nights rotation. Both verbal feedback and the written evaluations in New Innovations for this rotation were overall very good.

27.     In September and October, 2016, Dr. Rice was assigned as chief resident to the SLU Vascular Service, on which Dr. Wittgen was a supervising attending.  During this rotation, on or about September 9, 2016, Dr. Rice was describing for the scrub tech and circulating nurse assigned to a surgery she was to perform how she wanted the patient to be positioned and prepped for an amputation.  Dr. Wittgen entered the room and angrily told Dr. Rice to, "Stop being a nurse!  Go be a surgeon and scrub."  When Dr. Rice tried to explain to Dr. Wittgen that Dr. Rice needed to direct the team to prepare the patient prior to her scrubbing and performing the operation, Dr. Wittgen adamantly repeated, in a loud voice, her instruction that Dr. Rice go and scrub.  This was stated in front of the OR and anesthesia staff.  This was not the first time that Dr.

9

Rice had been reprimanded by Dr. Wittgen or other attendings for being "too much of a nurse." This was just one example of Dr. Wittgen's displaying intimidating behavior towards Dr. Rice during her rotation on the vascular service.

28.     Dr. Wittgen generally created a hostile environment for, and exhibited animus toward, Dr. Rice which made it difficult for Dr. Rice to perform her job as a chief resident of the Vascular Service.

29.     Further, contrary to the American Board of Surgery's ("ABS") training requirements, a surgical fellow was assigned to the vascular service at the same time Dr. Rice was assigned as chief resident to the same service.  As a result, the lines of authority were unclear, and created further difficulties for Dr. Rice during her vascular rotation.

30.     Neither Dr. Wittgen nor any other attending from the vascular service ever entered an evaluation of Dr. Rice in the New Innovations system to assess her overall performance as chief resident during September and October 2016.  Other than Dr. Wittgen's negative comments to Dr. Rice during their meeting on September 9, 2016 (see paragraph 34, below), Dr. Rice received overall positive verbal feedback from the other attending physicians on the vascular service.

31.     At the end of August 2016, Dr. Rice was instructed to go to the Program Coordinator's office to sign the Milestones Evaluation Report prepared from the findings made at a March 2016 meeting of the Surgery Residency Clinical Competency Committee ("CCC") (one of the CCC's responsibilities is to evaluate residents on a semi-annual basis).

32.     Receiving written Milestone scores from the March 2016 CCC meeting,
nearly 6 months after the CCC meeting, did not provide Dr. Rice with timely guidance as
to what she might need to do to improve her performance as a resident and surgeon.
This is in violation of §2.1.II.3 of the GME Policies and Procedures, which require that
residents be provided a quarterly evaluation by their residency program, and §2.1.II.4
thereof, which requires that "concerns about unsatisfactory performance should be
communicated in writing to the resident as soon as possible during the academic year
with suggestions for improvement." Instead, Dr. Rice was presented during her fourth
year of residency with an evaluation performed during her third year of residency.

33.     The low scores on the Milestones report were generally contradictory to
evaluations of Dr. Rice that had been input in the New Innovations system, and also
with the oral feedback that Dr. Rice received from her attending physicians.

34.     Upon receipt of the Milestones report, Dr. Rice requested a meeting with
Dr. Wittgen and Dr. Jason Keune, the assistant program director, to discuss the
evaluations of her set forth in the report. This meeting was scheduled for and took
place on September 9, 2016. However, Dr. Keune did not attend most of this meeting
(he came in at the very end) as he was in surgery. Dr. Wittgen started the meeting with
the statement, "wipe that puppy dog look off of your face," then began criticizing Dr.
Rice's performance on her vascular service where Dr. Rice was currently serving as
chief resident, although Dr. Wittgen never submitted a written evaluation of Dr. Rice's
performance on the vascular service in the New Innovations System.

35.     During the meeting, Dr. Rice explained to Dr. Wittgen the difficulties and
disruptions that resulted from having both a fellow and chief resident on the Vascular

Service at the same time, and also stated that having both a chief resident and fellow on a service at the same time violated ABS training requirements. The difficulties and disruptions were, at least in part, the result of contradictions in treatment plans for patients; confusion within the team as to whom assumed ultimate clinical responsibility under the attending surgeon; breaks in the lines of communication between team members such that important information, consult requests, and plans regarding patients would bypass Dr. Rice as the chief resident, which could put patients at risk and potentially give the impression to attending physicians and others that Dr. Rice was inattentive or uninformed regarding the patients for whom she was responsible. In essence, the disruptions undermined Dr. Rice's leadership and clinical decision making. While Dr. Wittgen promised to get the fellow "off Dr. Rice's back," the problems caused by having both a fellow and chief resident on service at the same time continued throughout Dr. Rice's remaining time on the Vascular Service.

36.    Although the meeting had been requested by Dr. Rice to review the Milestone report, and the basis for the low scores reflected on that report, Dr. Wittgen did not discuss the report at the meeting, other than to state "We're moving on and not re-writing any of it." Dr. Keune arrived from surgery at the end of this meeting and did not express any opinions concerning Dr. Rice or the Milestone report.

37.    At the end of the vascular surgery rotation, Dr. Rice sought oral feedback from attending physicians in the vascular surgery service, including Dr. Michael Williams and Dr. Wittgen. Dr. Williams, who is a member of the CCC, reassured Dr. Rice that there were no significant problems with her performance on the vascular service. Dr. Wittgen told Dr. Rice that she had seen improvement and could see that Dr. Rice had

12

been studying. Thus, Dr. Rice's time on the Vascular Service ended with her receiving positive verbal feedback.

38.     However, Dr. Rice never received any written, or additional oral, evaluations during or following her vascular surgery rotation. This violates ACGME Common Program Requirement §V.A.2.a), which provides that, "The faculty must evaluate resident performance in a timely manner during each rotation or similar educational assignment, and document this evaluation at completion of the assignment."  Further, § 2.1.II.3. of the SLU GME Policies and Procedures requires, in relevant part, that "Each department/program director is responsible for developing and implementing a system to evaluate the knowledge, skills and professional growth of residents using defined criteria that meets or exceeds ACGME and specialty board standards…"

39.     In November and December 2016, Dr. Rice was assigned to a trauma/acute care surgery rotation at Mercy Hospital.  The evaluations submitted to the New Innovations system, and oral feedback received by Dr. Rice, concerning her performance during this rotation were universally positive.

40.     Although Dr. Wittgen had provided Dr. Rice with generally positive oral feedback in October 2016, at the conclusion of her vascular surgery rotation, Dr. Rice soon was informed that Dr. Wittgen was saying very different things about Dr. Rice behind her back.   On Monday, November 7th, 2016, Dr. Rice  was told that earlier that afternoon, during a high school girls' career day at SLU Hospital, Dr. Wittgen told several people in a public setting that "I think that Mandy is too much of a nurse to be a surgeon," and that she would "give (Dr. Rice) until April." These statements by Dr.

Wittgen in a public setting violated the provision of §2.1.II.3 of the GME Policy and Procedures, which provides, in relevant part, that "Departmental deliberations concerning the performance of individual residents should be confidential."

41.     On November 10, 2016, Dr. Rice met with Dr. Bryan Troop to discuss the allegation that she was "too much of a nurse". Dr. Troop is a trauma surgeon, the Residency Director at Mercy, and additionally, a member of the CCC. At that meeting, Dr. Troop stated he didn't think there was concern about Dr. Rice having been a nurse, but rather that she had a people-pleasing personality. He said, "We don't want to change your personality." He described that his group at Mercy wanted to push her to clearly state her plans with confidence so that they could evaluate her judgment. He denied there being any critical deficiencies, said that Dr. Rice had good judgment and is a safe surgeon. He told Dr. Rice that he did not see a need for remediation or repeating of the year. He noted that no one at Mercy was worried about her and that the group of surgeons there enjoyed working with her.

42.     Later that same day, November 10, 2016, Dr. Rice met with Dr. Keune, the Assistant Program Directory, and Ms. Kris Forneris, the Program Coordinator (a non-medical position), to review findings concerning Dr. Rice at the most recent CCC meeting.  In that meeting, Dr. Keune said that the group had determined that Dr. Rice had "critical deficiencies" and that some attending physicians believed her lack of confidence could lead to reduced trust in her decision making. Additionally, he stressed that Dr. Rice should work on as many ABSITE practice questions as possible in an effort to increase her ABSITE score.

43.     Before the conclusion of the November 10, 2016 meeting, Dr. Rice requested that she be provided with documentation of her alleged deficiencies (including dates of observed deficiencies, specific descriptions of any problems observed by faculty, and who witnessed each alleged deficiency), the specific metrics that would be used to measure her progress, and a specific plan for improving performance.

44.     In response to Dr. Rice's request made at the conclusion of the meeting on November 10, 2016, Dr. Rice received a letter from Drs. Wittgen and Keune dated November 14, 2016, attached hereto as **Exhibit 6**.  This letter had been placed in Dr. Rice's mailbox at the SLU library, despite the fact that she was on a two month rotation at Mercy Hospital in November and December 2016.  Dr. Rice only became aware that there was a letter for her in her mailbox at SLU when Ms. Forneris e-mailed her on December 14, 2016, asking that Dr. Rice sign a letter, without any indication of its content.  Dr. Rice's schedule did not permit her to retrieve the letter until December 21, 2016.

45.     The letter dated November 14, 2016, from Drs. Wittgen and Keune contained no specifics to back up the alleged deficiencies noted in the Milestone report and no information as to the metrics which would be used to measure Dr. Rice's progress.  Further, it contained no suggestions regarding how Dr. Rice could improve with regard to any of the alleged deficiencies cited in the letter. While the letter stated that all members of the Department of Surgery faculty had offered to assist Dr. Rice none of them offered any assistance to Dr. Rice outside of normal supervision in the operating room, until Dr. Keune spent less than half an hour with her near the end of a

session in the cadaver laboratory on April 14, 2017. (Dr. Rice had scheduled this session on her own initiative).

46.     The November 14, 2016 letter identified nine issues of supposed deficiency, however, despite her request, Dr. Rice never received any supporting documentation or other evidence for these allegations of deficient performance. Reference is made in the letter to alleged "common issues identified by attending surgeons on the trauma, vascular, blue surgical service(s)...." Of the services listed: (a) the only New Innovations evaluation from the blue service was submitted by Dr. Hsueh, which was good; (b) the New Innovations evaluations from trauma had some constructive criticism, but were overall good; and (c) none of Dr. Rice's attending physicians on the vascular service ever submitted any evaluations on New Innovations.

47.     The lack of specifics regarding deficiencies, the metrics which would be used to evaluate Dr. Rice, and suggestions regarding steps Dr. Rice should take to improve her performance in both the CCC evaluation of Dr. Rice and the follow up letter of November 14, 2016, demonstrate a lack of compliance by the surgery residency program with § 2.1.II.3. of the SLU GME Policies and Procedures, which provide in relevant part, that:

> The residency program must demonstrate that it has an effective plan for assessing resident performance throughout the program and for utilizing assessment results to improve resident performance. This plan should include: use of dependable measures to assess residents' competence..., and a process involving use of assessment results to achieve progressive improvements in residents' competence and performance."

48.     Dr. Rice responded to the November 14, 2016 letter from Drs. Wittgen and Keune, by letter dated December 27, 2016 (attached hereto as **Exhibit 7**). In that

16

letter, Dr. Rice pointed out that the November 14 letter did not contain any specifics regarding the alleged deficiencies to which she could respond, and again requested such specifics. The only response Dr. Rice received to her December 27 letter was an email from Dr. Wittgen which directed Dr. Rice back to her resident file for clarification. However, there was no documentation in the file which supported the alleged deficiencies, and nothing in the file which specified how her progress would be measured or which identified steps Dr. Rice should take to improve her performance.

49.     Since December 2016, a number of documents which are critical of Dr. Rice have been placed in her resident file. A number of these documents have been backdated, so as to indicate that they were placed in her file prior to December 2016, and/or contain incorrect information. These documents were placed in Dr. Rice's file despite the absence of any negative events, poor patient outcomes, complaints or written evaluations that would support the negative findings, much less the conclusion that Dr. Rice exhibited critical deficiencies.

50.     Prior to the conclusion of Dr. Rice's trauma/acute care surgery rotation at Mercy Hospital at the end of December, 2016, Dr. Rice sought out formal and/or informal feedback from her attending physicians in that program. Overall, the feedback was quite positive, and all of the attending physicians with whom Dr. Rice worked during that rotation denied that she had any critical deficiencies. Several of these physicians wrote formal evaluations which were submitted through the New Innovations system. Dr. Rice received no rating of less than a 4 on a scale of 6 from any of the reviewing physicians.

51. In January and February of 2017, Dr. Rice was assigned a rotation as daytime chief resident on the Trauma Service at SLU Hospital. While working on that service, Dr. Rice sought feedback and advice for improvements from her attending physicians. None of the attending physicians on the service stated that they had observed any significant deficiencies with regard to Dr. Rice's performance as a resident. Further, all of the evaluations submitted through New Innovations by trauma service attending physicians for this rotation were positive.

52. However, during an exchange that Dr. Rice had with Dr. Carl A. Freeman, the chief of the trauma service, in January 2017, he said that Dr. Rice was "too much of a nurse." After having heard that accusation for months, Dr. Rice responded that she found this statement to be discriminatory and biased. From that point on, Dr. Freeman accused Dr. Rice of being "too nice." Dr. Freeman did stress that Dr. Rice needed to be more direct and assertive, which is constructive criticism, but he did not identify any significant deficiencies or offer any specific improvement plans.

53. While she was serving her SLU Hospital trauma rotation, Dr. Rice was told that at the beginning of the rotation, in January of 2017, Dr. Wittgen had met with the attending physicians in the trauma department at which time she informed them of what Dr. Wittgen described as Dr. Rice's shortcomings. Reportedly, several of the trauma surgeons, when speaking amongst themselves after the meeting with Dr. Wittgen, wondered out loud "what Mandy had done to get on Dr. Wittgen's bad side," and noted that they had not witnessed what Dr. Wittgen had described to them when Dr. Rice had been on the SLU Trauma Service in July and August of 2016. Upon information and

belief, Dr. Wittgen met with the trauma surgery attending physicians to "poison" their evaluation of Dr. Rice.

54.     During the two-month trauma rotation at SLU, Dr. Rice successfully managed the trauma bay, the surgery floor, the operating room, and even the trauma ICU – as there was no trauma fellow present in January 2017. In her role as chief resident, Dr. Rice evaluated patients, created plans, and managed trauma and critical care patients every day with increasing autonomy. Dr. Rice notified her attending physicians of the surgery plans for patients of whom she took charge. These plans were rarely altered by her attending physicians. In addition, Dr. Rice operated, worked with the nurse practitioners, and directed the interns and medical students, without any significant problems.

55.     During her time as chief resident of the SLU Hospital Trauma Service, none of the patients for whom Dr. Rice was responsible suffered an adverse outcome. In fact, none of Dr. Rice's patients ever suffered an adverse outcome during her fourth year of residency. Nor did Dr. Rice receive any negative written evaluation from an attending physician while on the trauma service.

56.     At the end of her rotation as chief resident on the Trauma Service, Dr. Rice was invited by Dr. Freeman to an unprecedented meeting with some of the attending physicians from the Trauma Service. Dr. Freeman told Dr. Rice that this would be the first of what would become a routine end of rotation session for all subsequent residents. However, upon information and belief, no subsequent chief resident has had such a meeting with attending physicians at the conclusion of their rotation on the Trauma Service.

57. This meeting took place on March 2, 2017. There were four attending physicians from the Trauma Service present. Dr. Freeman handed Dr. Rice what he stated was a "consensus" letter, from the trauma service (attached hereto as **Exhibit 8**), dated February 24, 2017. The letter contained multiple severe critiques that were contradictory to the written evaluations, and oral feedback, that Dr. Rice had previously received from many of the same surgeons present at this meeting Dr. Freeman's overarching critique was that Dr. Rice was "too nice," which "could interfere with leadership," and might also make it difficult for the attending physicians to "decipher through that." This letter was addressed to Dr. Wittgen as program director and recommended that Dr. Rice be remediated.

58. At least two of the attending physicians present at the March 2, 2017 meeting were visibly and vocally in disagreement with the letter's content. Upon information and belief, the letter had not been circulated to the attending physicians in the Trauma Service prior to the March 2, 2017 meeting, and did not actually represent the consensus of the attending physicians on the Trauma Service.

59. Despite the recommendation in the alleged "consensus letter," Dr. Rice received a passing grade for her January – February 2017 SLU Trauma Surgery rotation.

60. Dr. Rice responded to the "consensus" letter from the Trauma Service by letter dated March 4, 2017 (attached hereto as **Exhibit 9**), which was e-mailed to all of the trauma attendings and Dr. Wittgen, as program director. In that letter, Dr. Rice requested data to corroborate the "consensus" findings of the February 24 letter, which was never provided to her. In her March 4 letter, Dr. Rice cited from various, almost

entirely positive, New Innovations and email evaluations that she had received from the

attending physicians on the Trauma Service, and stated that the allegations in the

February 24 letter were contradictory to these evaluations.

61. Dr. Rice closed her March 4, 2017 letter as follows:

> A recurring theme in our meeting Thursday was a problem with my
> "niceness," which Dr. Freeman then stated may be interfering with
> the attendings' ability to assess me and my progression. This
> critique is vague and needs clarification. I don't believe that my
> personality has resulted in a problem or poor patient outcome and,
> in fact, I believe there is overwhelming evidence to the contrary. In
> summary, I believe that the statements in your letter, the concern
> for my progression to fifth year, and the call for remediation with
> formal counseling sessions are generally unfounded. Furthermore,
> the very late voicing of many of your concerns, after the completion
> of four months on trauma service, robs me of my ability to have
> been able to address them during our time together and to have
> made improvements. The submission of your letter to my residency
> file greatly threatens my progression to fifth year. This comes at an
> especially critical time as I need to be gathering letters of
> recommendation and starting applications for trauma/surgical
> critical care fellowship.

62. Because none of the concerns expressed in the February 24, 2017 letter

had been communicated to Dr. Rice during her rotation as Day Trauma Surgery Chief

Resident, Dr. Rice was not able to address the alleged deficiencies while working on the

Trauma Service. Again, this violates the spirit, of §§ 2.1.II. 3-6, and specifically violates

§ 2.1.II.4. which requires that, "Concerns about unsatisfactory performance should be

communicated in writing to the resident as soon as possible during the academic year

with suggestions for improvement; and § 2.1.II.3, which requires "regular and timely

performance feedback to residents; and … use of assessment results to achieve

progressive improvement in residents' competence and performance."

63.    On March 7, 2017, Dr. Wittgen wrote a letter to Dr. Rice, informing her that Dr. Theresa Schwartz had been appointed as a mentor for Dr. Rice. This was the first time Dr. Rice was notified that a mentor was being assigned to her.

64.    On or about February 23, 2017 Dr. Rice met with Dr. Julie Gammack, Associate Dean for Graduate Medical Education, to express Dr. Rice's concern that Dr. Wittgen was trying to set Dr. Rice up to require her to repeat her fourth year of residency. Dr. Gammack told Dr. Rice that she was unaware of any attempt to impose remediation and that since Dr. Rice had already signed her contract for the PGY-5 year (signed on January 12, 2017), it was unlikely that Dr. Rice would be remediated.

65.    The failure to appoint a mentor for Dr. Rice when she was placed on probation in March 2016, with the surgery residency program waiting a year to appoint a faculty mentor, violates § 2.1.II.6. of the SLU GME Policies and Procedures, which provides in relevant part that the required remediation plan "must include assistance by the GME Ombudsman and the appointment of a mutually agreeable faculty advisor."

66.    During the February 23, 2017 meeting, at Dr. Rice's request, Dr. Gammack agreed to attend and monitor the upcoming surgery residency CCC meeting to ensure objectivity and compliance with ACGME procedures. However, on information and belief, Dr. Gammack stated to Dr. Sara Barnett (SLU's learning analyst who was acting as ombudsman at the time), on or about March 6, 2017, that if Dr. Rice were made to repeat the 4th year of residency that Dr. Rice should consider that a gift, as she could be dismissed from the program entirely

67.    On or about April 3, 2017, the CCC met to discuss Dr. Rice's performance during her fourth year of residency. Upon information and belief, Dr. Gammack was

present at this meeting of the CCC (of which she is not a member). While the CCC was supposed to score Dr. Rice's performance during the previous 6 months on the Milestone report, upon information and belief, it did not do so and, instead, Dr. Wittgen individually scored Dr. Rice on the Milestone report.

68.     Upon information and belief, the CCC did not review any of the evaluations of Dr. Rice that had been filed in the New Innovations system, or any other written evaluations of her performance submitted by attending physicians, staff members, other residents or medical students (this violates the requirement for multiple evaluators set forth in ACGME Core Program Requirements §V.A.2.b).(2). This is despite that fact that Dr. Rice had emailed each CCC member on March 31, 2017, in advance of their meeting on April 3, 2017, with her concerns about both procedural irregularities in the evaluation process and the propagation of untrue statements about her in her resident file. Additionally, Dr. Rice attached all faculty evaluations submitted regarding her through the academic year-to-date for easy review by the CCC members.

69.     Instead of relying on written evaluations or other dependable measures of Dr. Rice's performance, in a discussion led by Dr. Wittgen, some of the CCC members discussed their general impressions of Dr. Rice, including re-stating gossip and information that was simply untrue. This included the false statement, made at this meeting by Dr. Wittgen and Dr. Williams that when Dr. Rice had been excused by Dr. Williams from vascular clinic on or about Sept 6, 2016, to prepare for a Morbidity and Mortality conference presentation the following day, Dr. Rice had instead gone to a shopping mall with her husband.  Additionally, on information and belief, the CCC

members specifically discussed Dr. Rice's former role as a nurse and the opinion that the role could be an impediment to becoming a surgeon.

70.     The subjective evaluation of Dr. Rice engaged in by the CCC, violated § 2.1.II.3. of SLU's GME Policies and Procedures, which requires the "use of dependable measures to assess residents' competence in patient care, medical knowledge, practice-based learning and improvement, interpersonal and communication skills, professionalism, and system-based practice…"; and also violated the requirement for "objective assessments of competence…" set forth in ACGME Core Program Requirements §V.A.2.b).(1).

71.     Upon information and belief, the CCC also heavily relied on the February 24, 2017 letter from Dr. Freeman, in which he falsely stated that the criticisms contained therein were the consensus of the attending physicians on the Trauma Surgery Service.

72.     The  CCC largely abdicated its duty to "advise the program director regarding resident progress, including promotion, remediation, and dismissal" (per ACGME Common Program Requirements §V.A.1.b).(1).(c)), instead deferring to the biases and hearsay-based opinions of Dr. Wittgen, the Program Director, and Dr. Freeman's letter which had falsely been labeled as representing the consensus of the Trauma Service.

73.     On April 7, 2017, Dr. Rice attended a meeting with Dr. Wittgen, Dr. Gammack, Dr. Keune and Kris Forneris, to discuss the CCC's conclusions.  At this meeting, Dr. Rice was presented the letter dated April 3, 2017, attached hereto as **Exhibit 10,** signed by Drs. Wittgen, Keune and Gammack, which stated, in part, that Dr. Rice had not demonstrated sufficient mastery of key milestones to advance to the fifth

year chief resident level, and would "continue (her) probationary status as a PGY-4 (fourth year) General Surgery Resident…"   This is apparently a continuation of the probation first imposed in March 2016 for low ABSITE scores, for which no term had been specified, in violation of § II.2.1.6. of SLU's GME Policies and Procedures. Further, the "extended probation" provided for by the April 3, 2017 letter is also without any term, again in violation of § II.2.1.6.

74.     The April 3, 2017 letter sets out what purports to be a remediation plan to address Dr. Rice's alleged deficiencies. However, while there are specifics in the plan regarding Dr. Rice's alleged knowledge gaps, including her admittedly low ABSITE score, there is nothing in the way of identification of specific deficiencies in her performance, surgical skills or competency, specifics concerning how her progress will be measured, or specific steps she is to take to improve her performance or competency, all of which she has been requesting since at least September 2016.  In this regard, SLU has failed to comply with § 2.1.II.6 of the GME Policies and Procedures, which requires, in relevant part, that: "Specific deficiencies must be pointed out in writing…"

75.     The April 3, 2017 letter informed Dr. Rice that she would be required to repeat the fourth year of the surgery residency program.

76.     Dr. Rice timely appealed the decision by Dr. Wittgen to require Dr. Rice to repeat her fourth year of residency, pursuant to the "Grievances and Due Process" procedures ("Due Process procedures") set forth in § 2.1.XI. of the GME Policies and Procedures.

77.    The Due Process procedures state, in part, "the GME ombudsman is available to assist any trainee through this process." Dr. Rice first started working with Sara Barnett, Ph.D., the GME ombudsperson in December 2016. Upon information and belief, Dr. Barnett continued throughout the 2016-2017 residency year to serve as SLU's GME ombudsman. However, despite Dr. Barnett's familiarity with Dr. Rice's situation, she was removed from acting as ombudsman on behalf of Dr. Rice on or about April 6, 2017. Dr. Rice was told this was because of an alleged "conflict of interest" in having Dr. Barnett act as ombudsman in Dr. Rice's case. This alleged conflict was never discussed with, or explained to, Dr. Rice. Thereafter, Dr. Michael Railey, the Associate Dean for Diversity and Student Affairs of the medical school, acted as ombudsman on behalf of Dr. Rice through the appeal process.

78.    Pursuant to the Due Process procedures, Dr. Rice first submitted her "appeal" of the decision to hold her back for a year to the CCC, which then made a recommendation to Dr. Wittgen on or about May 10, 2017. Upon information and belief, the CCC discussed promoting Dr. Rice into her fifth year and merely continuing her probationary status with a re-evaluation after 3 months. However, the committee voiced concern that given Dr. Freeman's negative trauma "consensus" letter and the negative "vascular opinion," that the CCC members "might be held liable if Dr. Rice didn't do well."

79.    Dr. Wittgen, in her capacity as program director, ultimately upheld her original decision to require Dr. Rice to repeat the fourth year of her residency.

80.    Dr. Rice then appealed to Dr. Donald Jacobs, the Department Chair, who is also an attending vascular surgeon. Dr. Rice met with Dr. Jacobs on May 25, 2017.

Upon information and belief, Dr. Jacobs had not reviewed the appeals materials or Dr. Rice's resident file prior to their meeting. Before Dr. Rice could present her case, Dr. Jacobs spent approximately the first ten minutes of the appeals meeting explaining that he would be upholding the CCC's decision to have her repeat the year. As Dr. Rice attempted to interject objective information from the printed materials she brought (and had provided to him ahead of time) in order to make her case, Dr. Jacobs began to flip through the materials in an unfamiliar manner, as if seeing it for the first time. Dr. Jacobs upheld Dr. Wittgen's decision to remediate Dr. Rice.

81.     Dr. Rice had previously met with Dr. Jacobs on or about February 18, 2017, at her request, to detail her concerns for documentation, evaluation and procedural irregularities in her case. Dr. Rice noted to Dr. Jacobs in that meeting that there were an increasing number of errors in her resident file and told him about Dr. Keune's submission of an evaluation on November 13, 2016, for a rotation that had ended in December 2015. At that February 18, 2017 meeting, Dr. Rice told Dr. Jacobs of her concern that a case was being built against her for remediation based upon false information. Dr. Jacobs told Dr. Rice that he would review her resident file and follow up with her. However, Dr. Rice never received any further communication from Dr. Jacobs on those topics until when they met on May 25, 2017.

82.     Further, Dr. Jacobs, as a vascular attending, had worked with Dr. Rice in September and October of 2016, while she served as chief resident on the Vascular Service. Dr. Jacobs did not submit any formal evaluations of Dr. Rice.

83.     Dr. Rice then appealed to the Associate Dean for Graduate Medical Education, Dr. Julie Gammack. Pursuant to § 2.1XI. of the SLU GME Policies and

Procedures, upon receipt of such an appeal, the Associate Dean for Graduate Medical Education or her designee, is to: "review the situation, meet separately with the trainee and the Program Director, review all program and performance documentation…" and either uphold or reverse the decision being grieved.  Dr. Gammack never met separately with Dr. Rice after Dr. Rice pursued her grievance following Dr. Jacobs decision to confirm Dr. Wittgen's decision to make Dr. Rice repeat her fourth year of residency.  Further, upon information and belief, Dr. Gammack did not "review all program and performance documentation" either prior to or after recommending to the Dean that a Grievance Committee be formed to hear Dr. Rice's appeal.

84.    Pursuant to SLU's Due Process procedures, Dr. Gammack recommended that a Grievance Committee be appointed.  The purpose of this committee is to consider the appeal and relevant information, and make a recommendation back to the Associate Dean for Graduate Medical Education, who then makes the final decision on the appeal.

85.    Upon information and belief, Dr. Gammack had already reached a conclusion to uphold the decision to require Dr. Rice to repeat the fourth year of her residency long before she received the recommendation of the Grievance Committee. Upon information and belief, Dr. Gammack had, on or about March 6, 2017, stated to Dr. Barnett that the decision to hold Dr. Rice back a year was not grievable, and that the decision of the CCC would be upheld without an opportunity for appeal.  Further, as noted in paragraph 59 of this Petition, Dr. Gammack had made a statement on or about March 6 that Dr. Rice should consider the "opportunity" to repeat her fourth year of residency a "gift."

86.     Given Dr. Gammack's participation in the CCC meeting on April 3, 2017, and the appearance that she had already reached a conclusion that Dr. Rice should be required to repeat the fourth year of her residency, Dr. Rice made a request to the Dean of the Medical School, Dr. Kevin Behrns, that he make the final decision on her appeal. Dr. Behrns responded by email to Dr. Rice on May 9, 2017, and "noted the rationale" of Dr. Rice's argument, however, he refused this request to intervene. Dean Behrns also sent Dr. Rice a letter dated May 8, 2017, in which he enclosed the GME policy for Due Process.

87.     Dr. Rice was allowed to appear and make a presentation to the Grievance Committee for approximately one-half hour on June 8, 2017.  She was not permitted to be represented by counsel.  Further, neither Dr. Rice nor any representative of Dr. Rice was permitted to be present for any other proceedings of the Grievance Committee, including the presentation made to the Grievance Committee by Dr. Wittgen.  Dr. Wittgen presented her case for Dr. Rice's remediation to the committee, behind closed doors, for approximately 45 minutes, prior to Dr. Rice's appearance before the committee. Thus, Dr. Rice had no chance to hear or rebut any information presented to the Grievance Committee by Dr. Wittgen. Following the Grievance Committee's "hearing," Dr. Gammack ultimately upheld the decision of Dr. Wittgen to require Dr. Rice to repeat the fourth year of her residency.

88.     On or about June 23, 2017, Dr. Rice was required to sign a new residency agreement (attached hereto as **Exhibit 11**).  This agreement stated that she would be repeating her fourth year of residency in the surgery program, although it also provided that she would be paid the stipend received by fifth year residents.

89. Also, on or about June 23, 2017, Dr. Rice was assigned a unique schedule of rotations for the 2017-2018 year. Although she was being required to repeat the fourth year of her residency, Dr. Rice, in fact, was not assigned to the rotations typically assigned to fourth year residents. Instead, two months of her assigned rotations are typically assigned to third year residents, even though Dr. Rice has previously successfully completed all of her third year rotations.

90. Dr. Rice was assigned to two months in the trauma ICU (one in July 2017, and again in February 2018) to substitute for a fellow (a physician who is obtaining post-residency graduate medical education) to cover the service during that fellow's absence. Having Dr. Rice substitute for a fellow during a rotation is clearly contrary to SLU's position that Dr. Rice had not sufficiently performed during her fourth year of residency to advance to the fifth year.

91. Upon information and belief, Dr. Rice was assigned this unique rotation schedule by Dr. Wittgen at least partially in retaliation for appealing Dr. Wittgen's decision to hold Dr. Rice back a year. Such retaliation is a violation of ACGME Institutional Requirement III.A., which states that each ACGME accredited residency program "must provide a learning and working environment in which residents/ fellows have the opportunity to raise concerns and provide feedback without intimidation or retaliation."

92. Upon information and belief, Dr. Wittgen structured this unique schedule for Dr. Rice, at least partially, to "fill gaps" to ensure resident coverage on services which would otherwise not have residents or fellows assigned during the months that

Dr. Rice was assigned to such services, without regard to the training and learning opportunities that Dr. Rice would have in such services.

93.    As a result of Dr. Rice being assigned to services which traditionally have been covered by third year residents, she was deprived of leadership roles and the opportunity to perform more complicated surgical procedures.  She was also be deprived of the number of resident-supervisory surgical cases required for graduation from the residency program.

94.    On June 29, 2017, at Dr. Rice's request, the Dean of the Medical School, Dr. Kevin Behrns, met with Dr. Rice.  With the prescribed appeals process complete, Dr. Rice intended to present to Dr. Behrns a summary of the events of the appeals process, the irregularities she had noted, a list of the surgery residency's ACGME violations in the evaluation process, her concerns for the use of hearsay and gossip in the evaluation of her in lieu of objective data, and the "unique" (per Dr. Wittgen's description) rotation schedule that she had been assigned for the upcoming residency year.

95.    Dr. Behrns did not give Dr. Rice an opportunity to present the information.  Dr. Behrns sternly told Dr. Rice that she was "way out on a limb," that she needed to "stop (her) personal crusade," that her persistence in the matter was "harassment," that she was "not accepting of peer review," that "there has been a decision, you just don't like it," and that "the ACGME recently did a site visit and found that things are fine." Dr. Rice offered to leave copies of her evaluations and other material with Dr. Behrns, but he held up his hand and stated, "you already sent me all of that documentation, I won't read it."

96.    Dr. Rice has further been damaged as a result of defamation engaged in by Drs. Wittgen, Williams and Freeman.  Not only has their defamation of Dr. Rice caused both the CCC and the Grievance Committee to recommend that Dr. Rice be held back for a year, but this defamation has further damaged Dr. Rice's reputation

among her resident peers, faculty, hospital staff, and throughout the broader medical community in St. Louis, and will, among other things, make it more difficult for her to become employed as a surgeon.

97. From July 1, 2017 through mid-March 2018, Dr. Rice received generally positive verbal feedback and New Innovations evaluations from the attending physicians she worked with in the rotations to which she was assigned. This was despite, upon information and belief, that Dr. Wittgen met with attendings in Dr. Rice's rotations and requested that they submit negative evaluations of Dr. Rice's performance on their services.

98. Despite the positive verbal feedback and New Innovations evaluations she received in this period, Dr. Rice received a poor mid-year Milestone report in January 2018. Upon information and belief, this poor Milestone report was in direct retaliation by Dr. Wittgen and SLU for Dr. Rice filing this lawsuit in or about October 2017, and her continuing to challenge the decision to make her repeat the fourth year of her residency.

99. On or about March 2, 2018, Dr. Rice was offered, and she and all required signatories on behalf of SLU executed, a contract for Dr. Rice to become a fifth-year resident starting July 1, 2018.

100. The execution by SLU of a fifth-year residency contract with Dr. Rice in early March 2018 demonstrates that, at that time, the surgery residency program believed that she had made sufficient progress to advance to the fifth year in the residency program.

101. During March of 2018, Dr. Rice was assigned to the "silver" surgical service, which performs both breast cancer surgery and colorectal surgery. Her

attendings on this service included both Dr. Schwartz and Dr. Grace Montenegro, who, upon information and belief, are close friends.

102.   On or about March 12, 2018, Dr. Rice was subjected to inappropriate and highly abusive language and behavior in the operating room directed toward her by Dr. Montenegro.

103.   Dr. Montenegro's abusive behavior violated numerous ACGME guidelines, including ACGME Institutional Requirement III.A., which states that each ACGME accredited residency program "must provide a learning and working environment in which residents/ fellows have the opportunity to raise concerns and provide feedback without intimidation or retaliation."  Dr. Montenegro's language and behavior constituted disruptive behavior, in violation of the requirements of the Joint Commission on Accreditation of Hospitals, and also violated Hospital and SLU regulations prohibiting disruptive or abusive behavior.

104.   On March 12, 2018, Dr. Rice made a formal complaint to Hospital's Chief Medical Officer, Dr. Nirav Patel, and Chief Nursing Officer, Patti Kelley, concerning the abusive language and behavior to which she and others had been subjected to by Dr. Montenegro in the operating room that day.  It should be noted that St. Louis University Hospital is not a division of St. Louis University but, instead, is owned by the Sisters of St. Marys ("SSM").

105.   Upon information and belief, complaints regarding Dr. Montenegro's abusive language and behavior in the operating room directed to Dr. Rice on March 12, 2018 were also made to SLU.

106.   Upon information and belief, Dr. Montenegro was disciplined both by Hospital and SLU for the language and behavior she directed toward Dr. Rice in the operating room, including being required to apologize to Dr. Rice (which apology was half-hearted and insincere).

107.   In the days following Dr. Rice complaining about Dr. Montenegro's abusive language and behavior on March 12, 2018, Drs. Schwartz and Montenegro wrote up severely negative reviews of Dr. Rice.  These reviews were, upon information and belief, in retaliation for Dr. Rice complaining about being subjected to abusive language and behavior by Dr. Montenegro.

108.   On or about March 19, 2018, SLU removed Dr. Rice from her rotation on the "silver" surgical service and reassigned to transplant surgery at SLU (a rotation she had completed during the 2016-2017 residency year (first fourth year).  Upon information and belief, she was re-assigned in retaliation for complaining about the abusive language and behavior to which she had been subjected in the operating room by Dr. Montenegro on or about March 12, 2018.  By being reassigned to transplant, Dr. Rice was deprived of the opportunity to obtain experience with breast cancer and colorectal cancer surgeries she needed to qualify for her boards.

109.   While Dr. Rice had generally received positive verbal feedback and positive New Innovations and e-mail reviews from her attendings during the 2017-2018 residency year prior to her complaining about the treatment to which she had been subjected by Dr. Montenegro on March 12, 2018, thereafter, almost all of the reviews she received from SLU attendings, and particularly Schwartz and Keune were negative.

This is despite the fact that Dr. Keune had given Dr. Rice two positive New Innovations review in or about October or November 2017.

110.    On May 4, 2018, Dr. Rice attended a meeting with Lisa Israel (SLU's then newly hired ombudsman) and Drs. Gammack and Keune, at which time Dr. Rice was told that SLU would not renew her contract and would not allow her to advance to the fifth year of the residency program.  She was given a letter at this meeting to this same effect, attached hereto as **Exhibit 12.**

111.    SLU's decision not to advance Dr. Rice to the fifth year of residency for the residency year starting July 1, 2018, was made in retaliation for Dr. Rice filing this lawsuit in August 2017 and/or for the complaint she made about the abusive language and behavior of Dr. Montenegro.  This, and all other retaliatory acts undertaken by SLU against Dr. Rice violate ACGME Institutional Requirement III.A., which states that each ACGME accredited residency program "must provide a learning and working environment in which residents/ fellows have the opportunity to raise concerns and provide feedback without intimidation or retaliation."

112.    Dr. Rice did not appeal the decision made in or about May 2018 not to renew her residency contract and not to advance her to the fifth year of the surgical residency program because to do so would have been futile, particularly given SLU's failure to comply with the Due Process requirements of its Policies and Procedures, and relevant provisions of the ACGME Requirements, when Dr. Rice appealed the decision to make her repeat the fourth year of the surgical residency program in 2017, and given the retaliation to which she had been subjected thereafter, as set forth above.

113.    As a result of Dr. Rice first being required to repeat a year of residency, and then not being allowed to advance to the fifth year of residency and not having her residency contract renewed, and the defamation against Dr. Rice by Drs. Wittgen, Williams and Freeman, as set forth in this Petition, Dr. Rice has been directly damaged in at least the following ways:

> a.    Even if Dr. Rice is able to obtain a position in another surgical residency program, she will not be able to start until at least July 1, 2019 and, because ACGME requires that a resident complete the last two years of residency in the same program in order to graduate, Dr. Rice will be delayed in graduating from surgical residency until at least June 30, 2021.  This is 3 years beyond when she would have graduated had she been advanced normally by SLU, and she has been denied the salary of a general surgeon during this time.  She is receiving no salary for the period of July 1, 2018 through June 30, 2019.  If she is admitted to another surgical residency program, she will receive only a resident's stipend for an additional two years. The difference between such stipend and the salary that Dr. Rice would be able to earn as a board eligible or board certified surgeon is in the hundreds of thousands of dollars per year;

> b.    If Dr. Rice is not admitted to another surgical residency program as a result of SLU's actions against her, including not advancing her in the surgical residency program, and the defamation against Dr.

Rice by Drs. Wittgen, Williams and Freeman, Dr. Rice will be severely limited in the medical job opportunities available to her, and her salary will be hundreds of thousands less per year than she would have earned as a board eligible or board-certified surgeon.

c. Even if Dr. Rice is able to gain admittance to another surgical residency program, the actions of SLU and the defamation of Dr. Rice by Drs. Wittgen, Williams and Freeman, as complained of in this Petition, will most likely make it impossible for Dr. Rice to gain acceptance into a sub-specialty surgical fellowship. The difference between the salary of a physician who has completed a sub-specialty fellowship and one who has only graduated from a residency program is more than one hundred thousand dollars per year;

d. Dr. Rice will most likely not be able to pursue an academic medical career, which has been her goal since prior to attending medical school.

## COUNT I – BREACH OF CONTRACT --
### FAILURE OF SLU TO COMPLY WITH SLU  GME POLICIES AND PROCEDURES

For Count I of her Petition, for breach of contract against St. Louis University, Plaintiff Mandy Rice, D.O., states as follows:

114. Dr. Rice hereby adopts by reference, as if fully set forth herein, paragraphs 1 through 111 of this Petition.

115. The GME Policies and Procedures were incorporated by reference into the Residency Agreements entered into by Dr. Rice with SLU.

37

116.    As set forth more fully above, SLU (by and through its agents, including Dr. Wittgen and the CCC) failed to comply with numerous provisions of its GME Policies and Procedures regarding evaluation of Dr. Rice's performance as a resident including, but not necessarily limited, to the following breaches of the GME Policies and Procedures:

(a) Failing to provide Dr. Rice with quarterly evaluations, in violation of §2.1II.3 of the GME Policies and Procedures;

(b) Failing to develop and implement a system to evaluate knowledge, skills and professional growth of residents using "defined criteria that meets or exceeds ACGME…standards" and "dependable measures", ignoring written evaluations of Dr. Rice in the New Innovations system, and instead making subjective evaluations of Dr. Rice, in violation of §2.1II.3 of the GME Policies and Procedures;

(c) Failing to timely evaluate Dr. Rice's performance, so that evaluations could be used to improve Dr. Rice's performance, in violation of §§2.1II.3. and 2.II.4. of the GME Policies and Procedures;

(d) Failure to maintain the confidentiality of assessment of Dr. Rice's performance as a resident, in violation of §2.1II.3 of the GME Policies and Procedures;

(e) Failure by Dr. Rice's supervisors to prepare and keep monthly performance evaluations after she was placed on probation in March 2016, in violation of §2.II.6 of the GME Policies and Procedures; and

(f) Engaging in numerous acts of retaliation against Dr. Rice for challenging the
decision that she be held back a year in her residency (including by filing this
lawsuit) and for complaining about the abusive language and behavior to
which she was subjected by Dr. Montenegro, as more fully set forth above.

117. As set forth more fully above, SLU (by and through its agents, including
Dr. Wittgen and the CCC) failed to comply with the provisions of its GME Policies and
Procedures when it placed Dr. Rice on probation in March 2016, when it extended that
probation in or about April 2017 and when it decided in or about May 2018 not to renew
Dr. Rice's contract and not to advance her to the fifth year in the surgical residency
program, including but not limited to the following breaches of the GME Policies and
Procedures:

> (a) Failing in March 2016 to point out in writing to Dr. Rice any specific
> deficiency other than her low ABSITE score, in violation of §2.II.6 of
> the GME Policies and Procedures;

> (b) Failure in March 2016 to include in the probation letter an offer of
> assistance of the GME Ombudsman or otherwise referring Dr. Rice to
> the Ombudsman at that time, in violation of §2.II.6 of the GME Policies
> and Procedures;

> (c) Failing in March 2016 to appoint a mutually agreeable faculty advisor
> for Dr. Rice, in violation of §2.II.6 of the GME Policies and Procedures;

> (d) Failure in April 2017, when the decision was made to extend Dr. Rice's
> probation and require her to repeat the fourth year of her residency, to
> utilize objective, dependable and defined criteria to evaluate Dr. Rice's

performance in her fourth year of residency, in violation of §2.II.3 of the GME Policies and Procedures;

(e) Failure by Dr. Wittgen, in her capacity as program director, and the CCC, to review written evaluations of Dr. Rice's performance by her supervisors (i.e., attending physicians) prior to extending her probation in or about April 2017, and deciding in or about May 2018 not to renew her contract and not to advance her to the fifth year of the surgical residency program, in violation of §2.II.6 of the GME Policies and Procedures; and

(f) Failure to specify a time period in April 2017 for the extended period of probation, in violation of §2.II.6 of the GME Policies and Procedures.

118.    SLU violated the due process provisions of its GME Policies and Procedures, §2.II.XI, in the following respects:

(a)  The CCC, and upon information and belief the Grievance Committee and Dr. Gammack, in making their recommendations and/or decisions regarding whether Dr. Rice should be required to repeat the fourth year of her residency, considered false and defamatory information, and Dr. Rice was not given an opportunity to rebut such information;

(b) Neither Dr. Rice, nor any representative of Dr. Rice was permitted to hear, and therefore was unable to rebut, information presented to the Grievance Committee by Dr. Wittgen;

(c) The Ombudsman, Sara Barnett, who had been assisting Dr. Rice since December 2016 was "disqualified" by SLU prior to the beginning of the

40

appeal process, without any explanation provided to Dr. Rice, which

denied Dr. Rice of an effective advocate with knowledge of Dr. Rice's

situation; and

(d) Dr. Gammack was the final decision-maker with regard to Dr. Rice's

appeal, although she had made statements which clearly indicated she

had already decided to uphold Dr. Wittgen's decision to make Dr. Rice

repeat her fourth year of residency before the Grievance Committee

hearing; and

(e) In deciding not to renew Dr. Rice's contract for the residency year

beginning July 1, 2018 and not to advance Dr. Rice to the fifth year of

the surgical residency program, in retaliation for Dr. Rice challenging

the decision to make her repeat the fourth year of the residency

program (including filing this lawsuit) and/or for complaining about the

abusive behavior to which she was subjected by Dr. Montenegro.

119.   The various breaches by SLU and/or its agents of the SLU GME Policies

and Procedures are a violation of the Residency Agreements entered into between SLU

and Dr. Rice for the years starting July 1, 2015, July 1, 20116, and July 1, 2017.

120.   The various breaches of the SLU GME Policies and Procedures by SLU

and/or its agents contributed to, or caused: (a) the decision by SLU to require Dr. Rice

to repeat the fourth year of her residency, and (b) its decision not to renew Dr. Rice's

contract for the residency year beginning July 1, 2018 and not to advance Dr. Rice to

the fifth year of the surgical residency program.

121.   As a result of these breaches, and being required to repeat the fourth year of her residency and not being allowed to advance to the fifth year of the residency program, Dr. Rice has been damaged as set forth in paragraph 91 of this Petition.

WHEREFORE, Plaintiff, Mandy Rice, D.O., prays that the Court:

(a) Award damages in her favor and against SLU, in an as yet

undetermined amount, in excess of $25,000.00;

(b) Order SLU to pay Court costs; and

(c) For such other and further relief as this Court deems just and proper.

## COUNT II – BREACH OF CONTRACT –
## FAILURE OF SLU TO COMPLY WITH ACGME REQUIREMENTS

For Count II of her Petition, for breach of contract against St. Louis University, Plaintiff Mandy Rice, D.O., states as follows:

122.   Dr. Rice hereby adopts by reference, as if fully set forth herein, paragraphs 1 through 100 of this Petition.

123.   The ACGME Requirements were incorporated by reference into the Residency Agreements entered into by Dr. Rice with SLU.

124.   SLU and/or its agents failed to comply with, and breached, the ACGME Requirements in the following respects:

(a) By failing to timely evaluate Dr. Rice's performance during each

rotation and also by failing to document such evaluations at the end of

each rotation, in violation of ACGME Common Core Requirement

§V.A.2.a);

42

(b) By failing to utilize multiple evaluators to assess Dr. Rice's performance, instead essentially deferring to the evaluation of Dr. Wittgen, , in violation of ACGME Common Core Requirement §V.A.2.b).(1);

(c) By failing to engage in an "objective assessment of (Dr. Rice's competence…", in violation of ACGME Common Core Requirement §V.A.2.b).(1), and instead relying on hearsay, gossip, and false information;

(d) The CCC abdicated one of its most important roles, as imposed by Common Core Requirement §V.A.1.b).(1).(c), which required that it to advise the program director regarding the progress of Dr. Rice as a resident, including advising whether Dr. Rice should be promoted and/or remediated, instead deferring to the decision made by Dr. Wittgen in this regard;

(e) By engaging in retaliation against Dr. Rice for advocating for herself, requesting specific information regarding her alleged deficiencies, and raising concerns about her treatment as complained of herein (including, but not limited to Dr. Rice filing this Petition), and for complaining about the abusive treatment to which she was subjected by Dr. Montenegro.  SLU's retaliation against Dr. Rice includes, but is not necessarily limited to: (a) the decision to require Dr. Rice to repeat her fourth year of residency; (b) the residency schedule for Dr. Rice for July 1, 2017 through June 30, 2018; (c) the extremely poor mid-year

Milestone evaluation of Dr. Rice for the 2017-2018 residency year; (d) removing Dr. Rice from the "silver" surgery service after she complained about Dr. Montenegro's abusive language and behavior directed at Dr. Rice; and (e) the decision on or about May 4, 2018 not to advance Dr. Rice to the fifth year of the surgical residency program and not to renew Dr. Rice's contract for the residency year beginning July 1, 2018, after SLU and Dr. Rice had executed a fifth-year residency contract on or about March 2, 2018.

125. The various breaches of the ACGME Requirements by SLU and/or its agents contributed to, or caused, the decision made by SLU to require Dr. Rice to repeat the fourth year of her residency and the decision by SLU not to renew Dr. Rice's residency contract for the year beginning July 1, 2018, and not to promote her at that time to the fifth year of the residency program.

126. As a result of these breaches, Dr. Rice has been damaged as set forth in paragraph 111 of this Petition.

WHEREFORE, Plaintiff, Mandy Rice, D.O., prays that the Court:

(a) Award damages in her favor and against SLU, in an as yet undetermined amount, in excess of $25,000.00;

(b) Order SLU to pay Court costs; and

(c) For such other and further relief as this Court deems just and proper.

## COUNT III – PROMISSORY ESTOPPEL

For Count III of her Petition, for promissory estoppel against St. Louis University, which is pleaded in the alternative to Counts I and II, Plaintiff Mandy Rice, D.O., states as follows:

127.    Dr. Rice hereby incorporates by reference, as if fully set forth herein, the allegations of paragraphs 1 through 124 of this Petition.

128.    SLU makes a promise to all of its medical residents, including Dr. Rice, that SLU will comply with all of the provisions of SLU's GME Policies and Procedures, and with the provisions of ACGME Requirements.

129.    Dr. Rice relied upon SLU's promise to comply with the GME Policies and Procedures and ACGME Requirements in deciding to accept the surgical residency at SLU and when she signed a new residency agreement with SLU at the beginning of each year (rather than seeking to transfer her residency to another institution).

130.    Dr. Rice's reliance on SLU's promise to comply with the GME Policies and Procedures and ACGME Requirements when making a decision to accept the surgical residency at SLU and when she signed new residency agreements should have been expected or reasonably anticipated by SLU.

131.    As set forth in detail above, SLU failed to comply with the terms and conditions set forth in the GME Policies and Procedures and ACGME Requirements regarding evaluation of Dr. Rice, probationary terms, offering an educational environment free of intimidation and retaliation, and provision of due process to Dr. Rice.  SLU's failures to comply with the GME Policies and Procedures and ACGME Requirements resulted in Dr. Rice being required by SLU to repeat the fourth year of

her surgical residency and ultimately being terminated from that program instead of being allowed to advance to the fifty year of the residency program.

132. Unless SLU's commitment to comply with the GME Policies and Procedures and ACGME requirements is enforced by this Court, Dr. Rice will suffer a grave injustice, in that she will have been wrongfully required to repeat a year of residency.

WHEREFORE, Dr. Rice prays that the Court:

WHEREFORE, Plaintiff, Mandy Rice, D.O., prays that the Court:

(a) Award damages in her favor and against SLU, in an as yet undetermined amount, in excess of $25,000.00;

(b) Order SLU to pay Court costs; and

(c) For such other and further relief as this Court deems just and proper.

## COUNT IV – PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF (ALL DEFENDANTS)

For Count IV of her Petition, for preliminary and permanent injunctive relief against all Defendants, Plaintiff Mandy Rice, D.O., states as follows:

133. Dr. Rice hereby incorporates by reference, as if fully set forth herein, the allegations of paragraphs 1 through 112 of this Petition.

134. Dr. Rice is suffering, and will continue to suffer, immediate and irreparable harm as a result of: (a) not being advanced to the fifth (PGY-5) year in SLU's surgical residency; and (b) being subject to retaliation for advocating for herself, including but not limited to being placed on a "unique" schedule or rotations. This harm includes damage to her reputation in the medical community in the St. Louis area and beyond,

which will impact her employment opportunities throughout her career, her ability to obtain a surgical sub-specialty fellowship, and which will also likely prevent her from obtaining an academic medical position after completion of her training.

135. Given SLU's failure to comply with both its own GME Policies and Procedures and ACGME Requirements, and the harm suffered by Dr. Rice as a result, Dr. Rice is likely to prevail on the merits of her claims.

136. The balance of harm if the relief requested by Dr. Rice is granted as opposed to if it is not weighs in favor of Dr. Rice, particularly as no patient treated by Dr. Rice during either of the fourth years of her residency (2016-2017 and 2017-2018) suffered any adverse consequence, and as Dr. Rice passed each of the rotations on which she served during her fourth year.

WHEREFORE, Plaintiff Mandy Rice, D.O., prays that this Court issue a permanent injunction:

- a) Ordering Defendants not to engage in further retaliation against Dr. Rice;
- b) Ordering Defendants to expunge from Dr. Rice's record any reference to her having been required to repeat the fourth year of her residency, or that she was terminated from the residency program and not permitted to advance to the fifth year of surgical residency;
- c) Prohibiting Defendants from reporting to, or telling, any potential employer, fellowship program, licensing board, or reporting entity (e.g., the National Practitioners Data Bank) that Dr. Rice was required to repeat the fourth year of residency or that she was terminated from the

residency program and not permitted to advance to the fifth year of
surgical residency;;

d) Ordering Defendants to pay court costs; and

e) For such other and further relief as the Court deems just and proper
under the circumstances.

## COUNT V – DEFAMATION, DR. WITTGEN AND DR. WILLIAMS

For Count V of her Petition, for defamation against Defendants Catherine M.
Wittgen and Michael Williams, M.D., Plaintiff Mandy Rice, D.O., states as follows:

137. Dr. Rice hereby incorporates by reference, as if fully set forth herein, the
allegations of paragraphs 1 through 112 of this Petition.

138. Dr. Williams reported to Dr. Wittgen and, upon information and belief,
again stated at the April 3, 2017 CCC meeting, that Dr. Rice had not been present at
one of his clinics on or about September 6, 2016, and when he called her he heard
significant noise, at which time Dr. Rice allegedly admitted that she was at the mall.

139. This statement was false, and Dr. Williams was aware that this statement
was false at the time he had made it.

140. Dr. Williams had told Dr. Rice that she did not need to remain in the clinic,
and instead could use that time to prepare for a Morbidity and Mortality presentation the
next day, which she did.

141. Dr. Rice did not go to the mall either during Dr. Williams clinic or at any
time thereafter on September 6, 2016.

142. Dr. Wittgen made a statement to all of the surgical faculty members
present at the CCC meeting on or about April 3, 2017, that Dr. Rice had been excused

from the vascular clinic by Dr. Michael Williams on or about September 6, 2016 so that she could prepare to make a presentation at a Morbidity and Mortality conference the next day, but that she instead went to a shopping mall with her husband (the "Statement").

143.     Upon information and belief, the April 3, 2017 CCC meeting was not the first time that Dr. Wittgen had made this defamatory Statement.

144.     Upon information and belief, the Statement was repeated by Dr. Wittgen when she met with the Grievance Committee.

145.     The Statement made by Dr. Wittgen concerning Dr. Rice going to the mall, instead of preparing for her presentation at the Morbidity and Mortality conference is false.  This never occurred.

146.     The Statement was defamatory, in that it specifically implied a lack of capacity or fitness on the part of Dr. Rice to perform her duties as a surgical resident.

147.     Dr. Wittgen made the Statement with malice, in that she made the Statement with reckless disregard to whether it was true or false at a time when Dr. Wittgen should have had serious doubt as to whether it was true.

148.     The Statement damaged Dr. Rice's reputation for professionalism amongst the faculty of the surgery residency, the medical school faculty generally, and the medical community in the St. Louis area at large.  Further, Dr. Rice was damaged by the Statement as it was considered and relied upon by the CCC in imposing the requirement that Dr. Rice repeat the fourth (PGY-4) year of her residency, upon information and belief was also considered and relied upon by the Grievance Committee in recommending that the decision to hold Dr. Rice back for a year be upheld, and upon

information and belief was relied upon by the CCC in deciding not to renew Dr. Rice's residency contract for the year beginning July 1, 2018, and not allowing her to advance to the fifth year of the residency program.

WHEREFORE, Plaintiff, Mandy Rice, D.O., prays that this Court grant judgment in her favor and against Drs. Wittgen and Williams:

- a) Granting actual damages against Drs. Wittgen and Williams in such amount as will justly and fairly compensate Dr. Rice for the actual damages suffered by her as a result of their defamatory statements;

- b) Granting punitive damages against Drs. Wittgen and Williams in such amount as will deter them and others from engaging in similar egregious conduct in the future;

- c) Ordering Defendants Wittgen and Williams to pay court costs; and

- d) For such other relief as this Court deems just and proper under the circumstances.

## COUNT VI – DEFAMATION, DR. FREEMAN

For Count VI of her Petition, for defamation against Defendant Catherine M. Wittgen, M.D. Plaintiff Mandy Rice, D.O., states as follows:

149. Dr. Rice hereby incorporates by reference, as if fully set forth herein, the allegations of paragraphs 1 through 112 of this Petition.

150. In the February 24, 2017 letter written by Dr. Freeman to Dr. Wittgen (**Exhibit 8**) (the "Letter"), Dr. Freeman represented that it was the "consensus" of the attending physicians on the trauma surgical service that Dr. Rice had serious deficiencies, that as a group they were concerned about whether Dr. Rice should be

permitted to advance to the fifth year of residency, and "at least remediation is warranted…"

151. The statement made by Dr. Freeman that the Letter represented the consensus of the attending physicians on the trauma surgical service was false.

152. The statement that the Letter represented the consensus of the attending physicians on the trauma surgical service was defamatory, in that it specifically implied that there was a consensus among the trauma surgery attendings that Dr. Rice lacked the knowledge, skill capacity or fitness to perform her duties as a surgical resident.

153. Dr. Freeman knew that the representation that the defamatory statements in the Letter were false, such that this statement was made with actual malice.

154. The statements in the Letter that it was the consensus of the attending physicians in the trauma surgery service that Dr. Rice had numerous deficiencies, that they were unsure whether she should be advanced to the fifth year of residency, and that at a minimum she should be subject to remediation damaged Dr. Rice's reputation for competency and professionalism amongst the faculty of the surgery residency, the medical school faculty generally, and the medical community in the St. Louis area at large. Further, Dr. Rice was damaged by the representation that the Letter represented the consensus of the attending physicians on the trauma surgery service in that it was considered and relied upon by the CCC in imposing the requirement that Dr. Rice repeat the fourth (PGY-4) year of her residency, upon information and belief was also considered and relied upon by the Grievance Committee in recommending that the decision to hold Dr. Rice back for a year be upheld, and upon information was relied upon by the CCC in deciding not to renew Dr. Rice's residency contract for the year

beginning July 1, 2018, and not allowing her to advance to the fifth year of the residency program.

WHEREFORE, Plaintiff, Mandy Rice, D.O., prays that this Court grant judgment in her favor and against Dr. Freeman:

> e) Granting actual damages against Dr. Freeman in such amount as will justly and fairly compensate Dr. Rice for the actual damages suffered by her as a result of the defamatory statement made by Dr. Freeman;
>
> f) Granting punitive damages against Dr. Freeman in such amount as will deter him and others from engaging in similar egregious conduct in the future;
>
> g) Ordering Defendant Freeman to pay court costs; and
>
> h) For such other relief as this Court deems just and proper under the circumstances.

Respectfully submitted,

DANNA McKITRICK, P.C.

BY:  /s/ David R. Bohm
David R. Bohm, # 35166
David W. Morin, # 61590
7701 Forsyth Blvd., Suite 800
St. Louis, MO  63105-3907
(314) 726-1000/(314) 725-6592 fax
E-Mail: dbohm@dmfirm.com
ATTORNEYS FOR PLAINTIFF
MANDY RICE, D.O.

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that I caused true and correct copies

of the foregoing document to be served upon the parties receiving notice through the

Court's ECF system by filing with the Court's ECF system on this 14th day of

December, 2018.

/s/ David R. Bohm