## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| MANDY RICE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 4:19-cv-03166 SEP |
| v. | ) |
| | ) |
| ST. LOUIS UNIVERSITY, | ) |
| | ) |
| Defendant. | ) |

### SSM-SLUH, INC.'S RESPONSE IN OPPOSITION
### TO PLAINTIFF'S MOTION TO COMPEL

### Introduction

On Wednesday, December 22, 2020, Plaintiff served a subpoena on non-party SSM-SLUH, Inc. d/b/a SSM Health Saint Louis University Hospital (the Hospital), commanding it to produce peer review and other privileged documents dating back nearly 3 years within 7 days (inclusive of the intervening Christmas holiday). Upon receipt of the subpoena, the Hospital's counsel contacted Plaintiff's counsel to address the failure to provide a reasonable time to comply with the subpoena in violation of Fed. R. Civ. P. 45. Ultimately, Plaintiff's counsel agreed to extend the Hospital's deadline to provide objections or responses to January 5, 2021. The Hospital provided its objections on January 4, 2021.

The Hospital objects to Plaintiff's subpoena for the same reasons it previously objected during Plaintiff's state court litigation to a substantially similar subpoena served on its then Chief Medical Officer, Dr. Nirav Patel: (1) the subpoena seeks

1888842

information that is privileged and confidential under the Missouri peer review statute (peer review privilege) and the Federal Patient Safety and Quality Improvement Act, (patient safety privilege) and (2) the subpoena is vague, ambiguous, overly broad, and seeks attorney-client privilege communications and work product.

In her prior state court litigation, Plaintiff served the Hospital, a non-party, with a subpoena attempting to compel it to produce:

> any and all documents relating to the investigation of the events surround the complaints of Mandy Rice and others concerning Grace Montenegro, M.S. and Catherine Wittgen, M.D. from January 2018 to present.

After the Hospital objected based on the peer review privilege, patient safety privilege and scope of the subpoena, Judge Moriarty denied Plaintiff's motion to compel, finding that subpoena to be "ambiguous and overbroad" and "to the extent it seeks documents relating to plaintiff's complaint regarding the incident referenced in Dr. Patel's deposition [the March 2018 Complaint], it seeks privileged documents." (Exhibit A, Order).

In this litigation, Plaintiff attempts to take a second bite at the apple. This time she seeks to compel the Hospital to produce a slightly modified version of the earlier subpoena:

> All notes, investigations, reports, analyses, or other documents created from March 1, 2018 to present concerning any complaints or reports of mistreatment or bullying of Dr. Mandy Rice by Dr. Grace Montenegro.

1888842                                    2

Like the state court, this Court should deny Plaintiff's motion to compel, sustain the Hospital's objections, and clarify that although it has given Plaintiff's counsel permission to depose Dr. Patel again, Plaintiff's counsel may not question Dr. Patel about the same information that cannot be obtained through subpoena. The Court should do so for three reasons:

**First**, the Hospital is not party to this lawsuit, was not a party to Dr. Rice's prior state lawsuit or charge of discrimination, has never employed Dr. Rice, and has never employed any of the SLU faculty members about whom Plaintiff complains. This lawsuit involves **only** allegations of discrimination because of sex and retaliation for allegedly complaining about gender discrimination by Dr. Rice **against her former employer, SLU**. Accordingly, neither the Court's previous Memorandum and Order (Doc. #80) concerning **SLU**, nor Plaintiff's citation of cases in which courts have declined to allow **employers** to assert the peer review privilege when defending employment discrimination claims provide compelling reasons to invade the Hospital's peer review and patient safety privileges.

**Second**, this is not a situation where the Hospital is seeking to "hide behind the privilege" nor will it create the ability for other healthcare Title VII defendants to do so. Rather, this is a situation in which the Hospital construed Dr. Rice's complaint exactly as she presented it—as a complaint of "disruptive physician behavior" which gave rise to a "patient safety event." (Exhibit B – Plaintiff's March 2018 complaint to The Joint Commission (TJC)). Plaintiff never complained of discrimination based on sex or retaliation for having made a complaint of protected activity, nor was the complaint

investigation as such. Rather, it is undisputed that the Hospital investigated Plaintiff's complaint as a patient safety complaint through its confidential peer review process. Dr. Patel has already extensively testified to that in two separate depositions. (<u>Exhibit C</u> – Dr. Patel Deposition Excerpts). And the state court previously found this investigation to be covered by the peer review privilege.

**Third**, the Missouri peer review and federal Patient Safety and Quality Improvement Act ("PSQIA") privileges are applicable to the Hospital's investigation. These processes play a critical role in ensuring the safety of patient care in Missouri and across the nation. The risk to patients that could result if Courts begin declining to enforce the privilege when hospitals are investigating patient safety complaints far outweighs the hypothetical harm that Plaintiff describes in her motion.

<u>Argument</u>

**A.  This Court's previous discovery order concerning Defendant SLU and cases concerning Title VII defendants have no bearing on the Hospital's peer review or patient safety privileges.**

Plaintiff's heavy reliance in her motion to compel on the Court's prior order compelling Defendant SLU to respond to a written discovery request is misplaced. In the written discovery request directed to Defendant SLU, Plaintiff sought to discover the substance of her employer's investigation into complaints regarding her alleged mistreatment by physicians who were also employed by SLU. This Court overruled a peer review privilege objection asserted by SLU, recognizing that a line of cases decline to extend the privilege to defendants in employment discrimination lawsuits. Relying on this Court's prior Order, Plaintiff now attempts to paint her employer (SLU) and the

1888842                                    4

Hospital as being one and the same. However, they are not the same. As is explained above, Plaintiff has never filed a charge of discrimination against the Hospital, did not name the Hospital in her state lawsuit, and has not named the Hospital in this federal lawsuit. The fact that she has not brought any claim whatsoever against the Hospital arising from her employment with SLU undercuts her argument that the Court's rulings regarding Defendant SLU should bind or inform the Court's ruling here.

Similarly, the non-binding case law that Plaintiff cites fails to support her argument that the Court should overrule the Hospital's peer review and patient safety privilege objections in this case. In fact, her cases support the opposite conclusion. For example, in *Virmani v. Novant Health Inc.*, 259 F.3d 284, 293 (4th Cir. 2001), the Fourth Circuit declined to recognize a peer review privilege asserted by the defendant hospital because the plaintiff (an employed physician) asserted that the hospital had discriminated against her through the peer review process. Dr. Rice does not claim that the Hospital discriminated against her through its peer review process or on any other basis. Similarly, in *Mattice v. Mem'l Hosp. of S. Bend*, 203 F.R.D. 381 (N.D. Ill. 2001), the court found that the interest of an employed physician in obtaining evidence regarding discrimination based on disability outweighed the peer review privilege asserted by his employer Memorial Hospital. Each of the six cases cited by Plaintiff follow the exact same pattern. They involve current or former employees suing their former employer for discrimination and courts declining to recognize a peer review privilege asserted **by the defendant employer**. These cases provide no compelling basis to overrule the Hospital's objections.

B.  **Plaintiff complained to the Hospital that "disruptive physician behavior" by Dr. Grace Montenegro created "a patient safety event;" the Hospital investigated pursuant to its peer review and patient safety process.**

Plaintiff's Complaint in this case explains that the Hospital's limited involvement in Dr. Rice's dispute with SLU is that in March of 2018 Plaintiff complained to the Hospital's Chief Medical Officer, Dr. Patel, about Dr. Montenegro's treatment of her during a surgical procedure at the Hospital. Although Dr. Rice now claims that her complaint to the Hospital three years ago had nothing to do with patient safety, and had everything to do with Dr. Montenegro "harassing, bullying and treating Plaintiff differently **because of sex,**" her contemporaneous written complaint tells a different story. In the first sentence of her March 18, 2020 "Complaint of Inappropriate and Disruptive Physician Behavior by Grace Montenegro, M.D.," Dr. Rice explains: "As of January 10, 2009. TJC [The Joint Commission] requires medical leaders to address disruptive behavior or 'behaviors that undermine a culture of safety."  Dr. Rice then alleges that Dr. Montenegro undermines the culture of safety through her "disruptive behavior," which includes yelling at the staff and using foul language during surgery. Dr. Rice concludes her complaint, "What I have described, and many of us today witnessed, is unacceptable and creates all of the risk and disruption described above. This will be submitted to the SLU medical staff, the Missouri Board of Healing Arts, the ACGME, and The Joint Commission as a **patient safety event**." (emphasis added).

During Dr. Patel's first deposition nearly two years ago, Plaintiff's counsel asked him whether he construed Plaintiff's March 2018 complaint to be a patient safety complaint. Specifically, the testimony was: Plaintiff's counsel asked, "Dr. Rice's

1888842                                6

complaint was not concerning a patient care issue but treatment of her, wasn't it?" Dr. Patel responded:

> Q. Dr. Rice's complaint was not concerning a
> patient care issue but treatment of her, wasn't it?
>
> A. (By the Witness) So I would say that the
> concern that is raised by the complaint is that
> this was disruptive behavior. And we define
> disruptive behavior, as per our policy definitions,
> as behavior, any behavior that has the potential to
> impact, adversely impact, delivery of patient care.'
> So if this behavior is occurring in an
> operating room environment, in the public
> environment, in a patient care environment, then it
> has that potential to be disruptive and therefore
> it falls into our domain of ensuring high quality
> care, safe patient care.
> If the staff member or the team, the
> health care team, is unable to provide safe patient
> care because of potential disruptive behavior, then we would
> investigate that.

(Exhibit C, pp. 28-29). Dr. Patel was also asked if the complaint was investigated through the peer review process for investigation. He confirmed that it was.

> Q. (By Mr. Bohm) Well, you're saying
> the entirety of Dr. Rice's complaint went through
> the peer-review? Is that what you're saying, Dr.
> Patel?
>
> A. The input into peer-review is based on
> event reporting. A complaint such as this would go
> through the event reporting process, or events that
> were obtained through nursing or other complaints,
> complaint vehicles. And so yes, we would
> investigate that through our normal investigation
> process for peer-review committee.

(Exhibit C, pp. 30-31).

Given the substance of Dr. Rice's own contemporaneous complaint and Dr. Patel's prior testimony, it is clear that the Hospital reasonably understood Dr. Rice's concern to be that Dr. Montenegro was engaged in disruptive behavior that gave rise to patient safety concerns.  The complaint was never presented by Dr. Rice as a complaint of sex discrimination or retaliation for having engaged in protected activity and was not investigated as such. Rather, the complaint was investigated as a patient safety complaint through the Hospital's peer review process, entitling it to privilege and confidentiality protections under federal and state law as is discussed next.

C. **The Hospital's investigation into Plaintiff's Complaint about Dr. Montenegro is privileged pursuant to the Patient Safety and Quality Improvement Act and the Missouri peer review statute.**

Federal Rule of Evidence 501, provides: "The common law – as interpreted by the United States courts in the light of reason and experience – governs a claim of privilege unless any of the following provides otherwise:

- the United States Constitution,

- a federal statute or

- rules prescribed by the Supreme Court."

Here, a federal statute—the Patient Safety and Quality Improvement Act— cloaks the Hospital's investigation into complaints regarding alleged disruptive behavior by Dr. Montenegro with privilege and confidentiality protections. But even if it didn't, the Missouri peer review privilege would nevertheless protect the substance of the Hospital's investigation.

1. **The Patient Safety and Quality Improvement Act (PSQIA)**

The PSQIA, 42 U.S.C. 299b-21-299b-26, amended Title IX of the Public Health Service Act to provide for the improvement of safety and to reduce the incidence of events that adversely affect patients by encouraging confidential review and reporting of patient safety events. To facilitate this objective, the PSQIA created a uniform layer of national protection on top of state law so that health care providers can fully investigate and share information regarding medical errors without being subject to discovery in connection with a federal, state, or local civil, criminal or administrative proceeding.

Specifically, the PSQIA protects data, reports, records, memorandum, analyses and written and oral statements that are compiled in connection with patient safety activities by entities that participate in a Patient Safety Organization ("PSO"). A PSO is defined in the Act as "a private or public entity or component thereof that is listed by the Secretary [of Health and Human Services]." 42 U.S.C. § 299b-21(4). "Patient safety activities" are defined expansively to include: (1) efforts to improve patient safety and the quality of health care delivery; (2) the collection and analysis of patient safety work product; (3) the development and dissemination of information with respect to improving patient safety, such as recommendations, protocols, or information regarding best practices; and (4) the utilization of patient safety work product for the purposes of encouraging a culture of safety and of providing feedback and assistance to effectively minimize patient risk. 42 U.S.C. § 299b-21(5). "Patient safety work product" is also expansively defined as "any data, reports, records, memorandum, analyses (such as root cause analyses), or written or oral statements—

>    **(i)** which—
>
>>        **(I)** are assembled or developed by a provider for reporting to a patient safety organization and are reported to a patient safety organization; or
>>
>>        **(II)** are developed by a patient safety organization for the conduct of patient safety activities; and which could result in improved patient safety, health care quality, or health care outcomes; or
>
>    **(ii)** which identify or constitute the deliberations or analysis of, or identify the fact of reporting pursuant to, a patient safety evaluation system."

42 U.S.C. §299b-21(7). Finally, "patient safety evaluation system" means the collection, management, or analysis of information for reporting to or by a patient safety organization. 42 U.S.C. §299b-21(6).

The PSQIA provides broad privilege and confidentiality protections for "patient safety work product." It states: "Notwithstanding any other provision of Federal, State or local law, and subject to subsection (c), patient safety work product shall be privileged and shall not be—(1) subject to a Federal, State, or local civil, criminal or administrative subpoena or order. . . ." In addition, the Act provides, "Notwithstanding any other provision of Federal, State, or local law, and subject to subsection (c), patient safety work product shall be confidential and shall not be disclosed." 42 U.S.C. § 299-b-22.

The Hospital attached to its objections the policies evidencing that it is a participant in a PSO. (See Exhibits D and E; see also Exhibit F Declaration of Carol Davidson, confirming the Hospital participates in a PSO). Dr. Patel also explained

during his two depositions that Dr. Rice's complaint about Dr. Montenegro was submitted to the Hospital's peer review process, which also served as the Hospital's process for reviewing patient safety concerns. Dr. Patel explained that all patient safety complaints are submitted through the same process to avoid any criticism of being subjective as to who goes through and to avoid favoritism. (Exhibit C, p. 32).

Plaintiff appears to make two primary attacks on the Hospital's assertion of confidentiality and privilege under the PSQIA. First, she claims the PSQIA does not apply because "the information was not specifically generated or assembled for the purpose of reporting to an outside patient safety organization." (Motion, ¶13) But, the PSQIA privilege is not so limiting. The privilege applies to patient safety work product, which includes information generated in connection with a patient evaluation system, a term that is also broadly defined by the Act. The Hospital's review of Plaintiff's patient safety complaint meets the definition of a patient evaluation system, regardless of whether that investigation was ultimately reported to the PSO. Second, Plaintiff argues that the Hospital's investigation is not entitled to the privilege because the information exists outside of the peer review process, but that argument is circular. Plaintiff's March 2018 complaint was investigated through the peer review process because it was reported as a patient safety complaint. If no patient safety complaint had been made, then no investigation would have been conducted and no information would exist. The patient safety privilege and confidentiality protections apply to the Hospital's investigation.

### 2. The Missouri peer review privilege

The Missouri peer statute also broadly provides that the "the interviews, memoranda, proceedings, findings, deliberations, reports, and minutes of peer review committees or the existence of the same concerning healthcare provided to a patient are privileged and shall not be subject to discovery, subpoena, or other means of legal compulsion for their release to any person or entity or be admissible in any judicial or administrative action for failure to provide appropriate patient care. R.S.Mo. 537.035. This privilege applies to the Hospital's investigation regardless of the federal patient safety privilege. Again, Plaintiff cannot circumvent the application of the Missouri peer review privilege by claiming that the Hospital's peer review process did not concern healthcare provided to a patient, where Plaintiff's complaint to the Hospital thoroughly details the effect that the alleged "disruptive behavior" on the provision of healthcare to patients.

**D.    The motion to compel should also be denied because the subpoena directed to the Hospital, a non-party, is extremely vague, broad, unduly burdensome and would call for the production of documents protected from disclosure by the attorney-client privilege and work product doctrine.**

The Hospital's tangential involvement in this matter is limited to a particular complaint made by Dr. Rice in March of 2018. Yet, Plaintiff's subpoena covers all documents that could even remotely relate to her complaints that were made nearly three years ago. As drafted, the subpoena is vague, overly broad, unduly burdensome and calls for the production of attorney-client privileged documents and work product. Although Plaintiff's counsel suggests that the Hospital can simply provide a privilege

log, a non-party should not bear the cost of having to review, analyze and log privileged communications which have absolutely no bearing on Plaintiff's allegations of discrimination and retaliation by another entity. The motion should be denied on this basis as well.

## Conclusion

The Court should enter an order denying the motion to compel directed to the Hospital and sustaining the Hospital's objections. In its order, the Court should also clarify that at Dr. Patel's upcoming deposition, Dr. Rice's counsel may not invade the Hospital's or Dr. Patel's privileges and confidentiality pursuant to the Missouri peer review statute and Federal Patient Safety and Quality Improvement Act by asking about investigation into complaints that were subject to the Hospital's peer review and patient safety process.

Dated: January 26, 2021

Respectfully submitted,

GREENSFELDER, HEMKER & GALE, P.C.

By: ___/s/ Amy L. Blaisdell___
Amy L. Blaisdell, #51068
10 South Broadway, Suite 2000
St. Louis, Missouri  63102
Telephone: 314.241.9090
Facsimile:   314.241.8624
apb@greensfelder.com

*Attorney for SSM-SLUH, Inc. d/b/a SSM Health Saint Louis University Hospital*

## CERTIFICATE OF SERVICE

    The undersigned hereby certifies that the foregoing document was filed on January 26, 2021 using the CM/ECF filing system which provided service on counsel for all parties in this action, including the following:

| | |
|---|---|
| David R. Bohm<br>*dbohm@dmfirm.com*<br>David W. Morin<br>*dmorin@dmfirm.com*<br>DANNA MCKITRICK, P.C.<br>7701 Forsyth Blvd., Suite 800<br>St. Louis, MO  63105<br><br>***Attorneys for Plaintiff*** | Julie B. Drafahl<br>*julia.drafahl@ogletree.com*<br>Sarah J. Kuehnel<br>*sarah.kuehnel@ogletree.com*<br>Gregg M. Lemley<br>*gregg.lemley@ogletree.com*<br>OGLETRE, DEAKINS, NASH,<br>SMOAK & STEWART, P.C.<br>7700 Bonhomme Ave., Suite 650<br>St. Louis, MO  63105<br><br>***Attorneys for Defendants*** |

            /s/ Amy L. Blaisdell